No. 23-704L
(Judge Schwartz)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

ONF ENTERPRISES, LLC,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

DEFENDANT'S MOTION TO DISMISS

---

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

ELIZABETH M. HOSFORD
Assistant Director

OF COUNSEL:

JEFFREY LANDOU
Associate General Counsel
Nat'l Archives and Records Admin.

BORISLAV KUSHNIR
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 307-5928
Facsimile: (202) 353-0461
Email: Steven.Kushnir@usdoj.gov

September 22, 2023

Attorneys for Defendant

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

QUESTIONS PRESENTED......................................................................................... 2

STATEMENT OF THE CASE...................................................................................... 3

    I.      The Assassination Of President John F. Kennedy ................................. 3

    II.     Several Governmental Panels Analyze The Nix Film As They Investigate The Kennedy Assassination ......................................................................... 3

    III.    Mr. Nix's Granddaughter Seeks To Recover The Original Nix Film In The 1990s, Only To Discover That It Is Not In The Government's Possession............ 6

    IV.    More Recent Efforts To Recover The Original Nix Film Are Similarly Unfruitful ......................................................................................... 8

    V.     Procedural Background.......................................................................... 9

ARGUMENT ............................................................................................................ 10

    I.      Standard Of Review ............................................................................ 10

    II.     Applicable Takings Law Framework................................................... 10

    III.    ONF Does Not Allege A Taking Of Property As A Matter Of Law ................... 14

          A.     The HSCA Did Not Commit An Actionable Taking By Obtaining The Original Nix Film In 1978 ........................................................ 14

          B.     Congress Did Not Commit An Actionable Taking By Enacting The JFK Records Act In 1992......................................................... 17

          C.     NARA Did Not Commit An Actionable Taking By Allegedly Withholding The Original Nix Film From The Public Beyond 2017....... 20

CONCLUSION.......................................................................................................... 23

# TABLE OF AUTHORITIES

**Cases**

*Acadia Tech., Inc. v. United States*,
458 F.3d 1327 (Fed. Cir. 2006) ........................................................................... 15, 16

*Acceptance Ins. Companies, Inc. v. United States*,
583 F.3d 849 (Fed. Cir. 2009) ..................................................................................... 12

*Air Pegasus of D.C., Inc. v. United States*,
424 F.3d 1206 (Fed. Cir. 2005) ................................................................................... 11

*AmeriSource Corp. v. United States*,
525 F.3d 1149 (Fed. Cir. 2008) ........................................................................ 14, 15, 16

*Ark. Game & Fish Comm'n v. United States*,
568 U.S. 23 (2012) ...................................................................................................... 11

*Armstrong v. United States*,
364 U.S. 40 (1960) ...................................................................................................... 11

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ..................................................................................................... 10

*Branch v. United States*,
69 F.3d 1571 (Fed. Cir. 1995) ..................................................................................... 12

*Casitas Mun. Water Dist. v. United States*,
708 F.3d 1340 (Fed. Cir. 2013) ................................................................................... 11

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
511 U.S. 164 (1994) ..................................................................................................... 19

*Cienega Gardens v. United States*,
331 F.3d 1319 (Fed. Cir. 2003) ................................................................................... 20

*Columbia Basin Orchard v. United States*,
132 F. Supp. 707 (Ct. Cl. 1955) .................................................................................. 21

*Comm. on Judiciary of U.S. House of Representatives v. McGahn*,
968 F.3d 755 (D.C. Cir. 2020) ................................................................................. 15-16

*Dep't of Homeland Sec. v. MacLean*,
574 U.S. 383 (2015) ..................................................................................................... 19

*Fallini v. United States*,
56 F.3d 1378 (Fed. Cir. 1995) ..................................................................................... 19

*Goodrich v. United States*,
    434 F.3d 1329 (Fed. Cir. 2006)........................................................................ 14, 16

*Hooe v. United States*,
    218 U.S. 322 (1910) .......................................................................................... 23

*Jackson v. United States*,
    248 F. Supp. 3d 167 (D.D.C. 2017) ................................................................... 8

*Kam-Almaz v. United States*,
    682 F.3d 1364 (Fed. Cir. 2012) ....................................................... 10, 14, 15, 16

*Kemp v. United States*,
    65 Fed. Cl. 818 (2005) ...................................................................................... 19

*Kitt v. United States*,
    277 F.3d 1330 (Fed. Cir. 2002) ........................................................................ 12

*K-Tech Telecomm., Inc. v. Time Warner Cable, Inc.*,
    714 F.3d 1277 (Fed. Cir. 2013) ............................................................. 10, 12, 21

*Love Terminal Partners, L.P. v. United States*,
    889 F.3d 1331 (Fed. Cir. 2018) ............................................................. 13, 19, 20

*Martinez v. United States*,
    333 F.3d 1295 (Fed. Cir. 2003) ................................................................... 13, 16

*McGrain v. Daugherty*,
    273 U.S. 135 (1927) .......................................................................................... 15

*Morley v. CIA*,
    894 F.3d 389 (D.C. Cir. 2018) ...................................................................... 7, 18

*Petro-Hunt, L.L.C. v. United States*,
    862 F.3d 1370 (Fed. Cir. 2017) ................................................................... 14, 17

*Rith Energy, Inc. v. United States*,
    247 F.3d 1355 (Fed. Cir. 2001) ........................................................................ 22

*Stephens v. United States*,
    165 Fed. Cl. 341 (2023) .................................................................................... 23

*Taylor v. United States*,
    959 F.3d 1081 (Fed. Cir. 2020) ........................................................................ 23

*Thune v. United States*,
    41 Fed. Cl. 49 (1998) ........................................................................................ 21

*Trump v. Mazars USA, LLP*,
   140 S. Ct. 2019 (2020).................................................................. 15, 16

*United States v. N. Am. Transp. & Trading Co.*,
   253 U.S. 330 (1920)........................................................................ 23

*Watkins v. United States*,
   354 U.S. 178 (1957)........................................................................ 15

*Whitney Benefits, Inc. v. United States*,
   752 F.2d 1554 (Fed. Cir. 1985)...................................................... 19

## <u>United States Constitution</u>

U.S. Const. Amend. V. .................................................................... 10

