**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| ONF ENTERPRISES, LLC,<br><br>        Plaintiff,<br><br> v.<br><br>THE UNITED STATES OF AMERICA,<br><br>        Defendant. | Case No. 23-704L<br><br>(Judge Schwartz) |

**PLAINTIFF'S SUPPLEMENTAL RESPONSE TO MOTION TO DISMISS**

|  |  |
|---|---|
|  | Thomas L. Halkowski<br>FISH & RICHARDSON P.C.<br>1000 Maine Avenue, S.W., Suite 1000<br>Washington, D.C. 20024<br>Tel: (202) 783-5070<br>Email: halkowski@fr.com |
| OF COUNSEL:<br><br>Kurt L. Glitzenstein<br>Daniel H. Wade<br>FISH & RICHARDSON P.C.<br>One Marina Park Drive<br>Boston, MA 02210<br>Tel: (617) 542-5070<br>Email: glitzenstein@fr.com<br>Email: wade@fr.com<br><br>Date: May 1, 2024 | Attorneys for Plaintiff |

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| I. | THE ACT AUTHORIZED THE TAKING OF THE NIX FILM IN 1992 | 2 |
| II. | THE GOVERNMENT'S AFFIRMATIVE MISCONDUCT ESTOPS ASSERTION OF THE STATUTE OF LIMITATIONS DEFENSE | 5 |
| III. | THE GOVERNMENT'S AFFIRMATIVE MISCONDUCT ALSO SUPPORTS SUSPENSION OF THE LIMITATIONS PERIOD | 7 |
| IV. | CONCLUSION | 10 |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Braude v. United States*,
   585 F.2d 1049 (Ct. Cl. 1978) ..................................................................................8

*Cochran v. United States*,
   19 Cl. Ct. 455 (1990) ..............................................................................................8

*Hanson v. Off. Of Pers. Mgmt.*,
   833 F.2d 1568 (Fed. Cir. 1987) ...............................................................................5

*Heckler v. Cmty. Health Servs. Of Crawford Cnty., Inc.*,
   467 U.S. 51 (1984) ..................................................................................................6

*Henry v. United States*,
   870 F.2d 634 (Fed. Cir. 1989) .................................................................................5

*Japanese War Notes Claimants Ass'n v. United States*,
   373 F.2d 356, *cert. denied*, 389 U.S. 971 (1967) ..................................................8

*Kingman Reef Atoll Development, L.L.C. v. United States*,
   116 Fed. Cl. 708 (2014) ..........................................................................................6

*Mukherjee v. INS*,
   793 F.2d 1006 (9th Cir. 1986) .................................................................................5

*Nitol v. United States*,
   7 Cl. Ct. 405 (1985) ................................................................................................8

*Schweiker v. Hansen*,
   450 U.S. 785 (1981) ................................................................................................5

**Statutes**

JFK Records Act, Pub. L. No. 102-526, 106 Stat. 3443 ................................................1, 2, 4, 10

Plaintiff, ONF Enterprises, LLC,[1] respectfully submits this Supplemental Response to address questions raised at the February 15, 2024, oral argument regarding the Motion to Dismiss filed by Defendant, the United States of America ("Government"). Dkt. No. 9.

Can a citizen trust his or her government?[2]

With the enactment of the JFK Records Act (the "Act") on October 26, 1992, the camera original Nix film (the "Nix Film") became an assassination record subject to the Act, and the National Archives and Records Administration ("NARA") became duly authorized to take ownership of the Nix Film because—unbeknownst to Plaintiff—the Nix Film was already in the possession of the Government as of October 26, 1992. However, if Plaintiff (or another private citizen or organization) had possession of the Nix Film as of October 26, 1992, no taking would have occurred at that time. Thus, before filing a lawsuit for a takings claim in this court, it was incumbent upon Plaintiff to ascertain whether a good-faith evidentiary basis existed to allege that the Nix Film was in possession of the Government as of October 26, 1992 (or, at a minimum, that such contention would likely have evidentiary support after a reasonable opportunity for further investigation or discovery). *See* RCFC 11 (a)(3).