## <u>Statutes</u>

28 U.S.C. § 2501.................................................................. 13, 16, 20

Pub. L. No. 89-318, 79 Stat. 1185 (1965)................................. 4, 18

President John F. Kennedy Assassination Records Collection Act of 1992,
   Pub. L. No. 102-526, 106 Stat. 3443 (1992).................... 7, 18, 19, 21, 22

## <u>Administrative And Executive Materials</u>

Providing for the Acquisition and Preservation by the United States of Items of Evidence Pertaining to the Assassination of President John F. Kennedy,
   31 Fed. Reg. 13,968 (Oct. 31, 1966)................................................. 4

Temporary Certification for Certain Records Related to the Assassination of President John F. Kennedy,
   82 Fed. Reg. 50,307 (Oct. 26, 2017)................................................. 9

Certification for Certain Records Related to the Assassination of President John F. Kennedy,
   83 Fed. Reg. 19,157 (Apr. 26, 2018) ................................................ 9

Temporary Certification Regarding Disclosure of Information in Certain Records Related to the Assassination of President John F. Kennedy,
   86 Fed. Reg. 59,599 (Oct. 22, 2021)................................................. 9

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

|  |  |  |
|---|---|---|
| ONF ENTERPRISES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 23-704L |
| v. | ) | |
| | ) | (Judge Schwartz) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S MOTION TO DISMISS

Pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC), defendant, the United States, respectfully requests that the Court dismiss the complaint filed by plaintiff ONF Enterprises, LLC (ONF) for failure to state a claim upon which relief could be granted.

## INTRODUCTION

Six decades ago, in one of the defining moments of American history, Lee Harvey Oswald assassinated President John F. Kennedy. A member of the public, Orville Nix, Sr., captured the historic event on his personal movie camera, and in the years that followed several governmental panels investigating the assassination analyzed the resulting footage. The in-camera original of that film, however, likely never reached the National Archives and Records Administration (NARA), the Federal agency tasked with the collection of assassination records. As a result, the original film has never been released to the public.

In this case, Mr. Nix's alleged successor in interest claims that the United States appropriated the original film without paying just compensation, in violation of the Fifth Amendment's Takings Clause. Despite record evidence to the contrary, plaintiff insists that the

Government continues to possess the original film, thus rejecting the notion that the original film may have been lost. Instead, plaintiff appears to allege that the Government effected a taking of property under the Fifth Amendment by obtaining the film in 1978 as part of its investigation of the Kennedy assassination, by passing a 1992 law designed to centralize the collection of assassination records in one place, or by allegedly refusing to release the original film to the public.

We accept at this stage the factual allegations in the complaint, including the doubtful proposition that the Government possesses the original film. Even so, the Court should dismiss the complaint for failure to state a claim upon which relief may be granted. At most, plaintiff alleges a series of events that do not amount to a taking of property as a matter of law: the collection of evidence as part of a legitimate congressional investigation that fits comfortably within the Government's police power; a law that applies only to assassination records that already belong to the Government; and unauthorized conduct that cannot form the basis for a takings claim. And regardless, as should be unsurprising in a case that concerns the Kennedy assassination, most of the events plaintiff complains of are well outside the six-year statute of limitations applicable to takings claims, as they took place many decades before plaintiff filed suit.

In short, none of plaintiff's allegations states an actionable takings claim against the United States. The Court should accordingly dismiss the complaint pursuant to RCFC 12(b)(6).

## **QUESTIONS PRESENTED**

1.      Whether a plaintiff can pursue a takings claim in 2023 based on Government actions from 1978 or a law enacted in 1992.

2.      Whether obtaining records for a congressional investigation, pursuant to a valid congressional subpoena, can amount to a taking of property under the Fifth Amendment.

3.      Whether a law enacted for the limited purpose of collecting records that already belong to the Government can amount to a legislative taking of property under the Fifth Amendment.

4.      Whether allegations that the Government acted in direct contravention of Federal law can give rise to a taking of property under the Fifth Amendment.

## STATEMENT OF THE CASE

### I.      The Assassination Of President John F. Kennedy

In the early afternoon of November 22, 1963, as he was traveling by motorcade through Dealey Plaza in Dallas, Texas, President John F. Kennedy was shot.  The shooting proved fatal, as President Kennedy died from his wounds later that day.

Orville Nix, Sr., a local resident watching the presidential motorcade, captured the Kennedy assassination (as well as the moments leading up to it) on his personal movie camera.  Compl. at ¶ 7, ECF No. 1.  Mr. Nix's recording, which was one of several video recordings of the Kennedy assassination, came to be known as the "Nix Film."  Two weeks later, on December 6, 1963, Mr. Nix verbally agreed to sell all rights to the Nix Film to United Press International (UPI) for $5,000.  *Id.* at ¶ 13.  UPI retained its interest in the Nix Film for a 25-year term.  *Id.*

### II.     Several Governmental Panels Analyze The Nix Film As They Investigate The Kennedy Assassination

Soon after President Kennedy's Assassination, various branches of the United States Government began forming panels to investigate the historic event.  The first such panel was the President's Commission on the Assassination of President Kennedy, known unofficially as the Warren Commission because it was chaired by Supreme Court Chief Justice Earl Warren.  *See*

Compl. at ¶ 14, ECF No. 1. The Warren Commission examined a wide array of evidence related to the Kennedy assassination, including the Nix Film. *See id.* at ¶ 16. It is unclear whether the Warren Commission obtained the original Nix Film or merely a copy. *Id.* at Ex. 14, ECF No. 1-15. On September 24, 1964, the Warren Commission issued a report concluding that Lee Harvey Oswald was the sole gunman who shot President Kennedy. *Id.* at ¶ 15, ECF No. 1.

On November 2, 1965, Congress enacted a law authorizing the Government to acquire and preserve items of evidence considered by the Warren Commission. *See* Pub. L. No. 89-318, 79 Stat. 1185 (1965). The law established a one-year statute of limitations for recovering just compensation for any items of evidence acquired by the United States. *See id.* at § 3. Attorney General Ramsey Clark later made a determination, published in the Federal Register, that "all of the items of evidence not owned by the United States which were considered by the [Warren] Commission, and were not returned by the Commission to the person who furnished them, should be acquired by the United States and be preserved together with all of the items of evidence already owned by the United States." Providing for the Acquisition and Preservation by the United States of Items of Evidence Pertaining to the Assassination of President John F. Kennedy, 31 Fed. Reg. 13,968 (Oct. 31, 1966). Through Public Law 89-318 and Attorney General Clark's determination, the United States acquired all rights to the version of the Nix Film reviewed by the Warren Commission. *See* Compl. at ¶ 32, ECF No. 1.