Gayle Nix Jackson (granddaughter of Orville Nix, Sr., the individual who filmed the Nix Film, and daughter of proposed co-Plaintiff Orville Nix, Jr.) trusted representatives of NARA who previously represented to her—as well as to former U.S. Senator Phil Gramm, who wrote to NARA on Ms. Jackson's behalf in 1991—that NARA did **not** possess the Nix Film. Proposed Amended Complaint ("PAC"), at 30-34. Now, after years of extraordinarily diligent investigation and after finally learning that what NARA said to Ms. Jackson was wrong, Plaintiff's suit is being challenged because, in effect, Ms. Jackson should **not** have trusted her Government when representatives of NARA represented in 1991, and then again via a sworn pleading in 2015, that NARA did not possess the Nix Film. The Government's Motion to Dismiss is predicated on the

---

[1] Plaintiff earlier today filed a motion for leave to file an amended complaint, (hereinafter Proposed Amended Complaint "PAC") that seeks, *inter alia*, to add Orville Nix Jr. as a plaintiff in this matter.

[2] "You must trust and believe in people, or life becomes impossible." Anton Chekhov.

1

notion that Plaintiff should have disregarded NARA's categorical representations, and sued NARA within six years of October 26, 1992, risking sanctions for filing a frivolous claim. The Government's position runs counter to logic, case law, and basic civility. Because Plaintiff reasonably trusted the Government's representations of fact—and promptly sued after learning that those representations appeared to be wrong—its motion should be denied.

I.  **THE ACT AUTHORIZED THE TAKING OF THE NIX FILM IN 1992.**

The Act authorized the creation of a permanent collection of records of the assassination of President Kennedy at NARA, known as the President John F. Kennedy Assassination Records Collection (the "Collection"). Pub. L. No. 102-526, 106 Stat. 3443 ("Act") at § 4(a)(1). Congress declared that all Government records related to the assassination of President Kennedy should be preserved for historical and governmental purposes. *Id*. § 2(a)(1). The Act required Government offices to transmit the assassination records in their possession to NARA for inclusion in the Collection. *Id*. § 5(a). The Act also authorized the creation, for a limited duration,[3] of an agency known as the Assassination Records Review Board ("ARRB"), to assist NARA in the establishment of the Collection. *Id*. § 7. The Act provided the ARRB with discretionary power to request the Attorney General to issue subpoenas, including to obtain assassination records from private persons. *Id*. § 7(j)(C)(iii). Thus, the Act effectively divides assassination records into two tiers: (i) assassination records that were in the possession of the Government (or later came into the possession of the Government) as of or after October 26, 1992 ("Tier 1 Records"), including the Nix and Zapruder films; and (ii) assassination records held as of that date by private citizens ("Tier 2 Records"). The applicable legal framework for both tiers of assassination records is addressed below.

For Tier 1 Records, as of and after October 26, 1992, they are required to be transferred to NARA for inclusion in the Collection. *Id.* at § 5. Once Tier 1 Records have been obtained by NARA, there is no provision for discarding or returning them. The Act only allows for the

---

[3] The ARRB finished its work on September 30, 1998, with the publication of a final report titled "Final Report of the Assassination Records Review Board." Ex. 1.

2

publication of *copies* of assassination records. *Id.* at 4(b). Indeed, the Government itself previously acknowledged that if it did possess the Nix Film, it could not return it to Plaintiff. PAC Ex. 28 at 18.

Apart from the Nix and Zapruder[4] films, the circumstances surrounding the Government's acquisition of the Alyea film, another camera-original film that was an assassination record and obtained by the Government after October 26, 1992, is instructive as to the treatment of Tier 1 records. The Alyea film was filmed by Tom Alyea, a Dallas television cameraman, and it captured the inside of the Texas School Book Depository in Dallas, Texas (including the so-called "sniper's nest" on the sixth floor) very shortly after the assassination of President Kennedy. Mr. Alyea had agreed to donate his film to the Collection, delivered his film to the Government, but then declined to execute a deed of gift covering it, and asked for his film to be returned to him.[5] Ex. 1 at 7.B.1. However, the ARRB informed Mr. Alyea that it could not return his film, explaining that since his film had been delivered to NARA, a federal agency, it therefore came under Section 5 of the Act, which requires all Government agencies to place all assassination records in their possession in the Collection. *Id.*