A decade later, in September 1976, the United States House of Representatives formed the House Select Committee on Assassinations (HSCA), which was created to investigate the Kennedy assassination in November 1963 and the assassination of Martin Luther King, Jr. in April 1968. *See* Compl. at ¶ 19, ECF No. 1. As part of its investigation, the HSCA issued a subpoena to William Lyon, UPI's Vice President, demanding that UPI produce the Nix Film.

*See id.* at Ex. 4, ECF No. 1-5.  UPI, acting through counsel, confirmed in a subsequent letter that it understood the subpoena as seeking production of the original Nix Film, rather than a copy. *See id.* at Ex. 5, ECF No. 1-6.  After UPI and the HSCA reached an agreement about producing the original Nix Film, *id.* at ¶ 36, ECF No. 1, the HSCA issued a second subpoena to Mr. Lyon, *id.* at ¶ 37.  UPI allegedly produced the original Nix Film to the HSCA on or about April 4, 1978.  *Id.* at ¶¶ 38-39.

HSCA staff attorneys are alleged to have immediately taken the original Nix Film to California, where they handed it over to Aerospace Corporation (Aerospace), a film laboratory, for digital scanning and enhancement.  Compl. at ¶¶ 40, 42, ECF No. 1.  At this point, however, it becomes unclear what precisely happened to the original Nix Film.  Plaintiff alleges that relevant Government records do not indicate that Aerospace ever returned the original Nix Film to the HSCA, *see id.* at ¶¶ 50-51, thus suggesting that the recording did not come back from California.  At the same time, plaintiff also alleges that multiple pieces of evidence in the HSCA's possession "mysteriously disappeared," *id.* at ¶ 68, which could indicate that the HSCA "lost" the original Nix Film after it was returned by Aerospace.  *See also id.* at ¶¶ 70-71 (alleging that the HSCA lost other Kennedy assassination records, including a 35mm color transparency and the camera used to take autopsy photographs of President Kennedy).  Regardless, the end result was allegedly the same: UPI did not receive the original Nix Film back from the HSCA. *See id.* at ¶ 57; *see also id.* at Ex. 1, ECF No. 1-2.

The HSCA issued its report on March 29, 1979.  Largely based on "scientific acoustical evidence," the HSCA found a "high probability that two gunmen fired" at President Kennedy. *See* Report of the Select Committee on Assassinations, *available at* https://www.archives.gov/

research/jfk/select-committee-report (last visited on September 21, 2023).  The HSCA

accordingly concluded that President Kennedy "was probably assassinated as a result of a

conspiracy."  *Id.*

### III.    Mr. Nix's Granddaughter Seeks To Recover The Original Nix Film In The 1990s, Only To Discover That It Is Not In The Government's Possession

Upon expiration of UPI's 25-year ownership term, Mr. Nix's granddaughter, Gayle Nix

Jackson, took up the effort to locate the original Nix Film.  In April 1991, Ms. Jackson wrote to

NARA with a request to return the "original" Nix Film, which, she believed, the Warren

Commission obtained from UPI.  *See* Compl. at Ex. 2, ECF No. 1-3.  NARA responded by

acknowledging that it retained an 8mm color version of the Nix Film from the Warren

Commission's records, along with several black and white copies.  *See id.* at Ex. 3, ECF No. 1-4.

It stated, however, that the color version is likely to itself be a copy, as "[t]here are no yellow

flashes or camera stops typical of [a] camera original."  *Id.*  And even if that color version was

the original Nix Film, NARA explained that the Government retained exclusive ownership rights

to it pursuant to Public Law 89-318.  *Id.*[1]

NARA also responded to other inquiries about Kennedy assassination records around the

same time period.  In responding to one such inquiry in July 1991, NARA again stated that it was

---

[1] Although the United States owns the version of the Nix Film examined by the Warren Commission, Mr. Nix's successors in interest retained the Film's copyright, such that any request to duplicate the Film had to be approved by the Nix family in writing.  Compl. at Ex. 3, ECF No. 1-4; *see also* National Archives Catalog Item No. 13222, *available at* https://catalog.archives.gov/id/13222 (last visited on September 21, 2023) (noting that use of the Nix Film is restricted due to copyright).  In recent years, the Nix family appears to have transferred all copyright in the Nix Film to the Sixth Floor Museum in Dallas, TX.  *See* Orville Nix Film, *available at* https://emuseum.jfk.org/objects/32262/nix-home-movie (last visited on September 22, 2023) (discussing the acquisition of copyright in the "Curator Notes" section). The Film is available for viewing online through the Sixth Floor Museum's website.  *Id.* Members of the public can also view the Film by vising NARA's facility in College Park, MD.

only in possession of "a copy of the original 8mm Nix [F]ilm," which it obtained from the Warren Commission.  Compl. at Ex. 24, ECF No. 1-25.

The following year, Congress enacted the President John F. Kennedy Assassination Records Collection Act of 1992 (JFK Records Act), Pub. L. No. 102-526, 106 Stat. 3443 (1992). The JFK Records Act was designed "to centralize all of the Federal Government's Kennedy assassination records in one place: the National Archives."  *Morley v. CIA*, 894 F.3d 389, 394 (D.C. Cir. 2018).  Congress tasked NARA with the collection of assassination records from other Federal agencies, including the records reviewed by the Warren Commission and the HSCA. JFK Records Act at §§ 3(2) & 4, 106 Stat. at 3444-46.  And it provided that:

> Each assassination record shall be publicly disclosed in full . . . no later than the date that is 25 years after the date of enactment of [the JFK Records Act], unless the President certifies, as required by this Act, that (i) continued postponement is made necessary by an identifiable harm to the military defense, intelligence operations, law enforcement, or conduct of foreign relations; and (ii) the identifiable harm is of such gravity that it outweighs the public interest in disclosure.