Once an assassination record is a Tier 1 Record, no further Governmental action (such as a subpoena) is required as a condition precedent for a taking of the assassination record to occur. The Government itself has acknowledged this point in a brief that it filed with the U.S. Supreme Court after the Fifth Circuit issued its ruling in *In re Connick* (Brief for the United States in Opposition to Petition for Writ of Certiorari, 1998 WL 34111975 (Apr. 10, 1998)). In this brief, the Government acknowledged that the Fifth Circuit had correctly ruled that since the assassination records at issue were already in the possession of a Government office, that office had a statutory responsibility to transmit the records to NARA *independent of the subpoena covering these*

---

[4] As alleged in the PAC, the Zapruder film was taken "in accordance with the JFK Records Act." PAC ¶ 163. The Zapruder family then sued the Government alleging a taking in violation of the Fifth Amendment. *Id.*
[5] Mr. Alyea went so far as to enlist the assistance of former U.S. Senator James Inhofe in pressing the ARRB for the return of his film, all to no avail. Ex. 2.

3

*records that had been previously issued by the Attorney General, at the request of the ARRB. Id.* at *14.

Conversely, Tier 2 privately-owned materials could be, but were not automatically, subject to a subpoena at the request of the ARRB, subject to the approval of the Attorney General. *See* Act at 7(i)(1)(C)(iii) (authorizing ARRB to "request the Attorney General to subpoena private persons to compel testimony, records, and other information relevant to its responsibilities under this Act"). The Government, therefore, during the ARRB's tenure (which expired in September 1998), on a discretionary basis, could have sought to acquire a privately-held record via a subpoena for inclusion in the Collection.

Since the Government understood that it did not automatically own Tier 2 Records, the ARRB encouraged and accepted *donations* of Tier 2 Records. *See* Ex. 1 at Chapter 7.A. (the Board ". . . actively encouraged private citizens and organizations who possessed assassination records to donate them to the JFK Collection . . ."). For example, the ARRB approached owners of other films showing a portion of the assassination of President Kennedy, *e.g.*, the Bronson Film. As the ARRB explained in Chapter 7.B.2. of the ARRB Final Report:

> The Review Board approached the family of the late Charles Bronson, a private citizen who filmed the scenes in Dealey Plaza shortly before and after President Kennedy's assassination, and requested that they consider donating Bronson's film. ***The family declined***.

Ex. 1 at Chapter 7.B.2 (emphasis added). When the ARRB reached out to request a *donation* of a Tier 2 Record, the private owner could decline the request, as the Bronson family did. The ARRB then had the discretion to request that the Attorney General issue a subpoena in an attempt to acquire ownership of the Tier 2 Record. In many instances, including with respect to the Bronson film, the ARRB did not act further to try to obtain the Tier 2 Record via subpoena, thereby allowing the owner to retain ownership.

Moreover, when private citizens agreed to donate Tier 2 Records, the ARRB requested them to execute a deed of gift. *See, e.g.*, Ex. 3 (deed of gift sent to Bronson family).[6] The

---

[6] Similar deeds of gifts evidencing the government's standard form are attached hereto. Exs. 4-8.

Government's deed of gift form required the private owner(s) to warrant that, at the time of the gift, the private owner(s) "possessed title to, and all rights and interest in the" donated materials "free and clear of all liens, claims, charges, or encumbrances." *Id.* Thus, the ARRB's own "in house" form for deeds of gift aligned with the framework of the Act. In particular, it reflected the Government's position that the Act did not convey ownership to the Government (or a lien, claim, charge, or encumbrance on) of Tier 2 Records. In other words, the Act itself did not automatically cause the taking of privately-created and privately-held property. Not surprisingly, this position is not disputed here by the Government, which has asserted that in order to have effected a taking of privately-held assassination records, additional steps were required by the Government. Ex. 9 (2024-02-15 Hearing Tr.) at 89:18–90:22.