*Id.* at § 5(g)(2)(D), 106 Stat. at 3448-49.  To make determinations about the public disclosure of assassination records, Congress created the Assassination Records Review Board.  *Id.* at §§ 7(i)-(j), 106 Stat. at 3451-52.  However, the JFK Records Act also provided that "[n]o assassination record created by a person or entity outside government . . . shall be withheld, redacted, postponed for public disclosure, or reclassified."  *Id.* at § 5(a)(4), 106 Stat. at 3446.

In a final report issued in September 1998, the Assassination Records Review Board did not mention the Nix Film.  *See* Final Report of the Assassination Records Review Board, *available at* https://www.archives.gov/research/jfk/review-board/report (last visited on September 21, 2023).

## IV.    More Recent Efforts To Recover The Original Nix Film Are Similarly Unfruitful

Notwithstanding NARA's 1991 letter explaining why it believed that it was not in possession of the original Nix Film, Ms. Jackson renewed her efforts in recent years.  In 2014, Ms. Jackson allegedly contacted G. Robert Blakey, the HSCA's chief counsel, to obtain more information about the Film's chain of custody.  Compl. at Ex. 25, ECF No. 1-26.  In February 2015, Ms. Jackson filed a Freedom of Information Act (FOIA) request in connection with the Nix Film.  *Id.* at ¶ 99, ECF No. 1.  NARA responded to the FOIA request by reiterating that it has "multiple early generation copies of the Nix [F]ilm," but that its "understanding has always been that the Nix [Film] original was lost while in the custody of UPI."  *Id.* at Ex. 26, ECF No. 1-27.

In November 2015, Ms. Jackson filed suit in the United States District Court for the District of Columbia, simultaneously seeking the Film's return and damages for its alleged taking.  Compl. at ¶ 100, ECF No. 1.  The Government moved to dismiss the action in May 2016.  *Id.* at ¶ 101.  In its motion, the Government emphasized that "NARA has told plaintiff that it does not have the [original Nix] [F]ilm."  *Id.*  The district court dismissed Ms. Jackson's complaint in March 2017 for lack of subject-matter jurisdiction.  *See Jackson v. United States*, 248 F. Supp. 3d 167 (D.D.C. 2017).  As for Ms. Jackson's takings claim, the district court held that it lacks jurisdiction because "[t]his claim [] falls within the exclusive jurisdiction of the Court of Federal Claims."  *Id.* at 171.

Pursuant to Section 5(g)(2)(D) of the JFK Records Act, NARA has continued to release Kennedy assassination records after the statutory 25-year postponement period ended in 2017.  *See* JFK Assassination Records Release Database, *available at* https://www.archives.gov/

research/jfk/release (last visited on September 21, 2023). The original Nix Film is not among the records released to the public. *See id.* Along with the release of records, the President has repeatedly certified, as he is authorized under Section 5(g)(2)(D) of the JFK Records Act, that some records must be withheld from the public. *See* Temporary Certification for Certain Records Related to the Assassination of President John F. Kennedy, 82 Fed. Reg. 50,307 (Oct. 26, 2017); Certification for Certain Records Related to the Assassination of President John F. Kennedy, 83 Fed. Reg. 19,157 (Apr. 26, 2018); Temporary Certification Regarding Disclosure of Information in Certain Records Related to the Assassination of President John F. Kennedy, 86 Fed. Reg. 59,599 (Oct. 22, 2021).

In total, NARA's collection of Kennedy assassination records contains over 300,000 individual records. Background on the Collection, *available at* https://www.archives.gov/research/jfk/background#law (last visited on September 21, 2023). Of those, only 515 Kennedy assassination records continue to be withheld in full, while an additional 2,545 records continue to be withheld in part. *See* Press Release: National Archives Releases New Group of JFK Assassination Documents, *available at* https://www.archives.gov/press/press-releases/2023/nr23-14 (last visited on September 21, 2023). The original Nix Film is not among the records withheld from the public pursuant to the JFK Records Act.

### V.   **Procedural Background**

ONF filed this action on May 11, 2023. *See* Compl., ECF No. 1. In its complaint, ONF offers remarkable detail about the Nix Film's depictions, *id.* at ¶¶ 6-11; the Warren Commission's and the HSCA's work, *id.* at ¶¶ 14-17, 33-84; and the documentary evidence demonstrating that NARA does not possess the original Nix Film, *id.* at ¶¶ 31, 50, 53-54, 95, 99, 101. ONF even offers several theories as to why the original Nix Film is not in NARA's

possession. *See id.* at ¶¶ 50-51 (suggesting that Aerospace may not have returned the original Nix Film to the HSCA); *id.* at ¶¶ 68-78 (suggesting that the HSCA may have lost the original Nix Film). Nonetheless, ONF insists that "NARA continues to possess the Nix Film." *Id.* at ¶ 128. In its sole cause of action, ONF alleges a taking of property without just compensation under the Fifth Amendment to the Constitution. *See id.* at ¶¶ 162-170. ONF seeks "compensatory damages in an amount to be determined at trial." *Id.* at 51.

## ARGUMENT

### I.    Standard Of Review

In reviewing a motion to dismiss pursuant to RCFC 12(b)(6), the Court must accept plaintiff's allegations as true and construe them in the light most favorable to plaintiff. *K-Tech Telecomm., Inc. v. Time Warner Cable, Inc.*, 714 F.3d 1277, 1282 (Fed. Cir. 2013). Legal conclusions and conclusory statements, however, are "not entitled to the presumption of truth." *Id.* "To avoid dismissal for failure to state a claim under RCFC 12(b)(6), a complaint must allege facts plausibly suggesting (not merely consistent with) a showing of entitlement to relief." *Kam-Almaz v. United States*, 682 F.3d 1364, 1367 (Fed. Cir. 2012). In other words, "[t]he facts as alleged must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 1367-68 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

### II.    Applicable Takings Law Framework

The Fifth Amendment's Takings Clause provides: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. Amend. V. This Clause "is designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and

justice, should be borne by the public as a whole." *Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 31 (2012) (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)).