Thus, before filing a lawsuit for a taking claim in this court, it was necessary for Plaintiff to develop a good-faith evidentiary basis for alleging that the Nix Film was in the possession of the Government as of or after October 26, 1992 (or, at a minimum, that such contention would likely have evidentiary support after a reasonable opportunity for further investigation or discovery). *See* RCFC 11 (a)(3).

## II. THE GOVERNMENT'S AFFIRMATIVE MISCONDUCT ESTOPS ASSERTION OF THE STATUTE OF LIMITATIONS DEFENSE

Here, the Government's actions were of "the type of affirmative misconduct that courts have required as an element of an estoppel claim against the Government." *Henry v. United States*, 870 F.2d 634, 637 (Fed. Cir. 1989) (citing *Schweiker v. Hansen*, 450 U.S. 785, 788–89 (1981); *Hanson v. Off. Of Pers. Mgmt.,* 833 F.2d 1568, 1569 (Fed. Cir. 1987); *Mukherjee v. INS*, 793 F.2d 1006, 1009 (9th Cir. 1986)). The remaining elements for application of equitable estoppel are well-known, and plainly exist here:

> Thus, the party claiming the estoppel must have relied on its adversary's conduct "in such a manner as to change his position for the worse." And that reliance must have been reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading.

*Heckler v. Cmty. Health Servs. Of Crawford Cnty., Inc.*, 467 U.S. 51, 59 (1984); *see also Kingman Reef Atoll Development, L.L.C. v. United States*, 116 Fed. Cl. 708, 767 (2014).

As detailed below, the Government's affirmative misconduct even frustrated the ARRB's efforts to find the Nix Film, notwithstanding all of the resources available to the Government.

First, and foremost, the House Select Committee on Assassinations (the "HSCA") permitted an employee from Aerospace (Charles Leontis) to transport the Nix Film from California. PAC ¶ 47. In doing so, the HSCA violated its agreement with UPI, pursuant to which an HSCA representative was required to deliver and return the Nix Film. *Id.* ¶ 48. Under the HSCA's agreement with UPI, Mr. Leontis, as an employee of Aerospace, was only permitted to handle the Nix Film while employing enhancement processes on it. *See id*. Moreover, this action broke the chain of custody over the Nix Film, because Mr. Leontis, not an HSCA representative, transported the Nix Film back from California. This was an egregious act of misconduct that, on information and belief, led to the Nix Film being assimilated into NARA's records in an irregular fashion, thus frustrating all subsequent efforts to locate it.

The Government's recordkeeping in regard to the Nix Film was also highly deficient, and failed to show precisely what happened to the Nix Film. *See id.* at ¶¶ 50-67. An ARRB staff member acknowledged that he could not figure out what happened to the Nix Film after he reviewed the Government's own paper trail in regard to the Nix Film. *See id*. at ¶ 68. Likewise, the Government (including NARA by its own acknowledgment) has mishandled or lost certain Nix Film-related materials and other materials created at Aerospace. *See id.* at ¶¶ 81-89.

Critically as well, the HSCA, in its final report (published in 1979), materially misrepresented its chain of custody over the Nix Film by stating that the Nix Film was scanned at Los Alamos, with merely the scanned data being sent to Aerospace. *See id.* ¶ 46. In fact, it was the opposite: The Nix Film was scanned at Aerospace, with the scanned data then sent to Los Alamos.

*Id.* This affirmative misrepresentation made a search for the Nix Film by any citizen nearly if not impossible, and certainly not without extraordinary diligence, because a key source of the *original* Nix Film was not only unknown to the public, but the Government affirmatively identified the wrong entity as having worked on the Nix Film. The Government has never corrected this material misrepresentation regarding the chain of custody of the Nix Film.[7]

Moreover, despite having crucial evidence in its possession, and despite Plaintiff's requests for such information, NARA did not provide the information to Plaintiff, including, *e.g.*, HSCA's photo control log (which NARA possessed since 1979) which Ms. Nix Jackson requested in 2015 when she sought information pertaining to the HSCA's custody of the Nix Film in NARA's possession. *See id.* ¶ 57. Moreover, as noted above, NARA also fundamentally misrepresented to Ms. Nix Jackson in 1991, and again in 2015, that it did **not** have the Nix Film.