Courts distinguish among several different types of takings. Most fundamentally, the distinction is between physical takings, brought about by "the government's physical invasion or appropriation of private property," and regulatory takings, whereby "government regulations [] unduly burden private property interests." *Air Pegasus of D.C., Inc. v. United States*, 424 F.3d 1206, 1213 (Fed. Cir. 2005). Here, ONF alleges that the Government physically obtained, and then retained physical custody of, the original Nix Film, a tangible item. *See* Compl. at ¶¶ 162-170, ECF No. 1. We thus assume that this case concerns allegations of a physical, rather than a regulatory, taking.[2]

The United States Court of Appeals for the Federal Circuit employs a "two-part test" for analyzing takings claims. *Casitas Mun. Water Dist. v. United States*, 708 F.3d 1340, 1348 (Fed. Cir. 2013). "First, the court determines whether the claimant has identified a cognizable Fifth Amendment property interest that is asserted to be the subject of the taking." *Id.* And "[s]econd, if the court concludes that a cognizable property interest exists, it determines whether the government's action amounted to a compensable taking of that interest." *Id.*

ONF has alleged a cognizable property interest in the original Nix Film. According to the complaint, when Mr. Nix died in 1972 and his wife died in 1990, any reversionary interest in the Nix Film (after UPI's ownership term ended) passed to the couple's only child, Orville Nix, Jr., Compl. at ¶¶ 25-26, ECF No. 1; he, in turn, allegedly transferred his entire ownership interest to ONF, *id.* at ¶ 26. The question of ownership may ultimately pose difficult legal questions about, *inter alia*, the terms of Mr. Nix's verbal agreement with UPI in 1963, the Texas intestacy

---

[2] Our assumption may change, of course, if plaintiff reformulates its legal theory.

laws that supposedly allowed ownership to pass to Mr. Nix's son in 1990, and the contractual instruments (if any) that transferred ownership to ONF on some unspecified date. But at the motion to dismiss stage, the Court is required to accept ONF's allegations about ownership as true. *See K-Tech*, 714 F.3d at 1282. We accordingly do not dispute at this time that ONF has stated a cognizable property interest in the original Nix Film.

Instead, our motion is about step two of the Court's takings inquiry, which asks whether the Government's alleged actions amounted to a compensable taking of property. When alleging a takings claim, the plaintiff must "pinpoint what step in the sequence of events . . . constituted conduct that the government could not engage in without paying compensation." *Branch v. United States*, 69 F.3d 1571, 1575 (Fed. Cir. 1995); *see also Acceptance Ins. Companies, Inc. v. United States*, 583 F.3d 849, 855 (Fed. Cir. 2009) (citing *Kitt v. United States*, 277 F.3d 1330 (Fed. Cir. 2002), for the proposition that "analysis of a takings claim requires identifying the precise governmental action that is the subject of the claim"). To determine whether ONF has alleged a compensable taking of property, the Court must therefore first ascertain what specific governmental actions are alleged to have constituted a taking.

The complaint appears to suggest three distinct actions that could amount to a taking. *First*, ONF alleges that the United States "obtained custody of the Nix Film on April 3, 1978," which it did "by issuing a subpoena requiring submission of the Nix Film to the HSCA." Compl. at ¶¶ 164-165, ECF No. 1.[3] According to ONF, this action was a taking of property because

_____

[3] Elsewhere in the complaint, ONF appears to allege that the HSCA obtained the Nix Film the following day, on April 4, 1978. *See* Compl. at ¶¶ 38-39, ECF No. 1. The exhibits to the complaint likewise support the notion that the HSCA obtained the Nix Film on April 4, 1978, rather than April 3, 1978. *See id.* at Ex. 7, ECF No. 1-8 (note date-stamped "4/4/78"); Ex. 13, ECF No. 1-14 (no mention of the Nix Film within the list of materials date-stamped "4/3/78"). This discrepancy is immaterial, however, because the precise date on which UPI provided the Nix Film to the HSCA does not affect our arguments for dismissal.

"[t]he Government obtained custody of the Nix Film for public use, including by using the film in the HSCA investigation of the assassination of President Kennedy." *Id.* at ¶ 166. *Second*, ONF alleges that "[b]y enacting the JFK Records Act, the Government gave itself the right to permanently possess the Nix Film and to display it to the public." *Id.* at ¶ 167. And *third*, ONF alleges that the Government continues to possess the Nix Film to this day, thus "intentionally and permanently depriv[ing] Plaintiff of possession of the Nix Film." *Id.* The Court must separately examine each of these actions to determine whether any one of them can be a taking of property. *See Love Terminal Partners, L.P. v. United States*, 889 F.3d 1331, 1341 (Fed. Cir. 2018).

Notably, ONF does *not* allege that the United States committed a taking by "losing" the original Nix Film, either through the actions and/or omissions of Aerospace or through the subsequent actions and/or omissions of the HSCA. *See* Compl. at ¶¶ 162-170, ECF No. 1. In fact, such an allegation, even if made, would be inherently incompatible with ONF's insistence that NARA continues to possess the original Nix Film. *See id.* at ¶ 128. Thus, notwithstanding some allegations that appear to suggest the opposite, ONF does not contend in this case that the Government "lost" the original Nix Film.

By statute, "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. This limitations provision applies to takings claims under the Fifth Amendment. *See Goodrich v. United States*, 434 F.3d 1329, 1333 (Fed. Cir. 2006). "[A] claim under the Fifth Amendment accrues when that taking action occurs." *Id.* Accrual of a takings claim may be suspended, however, until the moment at which "the claimant knew or should have known that the claim existed." *Martinez v. United States*, 333 F.3d 1295, 1319 (Fed. Cir. 2003). The plaintiff – not the Government – bears the burden of proving that their

takings claim is within the six-year statute of limitations. *Petro-Hunt, L.L.C. v. United States*, 862 F.3d 1370, 1378 (Fed. Cir. 2017).

### III.    ONF Does Not Allege A Taking Of Property As A Matter Of Law

As explained, ONF alleges three distinct governmental actions as possible takings of property: (1) the HSCA obtaining the original Nix Film from UPI; (2) Congress enacting the JFK Records Act; and (3) NARA retaining the original Nix Film. For the reasons that follow, none of these actions can amount to a taking compensable under the Fifth Amendment. The Court should accordingly dismiss ONF's complaint for failure to state a claim upon which relief could be granted.