The Government's affirmative misconduct in handling and recordkeeping regarding the Nix Film, and other materials related to Aerospace, caused the decades-long delay in finding evidence of the Nix Film's location. This misconduct frustrated even the ARRB efforts to find the Nix Film—despite all the resources of the Government. And with respect to NARA, its failure to provide Plaintiff with the HSCA's chain of custody log at an earlier time (despite Plaintiff's request for such documentation) and its affirmative misrepresentations as to not having the Nix Film likewise were a proximate cause of the delay in identifying the requisite evidence. Thus, the Government must be equitably estopped from asserting that Plaintiff should have brought a claim, based on NARA's possession of the Nix Film, at any earlier time than six years from 2021 when Plaintiff's representative discovered the key information that led to the filing of this lawsuit.

### III. THE GOVERNMENT'S AFFIRMATIVE MISCONDUCT ALSO SUPPORTS SUSPENSION OF THE LIMITATIONS PERIOD

---

[7] HSCA staff members were aware of a number of security violations prior to the time that the Nix Film was delivered to Aerospace, *see* PAC ¶ 74, and there was an issue with disappearing evidence. *Id.* ¶ 69.

The law regarding the suspension of the statute of limitations for claims against the Government is well-established:

> Plaintiff must either show that defendant has concealed its acts with the result that plaintiff was unaware of their existence or it must show that its injury was 'inherently unknowable' at the accrual date.

*Braude v. United States*, 585 F.2d 1049, 1051 (Ct. Cl. 1978); *see also Cochran v. United States*, 19 Cl. Ct. 455, 458 (1990); *Japanese War Notes Claimants Ass'n v. United States*, 373 F.2d 356, 359, *cert. denied*, 389 U.S. 971 (1967); *Nitol v. United States*, 7 Cl. Ct. 405, 414 (1985). The conduct of the Government supports the suspension of the statute of limitations as of October 26, 1992, at least up through and including May 12, 2021, when Plaintiff discovered the information leading to the basis for filing this suit. Plaintiff's efforts to discover the whereabouts of the Nix Film were frustrated by the Government's affirmative misconduct, as described above and below.

The facts fall neatly into two relevant time periods: (i) from 1991 (i.e., shortly before the Act was enacted) until 2013; and (ii) from 2014 (i.e., shortly before Ms. Nix Jackson filed a case in the U.S. District Court for the District of Columbia) until new information was discovered in 2021. During both time periods, the alleged taking was unknowable, the Government concealed its possession of the Nix Film, and Plaintiff reasonably relied upon affirmative misrepresentations by the Government.

<u>1991 to 2013</u>: Plaintiff's representatives began searching for the Nix Film in or around 1988 as the ownership rights were reverting back to the Nix family pursuant to a transaction between Orville Nix, Sr., and UPI. PAC ¶ 27. Ms. Nix Jackson was advised by UPI that it no longer had the Nix Film, and that NARA did. *Id*. at ¶ 28. In and around this time, Ms. Nix Jackson also reached out to NARA via a letter dated April 15, 1991, wherein she requested the return of the Nix Film. *Id*. at ¶ 30. The Government cites this letter as evidence that Plaintiff was admittedly on notice as of 1991 that NARA possessed the original Nix Film. However, the Government ignores the subsequent correspondence. First, NARA informed Ms. Nix Jackson on May 24, 1991, that it did not appear to have the original Nix Film. *Id*. at ¶ 32. Then, shortly thereafter, on September 12, 1991, NARA wrote to former U.S. Senator Phil Gramm (who had reached out to

NARA on Plaintiff's behalf) and clearly and unequivocally stated that NARA did *not* have the original Nix Film. *Id*. at ¶ 34.[8]

Thus, Plaintiff cannot be faulted for not bringing suit within the six-year statute of limitations, from 1992 to 1998, given that (i) NARA expressly represented that it did not have the Nix Film; and (ii) the ARRB itself failed to find the Nix Film, with all of the resources of the Government at its disposal.