#### A.    The HSCA Did Not Commit An Actionable Taking By Obtaining The Original Nix Film In 1978

As it began investigating the Kennedy assassination in the late 1970s, the HSCA issued two subpoenas for the Nix Film to UPI's Vice President, William Lyon. *See* Compl. at Ex. 4, ECF No. 1-5; *id.* at Ex. 6, ECF No. 1-7. UPI understood the subpoenas to demand the original Nix Film, rather than a copy. *See id.* at Ex. 5, ECF No. 1-6. According to ONF, UPI complied with the congressional subpoenas by producing the original Nix Film to the HSCA on or about April 4, 1978. *Id.* at ¶¶ 38-39, ECF No. 1.

This sequence of events, which we accept as true for the purposes of this motion, does not describe a taking of property under the Fifth Amendment. "Property seized and retained pursuant to the police power is not taken for a 'public use' in the context of the Takings Clause." *AmeriSource Corp. v. United States*, 525 F.3d 1149, 1153 (Fed. Cir. 2008). "Police power" in this setting refers to any "[l]awful seizures performed pursuant to . . . authority." *Kam-Almaz*, 682 F.3d at 1372; *see also id.* (explaining that "[t]he police powers are nothing more or less than the powers of government inherent in every sovereignty to the extent of its dominions" (internal

quotations and alterations omitted)).  Thus, for example, the Government exercises police power when Customs and Border Protection seizes items subject to civil forfeiture laws, *see Acadia Tech., Inc. v. United States*, 458 F.3d 1327, 1332-33 (Fed. Cir. 2006); when law enforcement agents seize items during a criminal investigation, *see AmeriSource*, 525 F.3d at 1152-55; or when Immigration and Customs Enforcement seizes items to investigate a possible violation of the Nation's immigration laws, *see Kam-Almaz*, 682 F.3d at 1371-72.  In all of these cases, obtaining property was part of the Government's police power, and therefore not subject to liability under the Takings Clause, because the Government was duly authorized to undertake the seizure in question as part of an ongoing investigation.  *See Kam-Almaz*, 682 F.3d at 1372 (citing regulations to demonstrate that "Customs officers unquestionably have the authority to search and seize property at our nation's borders"); *Acadia Tech.*, 458 F.3d at 1330 (noting that the seizure was likely authorized by Title 19 of the United States Code, but concluding that the issue of authority was ultimately immaterial).

So too here.  The Supreme Court has long recognized that "each House [of Congress] has power to secure needed information in order to legislate," a "power of inquiry" Congress can back up "with process to enforce it."  *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020) (cleaned up) (quoting *McGrain v. Daugherty*, 273 U.S. 135, 161 (1927)).  Indeed, "[t]he congressional power to obtain information is 'broad' and 'indispensable.'"  *Id.* (quoting *Watkins v. United States*, 354 U.S. 178, 187 (1957)).  To be sure, Congress's power to obtain records is not absolute, as a congressional subpoena "must serve a valid legislative purpose" and "must concern a subject on which legislation could be had."  *Id.* (cleaned up).  But so long as Congress is serving a legitimate legislative function, it has the inherent authority to compel the production of records through its subpoena power.  *See Comm. on Judiciary of U.S. House of*

*Representatives v. McGahn*, 968 F.3d 755, 764 (D.C. Cir. 2020) (holding that the power to investigate "entitles each House [of Congress] to the testimony of a witness and production of requested documents in response to a lawful subpoena," and explaining that once Congress issues a valid subpoena, "the recipient of a subpoena is obligated by law to comply").

The HSCA was thus duly authorized to use its subpoena power to obtain the original Nix Film in 1978 as part of its efforts to investigate the Kennedy assassination. *See Mazars*, 140 S. Ct. at 2031. Because it was so authorized, any subpoena the HSCA issued to further its investigation was an exercise of police power, which is not subject to the Fifth Amendment. *See Kam-Almaz*, 682 F.3d at 1371-72; *AmeriSource*, 525 F.3d at 1152-55; *Acadia Tech.*, 458 F.3d at 1332-33. The HSCA's actions in obtaining the original Nix Film could not amount to a compensable taking of property as a matter of law.

Moreover, even if the HSCA's actions could conceivably qualify as a taking of property, this theory of takings liability would fail for an additional reason: the Government actions at issue took place many decades ago. As explained, a takings claim accrues "when that taking action occurs." *Goodrich*, 434 F.3d at 1333. To the extent ONF's takings claim is based on the HSCA obtaining the original Nix Film, that "taking action" occurred in April 1978, about 45 years before ONF filed suit. *See* Compl. at ¶¶ 38-39. ECF No. 1. The HSCA's actions were thus well outside the six-year statute of limitations within 28 U.S.C. § 2501.

Accrual of a takings claim may, of course, be suspended until the point at which "the claimant knew or should have known that the claim existed." *Martinez*, 333 F.3d at 1319. But accrual suspension principles do not change the outcome of this case. UPI, ONF's predecessor in interest of the original Nix Film, was well-aware of the HSCA's efforts to obtain the Film in real time. This is evident from the subpoenas the HSCA issued to UPI's leadership in 1977 and

1978, *see* Compl. at Ex. 4, ECF No. 1-5; *id.* at Ex. 6, ECF No. 1-7, as well as the 1977

correspondence between the HSCA and UPI's counsel about UPI's terms for surrendering the

Nix Film, *see id.* at Ex. 5, ECF No. 1-6.  It is well settled that a takings claim accrues as soon as

the plaintiff's predecessor in interest "knew or should have known" of the claim, even if the

plaintiff itself did not (or could not) be aware of the claim at the time.  *See Petro-Hunt*, 862 F.3d

at 1378 (holding that Petro-Hunt's claim accrued in 1993 "because that was when Petro-Hunt's

predecessor in interest . . . and its co-owner . . . explicitly learned" of it).  UPI's actual

knowledge that the HSCA obtained the Nix Film in 1978 defeats any argument that ONF's claim

accrued at a later date.