2014-2020: Plaintiff continued its search for the Nix Film. In 2014, Plaintiff was advised by Robert Blakey, chief counsel for the HSCA, that the HSCA had the original Nix Film. *Id.* at ¶¶ 100-102; Ex. 10 ¶¶ 7-9. Mr. Blakey also advised Plaintiff to ask NARA about documentation in its possession in regard to the HSCA's custody of the Nix Film. However, NARA *failed* to provide Plaintiff with the HSCA's photo control log, which mentioned the Nix Film and Aerospace. *Id*. ¶¶ 58-61. Because the materials of the HSCA had been transferred to NARA in 1979 (*i.e.*, shortly after the HSCA had concluded its investigation, *see id.* ¶ 81), and had been in NARA's possession for decades, Mr. Blakely's information for the *first* time provided substantial evidence allowing Ms. Nix to challenge the decades-old denials by NARA that it possessed the Nix Film.

With the information from Mr. Blakey in hand, Ms. Nix filed suit in the U.S. District Court for the District of Columbia seeking either damages for the loss of the Nix film, or the return of the Nix Film. *Id.* ¶ 104. However, in 2015, the Government responded to the suit with a clear and categorical representation that NARA did not have the Nix Film. *Id.* ¶ 105. Given this representation by NARA, Ms. Nix could not have legitimately continued pursuit of a takings claim for the Nix Film absent material new information. Indeed, in 2017, NARA's prior representations that it did not have the Nix Film appeared to have been confirmed when it published information about the assassination records in the Collection, and the Nix Film was not listed as being in the

---

[8] In this letter, NARA also stated that it did not have any copies of the Nix film in the files of the HSCA. This too was false and, thus, bolsters Plaintiff's concerns regarding the reliability of NARA's denials regarding the Nix Film. *See, e.g.*, PAC ¶¶ 80, 86 n.1.

9

Collection. *Id.* ¶¶ 108-110. Plaintiff continued to diligently pursue its search for the original Nix Film.

Then, on May 12, 2021, Plaintiff uncovered a new and critical fact:

> . . . a representative of Aerospace contacted counsel for Plaintiff, stating that Aerospace had in fact sent the Nix Film to NARA, not to the HSCA or UPI. Prior to receiving this new information, Plaintiffs had understood from previous reports and statements by others that the Nix Film had been sent to either HSCA or UPI, as detailed above.

*Id.* ¶ 120; *see also generally id.* ¶¶ 89-119. This information, and related documentation, was entirely unexpected and provided a material new evidentiary basis to challenge NARA's decades-long denials that it did not have the original Nix Film. *Id.* In view of the fact that the Government itself (through the ARRB) failed to connect the path from the HSCA to Aerospace to NARA— *with all of the resources available to it (including the interagency cooperation mandated by the JFK Records Act)*—Plaintiff should not have been expected to do so at any earlier time. Plaintiff's representatives undertook extraordinary efforts to search for the Nix Film via voluminous and often contradictory public materials. *See generally* PAC ¶¶ 89-136. Plaintiff should not be penalized for not having earlier discovered evidence that the Nix Film was within the Government's *own possession*. Thus, the statute of limitations should be suspended since: (i) Plaintiff's injury (the Government's taking of the Nix Film) was unknowable as of October 26, 1992; (ii) NARA concealed its possession of the Nix Film and related critical documentation from Plaintiff; and (iii) Plaintiff relied on misrepresentations by the Government.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny the Government's Motion to Dismiss the Complaint.

Dated: May 1, 2024                                   Respectfully submitted,


                                                     By: */s/ Thomas L. Halkowski*
                                                         Thomas L. Halkowski
                                                         FISH & RICHARDSON P.C.
                                                         1000 Maine Avenue, S.W., Suite 1000
                                                         Washington, D.C. 20024
                                                         Tel: (202) 783-5070
                                                         Email: halkowski@fr.com

                                                         OF COUNSEL:
                                                         Kurt L. Glitzenstein
                                                         Daniel H. Wade
                                                         Fish & Richardson P.C.
                                                         One Marina Park Drive
                                                         Boston, MA 02210
                                                         Tel: (617) 542-5070
                                                         Email: glitzenstein@fr.com
                                                         Email: wade@fr.com

                                                     *Attorneys for Plaintiff*
                                                     *ONF Enterprises LLC*