The HSCA obtained the Nix Film in 1978 in support of an ongoing investigation into the

Kennedy assassination.  This action, which the HSCA undertook by issuing valid congressional

subpoenas, is part of the Government's police power, which is not subject to the Fifth

Amendment's Takings Clause.  In addition, the HSCA's actions took place decades before ONF

filed suit, placing them well outside the applicable statute of limitations.  ONF cannot base its

takings claim on the HSCA's efforts to obtain the Nix Film.

### B.  Congress Did Not Commit An Actionable Taking By Enacting The JFK Records Act In 1992

Next, ONF appears to allege that the United States committed a taking of property when

Congress enacted the JFK Records Act.  *See* Compl. at ¶ 167, ECF No. 1.  According to ONF,

this is so because, "[b]y enacting the JFK Records Act, the Government gave itself the right to

permanently possess the [original] Nix Film and to display it to the public, insofar and to the

extent that the film was in the Government's possession."  *Id.*

The JFK Records Act, however, did not appropriate any rights to which the Government

was not already entitled.  Congress enacted the JFK Records Act for the dual purpose of

collecting assassination records at NARA and releasing the records to the public to the maximum

extent permissible by law.  *See* JFK Records Act at § 2(b), 106 Stat. at 3443; *see also Morley*,

894 F.3d at 394.  To accomplish these tasks, Congress directed every Federal agency to identify

and organize "*its records* relating to the assassination of President John F. Kennedy."  JFK

Records Act at § 5(a)(1), 106 Stat. at 3446 (emphasis added).  Each agency was then required to

conduct a review to determine (1) "which of *its records* are assassination records;" (2) "which of

*its assassination records* have been officially disclosed or publicly available;" and (3) "whether

*its assassination records* or particular information . . . are covered by the standards for

postponement of public disclosure."  *Id.* at § 5(c)(2), 106 Stat. at 3447 (emphasis added).  This

statutory language focuses exclusively on the Government's records, without any mention of

records that are outside the Government's possession and control.  *See also id.* at § 3(2), 106

Stat. at 3444 (defining "assassination record" as only those records that are in the possession of

various Government agencies).  Plainly read, the JFK Records Act does not set out to appropriate

any additional assassination records for the United States.

Any argument that Congress appropriated the original Nix Film through the JFK Records

Act is further undermined when the JFK Records Act is compared to Public Law 89-318, which

Congress enacted in November 1965 to preserve assassination records reviewed by the Warren

Commission.  In Public Law 89-318, Congress expressly asserted a desire to "acquire all right,

title, and interest, in and to, certain items of evidence" because doing so would be in "the

national interest."  *See* Pub. L. No. 89-318, 79 Stat. at 1185.  To that end, Congress authorized

the Attorney General to determine which items should be "acquired and preserved by the United

States," *id.* at § 2, and established a process for adjudicating "any claim for just compensation for

any item or interest . . . acquired by the United States," *id.* at § 3.  This statutory text

demonstrates that, when it wishes to do so, Congress knows how to expressly authorize the appropriation of assassination records. That the JFK Records Act says nothing about "acquiring" (or otherwise obtaining) property rights from others, *see generally* JFK Records Act, 106 Stat. at 3443-59, is a strong indicator that the Act did not seek to appropriate any records to which the Government was not already entitled. *See Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383, 393-94 (2015) (rejecting a statutory interpretation because "Congress knew how to distinguish between regulations that had the force and effect of law and those that did not, but chose not to do so" in the provision at issue); *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 176 (1994) (rejecting a statutory interpretation because "Congress knew how to impose aiding and abetting liability when it chose to do so").

Moreover, like the notion that the HSCA could have appropriated the Nix Film in 1978, this second basis for takings liability is similarly untimely. "When the taking is effected by legislation, the taking accrues on the enactment of the legislation introducing the physical taking." *Kemp v. United States*, 65 Fed. Cl. 818, 822 (2005) (citing *Fallini v. United States*, 56 F.3d 1378 (Fed. Cir. 1995)). Indeed, the Federal Circuit has repeatedly recognized that alleged legislative takings accrue as soon as the legislation in question becomes law. *See Love Terminal Partners*, 889 F.3d at 1341 ("[A]ny Wright Amendment-based claim would have accrued at the time of the statute's enactment and would therefore be barred by the Tucker Act's six-year statute of limitations."); *Whitney Benefits, Inc. v. United States*, 752 F.2d 1554, 1558 (Fed. Cir. 1985) ("The complaint alleges a legislative taking, effective to accrue the claim on the date of enactment of the statute . . ."). Here, this principle means that a takings claim based on the JFK

Records Act accrued upon the law's enactment in 1992. ONF's complaint, filed more than three decades later, is far outside the six-year statute of limitations within 28 U.S.C. § 2501.[4]

## C.    NARA Did Not Commit An Actionable Taking By Allegedly Withholding The Original Nix Film From The Public Beyond 2017

Finally, ONF claims that NARA was required by law to release all Kennedy assassination records in the Government's possession by October 2017, which marked the 25th anniversary of Congress enacting the JFK Records Act. Compl. at ¶ 94, ECF No. 1. ONF believes that one of those assassination records is the original Nix Film, which, ONF insists, NARA continues to possess to this day. *Id.* at ¶ 128. NARA, however, has not released the original Nix Film to the public. *Id.* at ¶ 105. ONF thus seems to allege that the Government appropriated the original Nix Film through its continued refusal to make it publicly available.

Even at this early stage of the litigation, it is important to emphasize that ONF's third basis for takings liability rests on a counterfactual premise that appears to directly contradict the exhibits attached to the complaint. On multiple occasions over the last several decades, NARA has undertaken the effort to examine Kennedy assassination records, has determined that it has no basis for concluding that it has the original Nix Film in its possession, and has communicated its findings to Ms. Jackson. *See* Compl. at Ex. 3, ECF No. 1-4 (informing Ms. Jackson in May 1991 that NARA received an 8mm color version of the Nix Film from the Warren Commission, but that this version is likely to be a copy because "[t]here are no yellow flashes or camera stops typical of [a] camera original"); *id.* at Ex. 26, ECF No. 1-27 (informing Ms. Jackson in February

---

[4] In the event ownership in the original Nix Film did not transfer to ONF prior to 1992 (or if ONF did not exist until after 1992), ONF would also lack the property interest necessary for a legislative taking based on the JFK Records Act. *See Cienega Gardens v. United States*, 331 F.3d 1319, 1328 (Fed. Cir. 2003) ("For any Fifth Amendment takings claim, the complaining party must show it owned a distinct property interest at the time it was allegedly taken[.]"); *see also Love Terminal Partners*, 889 F.3d at 1341.

2015 that NARA has "multiple early generation copies of the Nix [F]ilm," but that its "understanding has always been that the Nix [Film] original was lost while in the custody of UPI"); *id.* at Ex. 28, ECF No. 1-29 (informing Ms. Jackson in May 2016 that NARA "does not have" the original Nix Film).[5]  Nonetheless, because this is a motion to dismiss, we recognize that the Court must accept ONF's factual allegations – however unlikely – as true.  *See K-Tech*, 714 F.3d at 1282.  We accordingly address ONF's third basis for takings liability with the doubtful assumption that ONF could somehow establish that NARA does, in fact, currently possess the original Nix Film.[6]

Congress enacted the JFK Records Act in 1992 to promote transparency, explaining that "all [assassination] records should be eventually disclosed to enable the public to become fully informed about the history surrounding the assassination."  JFK Records Act at § 2(a)(2), 106 Stat. at 3443.  The vast majority of assassination records were disclosed to the public within the first few years after the JFK Records Act became law in 1992.  The Act then established a presumption that the remaining assassination records were to be released no later than October 2017, or 25 years after enactment of the JFK Records Act.  *Id.* at § 5(g)(2)(D), 106 Stat. at 3448.

---

[5] *See also* Compl. at Ex. 24, ECF No. 1-25 (informing a member of the public in July 1991 that NARA is only in possession of "a copy of the original 8mm Nix [F]ilm," which it obtained from the Warren Commission).

[6] Notably, even if ONF had alleged that the original Nix Film was lost after the HSCA handed it over to Aerospace in April 1978, dismissal would still be the correct result.  This is so for two independent reasons.  First, such a course of events would at most describe "[a]n accidental or negligent impairment of the value of property," which amounts to a tort rather than a taking.  *Thune v. United States*, 41 Fed. Cl. 49, 52 (1998) (quoting *Columbia Basin Orchard v. United States*, 132 F. Supp. 707, 710 (Ct. Cl. 1955)).  And second, any such claim would have accrued no later than May 1991, when NARA informed Ms. Jackson, Mr. Nix's successor in interest, that it most likely did not have the original Nix Film in its possession.  *See* Compl. at Ex. 26, ECF No. 1-27.  But because ONF expressly disavows the notion that the United States may no longer possess the original Nix Film, *see id.* at ¶ 128, ECF No. 1, the Court need not decide whether such an allegation could state a takings claim.

Such public disclosure came with an important caveat, as the Act gave the President authority to periodically certify that the disclosure of certain assassination records must be postponed beyond the 25-year period due to "identifiable harm to the military defense, intelligence operations, law enforcement, or conduct of foreign relations." *Id.* However, the JFK Records Act also provided that "[n]o assassination record created by a person or entity outside government . . . shall be withheld, redacted, postponed for public disclosure, or reclassified." *Id.* at § 5(a)(4), 106 Stat. at 3446. In other words, Congress made clear that the postponement standard articulated in Section 5(g)(2)(D) can only apply to assassination records created by the Government itself.

The original Nix Film, which was captured by a private citizen on his personal movie camera, is precisely the type of assassination record covered by Section 5(a)(4) of the JFK Records Act. If ONF is correct that NARA has "withheld" or "postponed" the public disclosure of the original Nix Film beyond October 2017, then such action would directly contravene NARA's obligations under the JFK Records Act. Of course, this allegation is factually incorrect because NARA has repeatedly informed Ms. Jackson that it does not possess the original Nix Film, which necessarily means that it could not have released it to the public in October 2017 or any time thereafter. But accepting the allegation as true for the purposes of this motion again reveals that ONF has failed to state an actionable takings claim.

It is well established that a compensable taking can arise only if the Government action at issue is authorized. *See Rith Energy, Inc. v. United States*, 247 F.3d 1355, 1366 (Fed. Cir. 2001) (holding that the plaintiff in a takings case is "required to litigate its takings claim on the assumption that the administrative action was both authorized and lawful."). This is so, the Supreme Court has explained, because "[t]he constitutional prohibition against taking private property for public use without just compensation is directed against the government, and not

against individual or public officers proceeding without the authority of legislative enactment." *Hooe v. United States*, 218 U.S. 322, 335-36 (1910). "In order that the government shall be liable [under the Takings Clause] it must appear that the officer who has physically taken possession of the property was duly authorized so to do, either directly by Congress or by the official upon whom Congress conferred the power." *United States v. N. Am. Transp. & Trading Co.*, 253 U.S. 330, 333 (1920). Thus, if a plaintiff alleges that a Government agency engaged in conduct not authorized by law, such an allegation would defeat the plaintiff's takings claim. *See Taylor v. United States*, 959 F.3d 1081, 1090 n.4 (Fed. Cir. 2020) ("A government action cannot be a taking if . . . the government actors lacked the 'authority' to take the action[.]"); *Stephens v. United States*, 165 Fed. Cl. 341, 349 (2023) ("Claims under the Takings Clause require demonstration of a government action resulting in a deprivation of property that is authorized by law." (internal quotations omitted)).

To the extent ONF claims that NARA possessed the original Nix Film yet failed to disclose it to the public as required by the JFK Records Act, such a contention would allege, at most, an unauthorized act. This type of unauthorized action, in turn, cannot amount to a taking of property as a matter of law.

## **CONCLUSION**

For these reasons, we respectfully request that the Court dismiss the complaint for failure to state a claim upon which relief could be granted.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Elizabeth M. Hosford
ELIZABETH M. HOSFORD
Assistant Director

OF COUNSEL:

JEFFREY LANDOU
Associate General Counsel
Nat'l Archives and Records Admin.

/s/ Borislav Kushnir
BORISLAV KUSHNIR
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 307-5928
Facsimile: (202) 353-0461
Email: Steven.Kushnir@usdoj.gov

September 22, 2023

Attorneys for Defendant