## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ORVILLE NIX, JR.

             Plaintiff,

    v.

THE UNITED STATES OF AMERICA,

             Defendant.

Case No. 1:23-cv-00704-SSS

## AMENDED COMPLAINT

Plaintiff Orville Nix, Jr. ("Plaintiff") brings this action for just compensation against the United States of America ("Government") due to its permanent taking of the historic camera-original film of the assassination of President John F. Kennedy that was recorded by Orville Nix, Sr., (the deceased father of Orville Nix, Jr.), on November 22, 1963, in Dallas, Texas ("Nix Film").

## NATURE OF THE ACTION

1.   This action arises under the Fifth Amendment of the United States Constitution, as a result of the Government's taking of the Nix Film, private property of Plaintiff, without having provided just compensation.

## THE PARTIES

2.   Plaintiff Orville Nix, Jr. is a Texas resident who owned all of the ownership rights to the Nix Film on October 26, 1992, the date the Nix Film was taken by the United States. Plaintiff currently holds all of the ownership rights to the Nix Film.

3.   Defendant is the United States of America, acting through its instrumentalities, departments, agencies, and branches, including, without limitation, the National Archives and Records Administration ("NARA").

**JURISDICTION AND VENUE**

4. This is an action seeking compensation based on the Government's taking of certain private property of Plaintiff for public use without just compensation under the Takings Clause of the Fifth Amendment to the United States Constitution.

5. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1491(a).

**GENERAL ALLEGATIONS**

**Origin and History of the Nix Film**

6. The Nix Film is one of four known films of the assassination of President Kennedy.

7. The Nix Film was recorded by Orville Nix, Sr., on November 22, 1963, from a position near the intersection of Main and Houston Streets in Dealey Plaza, Dallas, Texas ("Dealey Plaza"). The Nix Film captured the fatal shot to President Kennedy.

8. The Nix Film is the only known film in existence showing the grassy knoll in Dealey Plaza in full, and in a clear and unobstructed manner, within the moments of the fatal shot to President Kennedy.

9. The Nix Film also captured a portion of the aftermath of the assassination of President Kennedy, showing throngs of people charging toward the grassy knoll very shortly after the fatal shot to President Kennedy.

10. A still image from the Nix Film, showing the moment of the fatal shot to President Kennedy, is reproduced below.



HSCA Record No. 180-10114-10418.

11.    Orville Nix, Sr., while recording the Nix Film, stood across the street from Abraham Zapruder, who, at the same time, was recording his film of President Kennedy's motorcade in Dealey Plaza ("Zapruder Film"). Mr. Zapruder can be seen in the Nix Film (in particular, in the image above, toward the top and to the right of the center, standing on a pedestal.)

12.    Shortly after the assassination of President Kennedy, a number of media outlets sought to purchase any available films of the assassination. One such media outlet was United Press International ("UPI").

13.    On December 6, 1963, Orville Nix, Sr., along with his son, Orville Nix, Jr., Plaintiff, met with Burt Reinhardt, representing UPI, in New York City. An agreement was reached, under which UPI licensed the Nix Film from Orville Nix, Sr., for a term of twenty-five years, in exchange for a payment to Orville Nix, Sr., of $5,000. The deal was sealed with a handshake. No written agreement between the parties was executed.

14.    The Government conducted its first official investigation into the assassination of President Kennedy through The President's Commission on the Assassination of President Kennedy, a Presidential commission established by President Lyndon B. Johnson on November 29, 1963 ("Warren Commission").

15.    Nearly one year later, in 1964, the Warren Commission concluded that Lee Harvey Oswald alone assassinated President Kennedy, and that no conspiracy was involved.

16.    The Warren Commission used a copy of the Nix Film in its investigation. The Warren Commission reproduced six frames from the Nix Film in Volume 18 of its report. Warren Commission Report, Volume XVIII, Exhibit No. 885.

17.    It was the Nix Film, along with another film of the assassination of President Kennedy filmed by Marie Muchmore ("Muchmore film")—not the Zapruder Film—that enabled the Warren Commission to establish the location of President Kennedy's limousine at the moment of the fatal shot to President Kennedy. The Warren Commission found that the Zapruder Film was not sufficient for this purpose because there were no landmarks in the background of the Zapruder Film for alignment purposes, other than a portion of a painted line on a curb. Warren Commission Report, Chapter 3, p. 110.

18.    On February 26 and 27, 1968, at the request of Attorney General Ramsey Clark, a panel of four doctors ("Clark Panel") reviewed the medical conclusions recorded by the doctors who performed the autopsy of President Kennedy on November 22, 1963. The Nix Film was one of only three films examined by the Clark Panel (along with the Zapruder Film and the Muchmore Film), along with other crucial items of evidence relating to the assassination of President Kennedy, such as autopsy photos and X-rays of President Kennedy, President Kennedy's clothing, and a bullet and bullet fragments.

4

19.  The Government conducted its second official investigation of the assassination of President Kennedy through the United States House of Representatives Select Committee on Assassinations ("HSCA") from 1976 to 1978. The HSCA was created in large part because the U.S. public, in the years after the Warren Commission's report was released, continued to doubt the Warren Commission's conclusions that Lee Harvey Oswald acted alone and that there was no conspiracy to assassinate President Kennedy.

20.  The HSCA obtained the Nix Film from UPI during its investigation of the assassination of President Kennedy. The HSCA designated the Nix Film as one of the most important items of original evidence that it obtained. HSCA Appendix to Hearings - Volume VI.I., p. 12, ¶ 42; Volume VI.IV.A, p. 109, ¶ 245.

21.  In the Spring of 1978, The Aerospace Corporation ("Aerospace"), a photo contractor working on behalf of, and at the direction of, the HSCA, digitally scanned frames from the Nix Film. Frames from the Nix Film were then examined and enhanced by Aerospace, along with the Los Alamos Scientific Laboratory ("Los Alamos"), another photo contractor working on behalf of, and at the direction of, the HSCA. One item in the Nix Film that was examined by Aerospace and Los Alamos was what the HSCA referred to as a "controversial aspect" of the Nix Film: an object on the grassy knoll behind Abraham Zapruder (and to his right) that has been interpreted as a rifleman in the classic prone posture for aiming and firing a rifle. Certain images that were generated based on the Nix Film, including a frame showing this "controversial aspect," are reproduced below.

22.  The HSCA concluded that there was a high probability that a second gunman fired at President Kennedy and, on the basis of the evidence available to it, that President Kennedy was probably assassinated as a result of a conspiracy.

23.   The location from which, according to the HSCA, there was a high probability that a second gunman fired at President Kennedy appears in the Nix Film. The Nix Film is the only known film to show this location within the moments surrounding the assassination of President Kennedy.

24.   The HSCA further concluded that the earlier investigation by the Warren Commission into the possibility of a conspiracy was seriously flawed, and that its failure to develop evidence of a conspiracy could not be given independent weight. In particular, the HSCA concluded that the Warren Commission's failure to adequately investigate the possibility of a conspiracy to assassinate the President was "attributable in part to the failure of the [Warren] Commission to receive all the relevant information that was in the possession of other agencies and departments of the Government." Thus, certain agencies and departments of the Government withheld information from the Warren Commission, and as a result the Warren Commission's investigation, and the conclusions from it, were flawed. Since the HSCA's investigation into the assassination of President Kennedy, the official position of the Government has been that President Kennedy was probably assassinated as a result of a conspiracy, as determined by the HSCA, and not the Warren Commission's conclusion that Lee Harvey Oswald acted alone.

25.   Orville Nix, Sr., died on January 17, 1972. Mr. Nix, Sr., left no will, so under Texas's intestacy laws at the time, (i) 50% of his interest in the Nix Film passed to Ella Lou Robison Nix, his wife, and (ii) 50% of his interest in the Nix Film passed to Orville Nix, Jr., Plaintiff, his sole descendant.

26.   In 1990, Ella Lou died intestate. Under Texas's intestacy laws, the interest in the Nix Film that Ella Lou acquired when Orville Nix, Sr., passed away then passed to Orville Nix, Jr. Plaintiff, her sole descendant. Orville Nix, Jr., thereby became the holder of 100% of the interest

in the Nix Film. While Orville Nix, Jr., subsequently transferred 100% of the ownership interest in the Nix Film to an entity named ONF Enterprises, LLC ("ONF"), that transfer was rescinded by a *nunc pro tunc* rescission agreement, Ex. 38, and any rights held by ONF were subject to a quitclaim assignment to Orville Nix, Jr. Ex. 39.

27. In 1988, twenty-five years after Orville Nix, Sr., reached his agreement with UPI, Gayle Nix Jackson, daughter of Orville Nix, Jr., initiated efforts to have the Nix Film and its copyright returned to the Nix family. Ms. Jackson contacted UPI and requested the return of the Nix Film and its copyright.

28. UPI informed Ms. Jackson of its understanding that the Nix Film, which was at one time in the possession of UPI, was at NARA. Frank H. Kane, general counsel of UPI, stated this in a letter to Ms. Jackson dated June 4, 1991.

29. Mr. Kane also confirmed and agreed in this letter to Ms. Jackson dated June 4, 1991, that (i) UPI had entered into a license agreement with Orville Nix, Sr., for a term that had ended; and (ii) UPI released all rights over the Nix Film back to Orville Nix, Sr.'s heirs and assigns. Ex. 1.

30. In a letter to NARA dated April 15, 1991, Ms. Jackson requested that NARA return the Nix Film to the Nix family. Ex. 2. Ms. Jackson's request included an affidavit confirming the Nix family's ownership of the Nix Film, along with a letter from UPI releasing any claim to the Nix Film.

31. On May 24, 1991, NARA replied to Ms. Jackson's request. Ex. 3. NARA stated that the film in NARA's possession was likely not the camera-original Nix Film, as there were "no yellow flashes or camera stops typical of camera original." *Id.*

32. On information and belief, NARA, in its reply dated May 24, 1991, was referring to a copy of the Nix Film (not the camera-original Nix Film) that was used by the Warren Commission

and stored at NARA under the name "CE-905." Under Public Law 89-318, enacted on November 2, 1965, title to this copy of the Nix Film passed to the Government, so NARA could not return this copy of the Nix Film to Ms. Jackson.

33. Ms. Jackson reached out to U.S. Senator Phil Gramm for further assistance in dealing with NARA, based on her belief that, notwithstanding NARA's denial as to having the Nix Film (per NARA's letter to her dated May 24, 1991), NARA had the original Nix Film. Ex. 40. Senator Gramm then reached out to NARA on Ms. Jackson's behalf.

34. On September 12, 1991, NARA archivist William Cunliffe replied to Senator Gramm, stating that NARA did not have the original Nix Film. Ex. 41.

**Defendant Took Possession of the Nix Film in 1978**

35. Unbeknownst to Plaintiff at the time, on November 1, 1977, the HSCA served a subpoena on UPI, requiring delivery of:

> … all photographs, negatives, slides of persons, events, objects, locations taken on November 22, 23, 24, 25 of 1963 relating to the circumstances surrounding the assassination and death of John F. Kennedy including but not limited to: 1) Photos taken by Frank Cancellare of scene at Dealey Plaza and environs on November 22, 1963; 2) Photos taken by Marie Muchmore of Presidential motorcade in Dealey Plaza on November 22, 1963; and 3) Photo taken by Orville Nix of Dealey Plaza and environs and events on November 22, 1963

> Ex. 4.

> Item 3 in this subpoena refers to the Nix Film.

36. Counsel for UPI wrote a letter dated November 14, 1977, to Louis Stokes, chair of the HSCA, to address the HSCA's request for the Nix Film and note the impasse that had arisen between the HSCA and UPI concerning the HSCA's request "for the originals of two very valuable copyrighted films owned by UPI . . . commonly referred to as the 'Nix' and 'Muchmore' films." Ex. 5.

37.     Counsel for UPI, aware that the HSCA was intending to arrange for a commercial film laboratory to subject the Nix Film and the Muchmore Film to photo enhancement techniques, also stated that UPI was "extremely concerned about the damage which might occur to the films as a result of such handling and processing techniques." *Id.* UPI further noted that "since the films are irreplaceable, even an insurance arrangement would not offset the harm that would result from their loss, damage, or destruction." *Id.* UPI did not object to providing copies of the Nix Film and the Muchmore Film—instead of the camera-original versions of these films. *Id.*

38.     UPI and the HSCA continued to negotiate the terms under which UPI would deliver the Nix Film and the Muchmore Film to the HSCA. Ultimately, UPI and the HSCA reached an agreement containing a number of terms governing the delivery of the Nix Film and the Muchmore Film to the HSCA. First, the HSCA had to return the Nix Film and the Muchmore Film to UPI after its evaluation was complete. *See* HSCA Record Nos. 180-10080-10304; 180-10070-10223. Second, the delivery and return of the Nix Film and the Muchmore Film was to be handled solely by a designated HSCA representative (and the HSCA's photo contractors were permitted to handle the films only while employing enhancement processes on them). *See* HSCA Record No. 180-10070-10223. Finally, UPI was entitled to receive a "first generation" copy of any enhancement work done on the Nix Film and the Muchmore Film. *See* HSCA Record Nos. 180-10080-10304; 180-10070-10223.

39.     On April 3, 1978, the HSCA served a second subpoena on UPI, this time specifically targeting the Nix Film and the Muchmore Film, requiring delivery of:

> … the movie films in your possession or control which pertain to the assassination of President John F. Kennedy in Dallas, Texas on November 22, 1963 which were taken by Mary Muchmore and Orville Nix in Dallas on November 22, 1963.
>
> Ex. 6.

40.   UPI delivered the Nix Film and the Muchmore Film to the HSCA in response to this second subpoena.

41.   On April 4, 1978, the HSCA had possession of the Nix Film in Washington, D.C. Jane Downey, staff attorney for the HSCA, memorialized this in a document dated April 4, 1978, noting that the HSCA had received from "UPI, New York: (2) rolls of 8mm film," one of which was the Nix Film:



Ex. 7.

42.   Later in the day on April 4, 1978, HSCA staff attorney Michael Goldsmith, along with Ms. Downey, took the Nix Film to California for an upcoming conference of the HSCA's photographic panel in California. *Id.*

43.    The HSCA assigned folders to the materials that it produced and obtained, including films and photographs. On information and belief, folder number 6869 ("Folder 6869") was the folder assigned to the Nix Film. The April 4, 1978, receipt was then placed into Folder 6869.

**The HSCA Arranged for the Nix Film to be Digitally Scanned at Aerospace, but the HSCA Then Permitted its Chain of Custody Over the Nix Film to be Broken, in Violation of its Agreement with UPI and Basic Protocols for the Handling of Evidence**

44.    On information and belief and unbeknownst to Plaintiff until 2021, while in California, the Nix Film was taken to Aerospace, in El Segundo, California, to be digitally scanned and enhanced.

45.    Aerospace was one of three institutions selected by the HSCA to perform digital image processing of films and photos relating to the assassination of President Kennedy using computer-based techniques that were state-of-the-art at the time. The other two institutions were Los Alamos and the University of Southern California.

46.    The HSCA, in its final report, stated that the scanning of the Nix Film was performed at *Los Alamos*; and the scanned data (i.e., copies) was then sent to Aerospace for enhancement by computer. HSCA Appendix to Hearings – Volume VI.IV.A, page 126, ¶ 307. On information and belief, this was an *error* published by the HSCA concerning the chain of custody of the Nix Film. The Nix Film was digitally scanned at *Aerospace*, not Los Alamos. To date, this error has not been officially corrected by the Government.

47.    The Nix Film was supposed to have been returned from Aerospace to the HSCA on or around May 2, 1978, and then returned by the HSCA to UPI. According to an "Outside Contact Report" prepared by Ms. Downey on May 2, 1978, memorializing a conversation with Robert Chiralo, a representative of Aerospace, the Nix Film was being delivered from California on that date by Charles Leontis, the head of Aerospace's optics division:

DATE ___5/2/78___ TIME ___1100___

**008033**

I. Identifying Information:

Name ___Bob Chiralo___ Telephone ___213-648-6142___

Address ___Aerospace Corp___

Type of Contact: _x_ Telephone
___ Person

II. Summary of Contact:

___Re: Aerospace scan of Nix original film. Scanned approximately___

___30 frames (numbered on film: A-B4 and B8-D2). Leontis is___

___bringing film from California today.___

Ex. 8.

48.   Under the HSCA's agreement with UPI, only a designated HSCA representative was supposed to have delivered and returned the Nix Film. In accordance with this material condition, Michael Goldsmith (a HSCA staff attorney/member) delivered the Nix Film from the HSCA (in Washington, D.C.) to Aerospace (in California). Ex. 7. However, Mr. Goldsmith did not thereafter bring the Nix Film back from Aerospace. Instead, the HSCA allowed an employee of Aerospace (Charles Leontis) to return the Nix Film from Aerospace. *Id.*. Under the HSCA's agreement with UPI, Mr. Leontis, as an employee of Aerospace, was only permitted to handle the Nix Film while employing enhancement processes on it. *See* HSCA Record No. 180-10070-10223. The HSCA's permitting of Mr. Leontis (who was not a HSCA staff member) to (i) handle the Nix Film outside of Aerospace's facility; and (ii) return the Nix Film from California violated the agreement between UPI and the HSCA. *Id*.

49. On information and belief, the HSCA imposed and adhered to much stricter controls over the Zapruder Film. The HSCA, in stark contrast to the manner in which it handled the Nix Film, arranged for its own staff members to maintain unbroken physical custody of the Zapruder Film at all times that it was outside the HSCA's secured facilities. Further, HSCA staff personally delivered the Zapruder Film to Los Alamos, monitored it at Los Alamos at all times, and returned it from Los Alamos. This is reflected in an affidavit executed by HSCA staff member Martin Daly on May 4, 1978:

A F F I D A V I T

IN THE DISTRICT OF COLUMBIA  ) ss:

      I, Martin Daly, a duly authorized representative of the Select Committee on Assassinations, United States House of Representatives, hereby depose and say:

      (1)  I am a duly authorized representative of the Select Committee on Assassinations, United States House of Representatives, directed by it to obtain custody and possession of the original movie film of the assassination of President John F. Kennedy on November 22, 1963, commonly referred to as the "Zapruder Film," for purposes of its investigation.

      (2)  On March 7, 1978, I received said Zapruder Film from Mr. Robert M. Trien, 919 Third Avenue, New York, N. Y.  10022 and executed a receipt.  I delivered it to Los Alamos Scientific Laboratory where it remained in  my custody while it was digitally scanned by computer process.

      (3)  On March 16, 1978, I relinquished custody of the film to Joseph J. Basteri, Staff Investigator for the Select Committee on Assassinations.  It remained in his custody or in secured facilities at Committee offices, until it was returned to Mr. Henry Zapruder, March 29, 1978.

_Martin J. Daly._
Martin Daly

Subscribed and sworn to before me this 4th day of May, 1978.

_Elizabeth L. Leming_
Notary Public

My Commission expires: 9-15-82

Ex. 9.

50.  On information and belief, the HSCA's records contain no comparable instructions in regard to the delivery of the Nix film from Aerospace, in California, back to the HSCA.

51. Similarly, the FBI imposed strict controls over its copies of the Nix Film that it provided to the HSCA. The FBI's internal instructions stated that, for chain of custody preservation purposes, an FBI agent had to maintain physical custody and physical observation of the FBI's copies of the Nix Film while they were being viewed by the HSCA. Ex. 10.

## The HSCA's Records Do Not Evidence the Receipt of the Nix Film from Aerospace, or its Return to UPI

52. On information and belief, the HSCA's visitor log does not contain an entry on May 2, 1978, or any date after that, reflecting a visit to the HSCA by Mr. Leontis, the Aerospace employee tasked with returning the Nix Film from Aerospace.

53. On information and belief, Folder 6869, the HSCA folder associated with the Nix Film, does not contain a copy of a receipt evidencing that anyone at the HSCA received the Nix Film back from Aerospace.

54. By comparison, HSCA staff attorney Ms. Downey executed a receipt reflecting the HSCA's receipt of another film that was scanned at Aerospace shortly after the Nix Film. In particular, on July 5, 1978, Ms. Downey created a receipt showing that she received a film recorded by F.M. "Mark" Bell ("Bell Film") back from Aerospace and had transferred the Bell Film into a HSCA photo safe. HSCA Record No. 180-10074-10045. This information also appears in an entry in the HSCA's document log:



| | NUMBER | DOCUMENT I.D. | FROM |
|---|---|---|---|
| JFK/HESS Jane Downey | 009684 | To: J. Downey Re: #003295 –Negatives of Tramps/rifle & Bell Film Incoming Correspondence | Aerospace Corp. |

Ex. 11.

55. On information and belief, the HSCA's document log does not contain a similar entry reflecting either any receipt by the HSCA of the Nix Film from Aerospace, or any transfer of the Nix Film by the HSCA into a photo safe, pending its return to UPI.

56. On information and belief, Folder 6869 also does not contain any of the items below that might record or reflect receipt by the HSCA of the Nix Film:

- A copy of a cover letter from the HSCA to UPI, which one would expect to have accompanied the Nix Film in its return from the HSCA to UPI,

- A copy of a transmittal envelope,

- A copy of any letter from UPI to the HSCA, noting the HSCA's delivery of the Nix Film to UPI, or

- A receipt reflecting or recording UPI's receipt of the Nix Film.

57. By contrast, such documents appear in connection with other films viewed by the HSCA. For example, HSCA chief counsel Robert Blakey wrote a letter to Henry Zapruder, the son of Abraham Zapruder, thanking him for granting the HSCA's photographic experts access to the original Zapruder film:

LOUIS STOKES, OHIO, CHAIRMAN

RICHARDSON PREYER, N.C.          SAMUEL L. DEVINE, OHIO
WALTER E. FAUNTROY, D.C.         STEWART B. MC KINNEY, CONN.
YVONNE BRATHWAITE BURKE, CALIF.  CHARLES THONE, NEBR.
CHRISTOPHER J. DODD, CONN.       HAROLD S. SAWYER, MICH.
HAROLD E. FORD, TENN.
FLOYD J. FITHIAN, IND.
ROBERT W. EDGAR, PA.

(202) 225-4624

**Select Committee on Assassinations**

**U.S. House of Representatives**

3331 HOUSE OFFICE BUILDING, ANNEX 2

WASHINGTON, D.C. 20515

009366

JUN 20 1978

Henry Zapruder, Esquire
Cohen and Uretz
1776 K Street, N.W.
Washington, D.C. 20006

Dear Mr. Zapruder:

    In connection with the investigation of the House Select
Committee on Assassinations into the death of President John
F. Kennedy, I am writing to express the Committee's deep
appreciation for the invaluable assistance you have provided
us. Your continuing cooperation in regard to allowing
Committee photographic experts ready access to your original
copy of the Zapruder film has greatly facilitated our
investigative efforts.

    Again, my sincere thanks for your contribution to the work
of the Committee.

Sincerely,

*G. Robert Blakey*

G. Robert Blakey
Chief Counsel and Director

GRB:jdm

Ex. 12.

58. In 2015, Ms. Jackson requested from NARA a copy of an HSCA chain of custody index

covering the Nix Film ("photo control log"). At that time, NARA failed to provide Ms. Jackson

17

with a copy of the HSCA's photo control log. Notwithstanding this failure by NARA to provide Ms. Jackson with a copy of the HSCA's photo control log, counsel for Plaintiff, other than the undersigned (hereinafter "Other Counsel"), located it at NARA in 2021. On information and belief, NARA has possessed the HSCA's photo control log, on an uninterrupted basis, in a box on its premises since 1979, yet failed to locate it.

59.    On information and belief, the HSCA's photo control log does not record or reflect any return by the HSCA of the Nix Film to UPI.

60.    On information and belief, there is only a single page in the HSCA's photo control log that contains an entry referencing the Nix Film:

| LE # | DESCRIPTION OF PHOTO MATERIALS | PARTY RCVG OR DOCUMENT LOCATION | OUT | RETURNED |
|------|-------------------------------|----------------------------------|-----|----------|
| | 2 copies each of mug book photos on: Ferrie, Howard, Banister, Shaw, Oswald Ruby, Beckham | J Blackmer | 3/13/78 | 3/15/78 |
| 10. 002334 | 1 copy of each pose, A & B, prints made by Aschins from their prints (Bora to make 8x10 prints, one each) | Bora Photo | 3/16/78 | returned |
| 11. | 2 prints of nearly 50 photos (one each of A & B) | Cecil Kirk | 3/24/78 | returned |
| 12. | 10 Mug Book prints - 1 cy ea of: Shaw 5 Ferrie 12 (+ one extra unnumbered pose) Oswald 57 Slingus 92 Hemming 4 EM Hunt 90 Beckham 11 Banister 13 Howard 15 | J Blackmer to Chief mtl | 4/3/78 4/4/78 | returned |
| 13. 006869 ①  | 2 rolls 8mm film (UPI) original MA & Muchmore | (left at Aerospace) | Muchmore 4/24/78 returned | |
| 004576 ② | Bree 8mm film (orig) | (left at Aerospace) | | |
| 004349 ③ | Towner orig & slides | | 4/10/78 | |
| 005132 ④ | 7 slides & 8mm orig film | | " | |
| 005097 ⑤ | Dorman film | | " | |
| 005011 ⑥ | DCA master #3 film | | " | |
| ★ 004171 ⑦ | 13 prints from photo book (Dealey) | (left at Aer... | " 4/10/78 | |
| ⑧ | 004171 (major files) Cersull print | | | |
| 002518 ⑨ | Betzner 3 blow up (from Time materials) | | " | |
| 002151 ⑩ | Oswald height chart 00151 | | " | |
| 002334 ⑪ | 2 backyard prints 133 A/B | | " | |
| 000632 ⑫ | Dees print of 133C | | " | |
| 001099 ⑬ | De M. print | | " | |

Ex. 13.

61.    On information and belief, the sole reference to the Nix Film in the HSCA's photo control log appears in entry 13, item 1:

| File # | Description of Photo Materials | Party Rcvg Or Document Location | Out | Returned |
|---|---|---|---|---|



*Id.* (column headings reproduced as in original).

62.    In the "File #" column, the file is identified as "006869," which, on information and belief, was the folder associated with the Nix Film. In the "Description of Photo Materials" column, the photo materials are described as "2 rolls of 8mm film (UPI) original Nix & Muchmore." In the "Party Rcvg or Document Location" column, the Nix Film and the Muchmore Film were on information and belief taken "to Calif" [to California] by "Mickey" (Michael Goldsmith) on April 4, 1978, thereby matching the information provided in the April 4, 1978, receipt. *See supra* ¶¶ 41-43.

63.    In the "Returned" column, the words "Muchmore 4/24/78" indicate that the Muchmore Film was returned to the HSCA on April 24, 1978. Next, underneath "Muchmore 4/24/78," the word "returned" was provided, but the document does not state what "returned" here refers to. The word "Nix" does not appear here, nor does a date of return appear here associated with the Nix Film.

64. On information and belief, when a HSCA staff member believed that a photographic item was returned to UPI, the transfer was noted in the HSCA's photo control log. For example, in entry 41 in the HSCA's photo control log, the words "returned to UPI" appear in the "Returned" column:



*Id*.

65. On information and belief, a similar and distinct entry reflecting "returned to UPI," together with a return date, does not appear in the HSCA's photo control log for the Nix Film.

66. The HSCA's photo control log provides two distinct entries for the Bell Film, which was scanned and copied at Aerospace shortly after the Nix Film: one entry reflecting the delivery of the Bell Film by the HSCA to Aerospace, and a second entry reflecting the HSCA's return of the Bell Film to F.M. Bell.

67. The first of such entries, reflecting the HSCA's delivery of the Bell Film to Aerospace, appears in the HSCA's photo control log in entry 13, item 2, which is immediately below the entry for the Nix Film and the Muchmore Film in the HSCA's photo control log:

*Id.*

The second of such entries for the Bell Film, reflecting the HSCA's return of the Bell Film to F.M. Bell, appears in entry 48 in the HSCA's photo control log:



*Id.*

68.   On information and belief, the HSCA's photo control log lacks any entries describing the HSCA's return of the Nix Film to UPI.

69.   On information and belief, in the 1990s, the Assassination Records Review Board ("ARRB"), a newly formed (temporary) Government agency whose major purpose was to re-examine, for public release, records relating to the assassination of President Kennedy that Government agencies regarded as too sensitive to open to the public, did not find any records within the HSCA's files indicating that the Nix Film was returned by the HSCA to UPI. Ex. 14. A staff member of the ARRB, Joe Freeman, acknowledged that he could not determine what

happened to the Nix Film after he reviewed the Government's own paper trail in regards to the Nix Film. Ex. 42, Ex. 43. Moreover, the ARRB itself searched for the Nix Film, yet failed to find it.

70.    During the tenure of the ARRB (which expired in September 1998), Plaintiff and Ms. Gayle Nix Jackson, Plaintiff's daughter, did not merely sit back and rely solely on the Government to try to find the Nix Film. They diligently continued their search for the Nix Film during the ARRB's tenure, and afterward. For instance, (1) prior to September 1, 1995, Ms. Jackson hired a former HSCA staff member, Kevin Walsh, to try to determine what happened to the Nix Film; (2) Ms. Jackson spoke with (a) Mr. Goldsmith, the former HSCA staff attorney who was primarily involved in obtaining the Nix Film from UPI and who took it to California on April 4, 1978; and (b) Ms. Downey, the former HSCA staff attorney who was primarily responsible for handling matters relating to the Nix Film while it was at Aerospace, and neither one of them mentioned anything about Aerospace to her; and (3) Ms. Jackson also spoke with Dr. Clyde Snow, a highly-regarded forensic anthropologist who was also a member of the HSCA's photographic panel, and Dr. Snow also did not mention anything about Aerospace to her. Ms. Jackson also corresponded with the ARRB and provided it with research leads. Further, Ms. Jackson told the ARRB that while she wanted the Nix Film back if they found it, she was willing to assist the ARRB in any way possible in trying to find the Nix Film. Ex. 44.

**Many Significant Items of Evidence Relating to the Assassination of President Kennedy Were Lost, Damaged, or Improperly Secured While in the Custody of the HSCA**

71.    On October 3, 1979, less than one year after the HSCA completed its investigation, the FBI interviewed Ms. Downey, the former HSCA staff attorney, in connection with a possible theft of autopsy photos of President Kennedy. Ms. Downey, at the end of this interview, told the

FBI that things in the HSCA's possession "mysteriously disappeared." Ex. 15. Ms. Downey then added that "she could offer no explanation" for the mysterious disappearances, and that she found it "difficult to leave many things unsecured because of the constant problem of these items disappearing." *Id.*

72. On information and belief, Ms. Downey did not report this constant problem of things disappearing to the HSCA until this FBI interview, after the HSCA had completed its investigation.

73. On information and belief, apart from the Nix Film, the HSCA lost a 35mm color transparency taken by James Powell. This transparency showed the window on the sixth floor of the Texas School Book Depository in Dealey Plaza from which many believe Lee Harvey Oswald assassinated President Kennedy. The HSCA designated this transparency (along with the Nix Film) as one of the seven items of original evidence that could be meaningfully enhanced and most relevant to the question of multiple gunmen in Dealey Plaza. HSCA Appendix to Hearings – Volume VI.IV.A, p. 109, ¶ 245. Mr. Blakey, in a letter to Mr. Powell dated March 30, 1979, acknowledged that the HSCA could not locate this transparency:

STOKES, OHIO, CHAIRMAN

C.                    SAMUEL L. DEVINE, OHIO
D.C.                  STEWART B. MC KINNEY, CONN.
BURKE, CALIF.         CHARLES THONE, NEBR.
OO, CONN.             HAROLD S. SAWYER, MICH.
TENN.
AN, IND.
GAN, PA.

(202) 225-4624

Select Committee on Assassinations

U.S. House of Representatives

3369 HOUSE OFFICE BUILDING, ANNEX 2
WASHINGTON, D.C. 20515

March 30, 1979

Mr. James W. Powell
1150 Monument Street
Pacific Palisades,
California 90272

Dear Mr. Powell:

In connection with the investigation of the House
Select Committee on Assassinations into the circumstances
surrounding the death of President John F. Kennedy, I am
writing concerning the 35mm color transparency that you
made available to the Committee's Photographic Evidence
Panel. This article was subjected to digital image pro-
cessing, and was the subject of extensive analysis in the
Final Report of the Photographic Evidence Panel. Upon
completion of the digital image processing the slide was
returned to the Committee's offices. I regret to inform
you, however, that it has since been misplaced in handling.
We have conducted an extensive review of our files, but
have not been able to locate it. This search will continue
until the Committee's files are delivered to the National
Archives.

Ex. 16.

74.   On information and belief, the HSCA also had custody of, but lost, the camera used to

take the autopsy photos of President Kennedy that the U.S. Department of Defense delivered to

the HSCA. The HSCA's file index of photographic materials identified this camera as an item that

was stored in security:

| File No. | Description | Return to |
|---|---|---|
| 4388 | Gary Carrico photos of motor-cade (2) | Gary Carrico |
| 4977 | DCA - copy | DCA, Dallas |
| 5011 | DCA originals | DCA, Dallas |
| ? | Tape of BBC broadcast furn-ished Committee by Osterlund | Osterlund, Syndicast, N.Y |
| 2518 | Time photos and negatives | Time, N. Y. |

PHOTOGRAPHIC MATERIALS IN SECURITY:

Powell color transparency showing TSBD

DeMoh original B/W of Neeley St.

Camera/accessories alleged to have been used for autopsy photos.

Ex. 17.

75. The ARRB did not find any records or working notes within the HSCA's files indicating that this camera was returned by the HSCA to the Department of Defense. Ex. 18. Further, neither Bethesda Naval Hospital nor the Bureau of Medicine and Surgery with the Department of Navy could locate the camera when asked to search for it by the ARRB. *Id.*

76. On information and belief, security violations at the HSCA were common. By May 12, 1978, there had been at least eight security violations involving unlocked safes, notwithstanding repeated warnings to HSCA staff members. For example, on May 2, 1978—the date that the Nix Film was supposed to have been returned to the HSCA—Robert Morrison, security director at the HSCA, noticed that a safe had been left open, and that no attempt had been made to secure this safe properly. Ex. 19.

77.	On information and belief, less than two months after this May 2, 1978, security violation, a CIA employee improperly accessed a HSCA safe containing important items of original evidence and improperly handled copies of autopsy photographs of President Kennedy *See* HSCA Record No. 180-10125-10172.

78.	On information and belief, in 1979, the HSCA mistakenly sent a first-generation Secret Service copy of the Zapruder film to a representative of the Zapruder family. On information and belief, rather than make this mistake known, a government employee made a copy of the Zapruder Film using Kodak film from 1979, and then swapped in this copy of the Zapruder Film (on 1979 film stock) for the 1963 first-generation Secret Service copy.

79.	On information and belief, a 35mm color transparency showing the window on the sixth floor of the Texas School Book Depository in Dealey Plaza taken by Tom Dillard was severely damaged while it was in the HSCA's custody. The HSCA designated this transparency as another one of the seven most relevant items of original evidence that could be meaningfully enhanced and most relevant to the question of multiple gunmen in Dealey Plaza. HSCA Appendix to Hearings - Volume VI.IV.A, p. 109, ¶ 245. The HSCA authorized the application of an enhancement technique called autoradiographic enhancement to this transparency, even though one of its photographic experts cautioned the HSCA that this enhancement technique was "unproven." HSCA Record No. 180-10077-10301. Moreover, another HSCA photographic expert specifically warned Mr. Goldsmith that subjecting this transparency to this enhancement technique involved "taking a risk in changing the integrity of a piece of original evidence." HSCA Record No. 180-10078-10407. Mr. Blakey, in a letter to Mr. Dillard dated March 30, 1979, stated that Dillard's transparency had been "severely damaged" while undergoing this enhancement technique:

LOUIS STOKES, OHIO, CHAIRMAN

CHARDSON PREYER, N.C.          SAMUEL L. DEVINE, OHIO
WALTER E. FAUNTROY, D.C.       STEWART B. McKINNEY, CONN.
YVONNE BRATHWAITE BURKE, CALIF. CHARLES THONE, NEBR.
CHRISTOPHER J. DODD, CONN.     HAROLD S. SAWYER, MICH.
HAROLD E. FORD, TENN.
FLOYD J. FITHIAN, IND.
ROBERT W. EDGAR, PA.

(202) 225-4624

*Select Committee on Assassinations*
*U.S. House of Representatives*
3369 HOUSE OFFICE BUILDING, ANNEX 2
WASHINGTON, D.C. 20515

March 30, 1979

Mr. Tom Dillard
Dallas Morning News
P. O. Box 225237
Dallas, Texas  75265

Dear Mr. Dillard:

In connection with the investigation of the House
Select Committee on Assassinations into the circumstances
surrounding the death of President John F. Kennedy, en-
closed are the materials that you loaned to the Committee
for our analytical work.  Your photographs were subjected
to extensive enhancement efforts, and received detailed
analysis in the Final Report of the Photographic Evidence
Panel.

I regret to inform you, however, that one of your
35mm transparencies was severely damaged while undergoing
autoradiographic enhancement.  This occurred despite assur-
ances that the Committee received from its contractor, SRI
International, that this process was nondestructive (see
page seven of the enclosed SRI Research Proposal).

Ex. 20.

80.   On information and belief, the HSCA failed to maintain other adequate records in
connection with the Nix Film. For instance, the HSCA generated lists and indices of photographs
and films that it obtained, including a photographic materials file folder list, and a file index for
original photographic materials. HSCA Record No. 180-10114-10402; HSCA Record No. 180-
10116-10418. None of these lists or indices mention the Nix Film.

81.   After the HSCA concluded its investigation, its records were split into two groups.
According to Mr. Blakey, one group of these records went to NARA. The other group of these

28

records were disposed of, unless a HSCA staff member or contractor wanted to keep a record as a souvenir:

> Blakey said that when the Committee ended all records were sorted into two groups. Group one records were sent to the Archives. Group two records were destroyed or thrown away. Group two comprised everything from copies of redacted FBI reports on LHO and Ruby to charts and exhibits used during Committee hearings. He said that if a Committee staffer wanted to take anything from Group two it would have been alright to do so. He said that as an example, police photographer and committee staffer Cecil Kirk asked if he could keep some of the photos he made himself for the committe and was allowed to do so. Kirk also asked if he could keep a drawing made by Ida Dox and was given permission to do so.

Ex. 21.

## The Government Mishandled or Lost Certain Nix-Film-Related Materials and Materials Created at Aerospace

82.    On information and belief, an image based on the Nix Film was generated by Aerospace or Los Alamos in 1978, and then placed onto a computer data tape (stored at NARA under the file name "NIX.2.FILE.08"). On information and belief, this image—which is now blank—captured the moment of (or a moment immediately before or after) the fatal shot to President Kennedy.

83.    On information and belief, an array of 44 images based on the Nix Film was generated by Aerospace or Los Alamos in 1978, placed onto computer data tapes (currently stored at NARA under file names NIX.2.FILE.07 through NIX.3.FILE.12) and then improperly read, copied, or processed. An example of how one such image currently appears, reflecting a shifting or rearrangement of portions of the image, is below.



Ex. 22.

84.   On information and belief, all three copies of a computer data tape generated by Los Alamos for the HSCA in 1978 having the title "ANDR5" are missing. Each copy of this ANDR5 tape contains two enhanced images based on the Nix Film. According to Los Alamos, the "subject of interest" (from the Nix Film) on each ANDR5 tape is a potential gunman on the grassy knoll in Dealey Plaza in a "classic military firing position":

Box 631
(No tape in box)

UNIVERSITY OF CALIFORNIA
LOS ALAMOS SCIENTIFIC LABORATORY
(CONTRACT W-7405-ENG-36)
P.O. BOX 1663
LOS ALAMOS, NEW MEXICO 87545

# 010493

IN REPLY
REFER TO: M-8
MAIL STOP: 263

August 4, 1978

Prof. H. C. Andrews
Image Processing Institute
University of Southern California
Los Angeles, CA 90007

Dear Harry:

Here, I hope, is the last tape, ANDR5, for the Select Committee.
It contains 5 images.

Zapruder Frame 200 has been recopied in order to eliminate the
streaks. Frame 313 is on this tape, and not confused with 314 as it was
at ETL. Frame 413 has been redone in order to get the bottom of the head
in the image.

The last two images are from the Nix film. NIXAV is an average of
eight frames approximately centered temporally at the head shot followed
by a MAP enhancement. The subject of interest is the gunman in "classic
military firing position." NIX219 is the Nix Frame 219 only plus a MAP
enhancement. Again, the feature of interest is the same.

I am also sending Jane Downey a copy of ANDR5 to go with the col-
lection which I left with her in July.

Ex. 23.

85.    On information and belief, at least one copy of the ANDR5 tape was placed in a box in

the HSCA's records identified under the number 631, and this copy of the ANDR5 tape was later

discovered to be missing from this box. *Id*.

86.   On information and belief, Aerospace digitized about 85 frames from the Nix Film. Despite this, on information and belief, NARA presently has computer data tapes from Aerospace showing only 28 frames from the Nix Film.[1]

87.   NARA, in its letter to Senator Gramm dated July 29, 1991, stated that it did not have the Nix Film, *supra* ¶ 34, and also stated that it did not have any copies of the Nix Film in the files of the HSCA. However, these 28 frames from the Nix Film, which were created for the HSCA, reflect a copy of the portion of the Nix Film showing the moments before, during, and after the assassination of President Kennedy. In addition, on information and belief, copies of this portion of the Nix Film, as digitized at Aerospace in 1978, are stored on data tapes currently in NARA's Center for Legislative Archives, in a file associated with the HSCA under the titles, "MAST1," "MAST2," and "MAST3", and under file names starting with "Nix 1_File_01" and ending with "Nix_3_File_39". As such, NARA incorrectly represented to Senator Gramm (and, as such, to Plaintiff) on July 29, 1991, that it did not have any copies of the Nix Film in the files of the HSCA.

88.   On information and belief, in 1991, NARA archivist Les Waffen acknowledged that NARA had gaps and incomplete information in its administrative history and handling of copies of the Zapruder, Nix, and Muchmore Films. Mr. Waffen stated that NARA could not answer completely all the questions about the administrative history and handling of the originals and various copies of the Zapruder, Nix, and Muchmore films:

---

[1]      On July 13, 2021, NARA sent Other Counsel for Plaintiff 84 unenhanced images based on the Nix Film, reflecting a copy of a portion of the Nix Film showing the moments before, during, and after the assassination of President Kennedy. The 84 unenhanced images began with a file identified as "NIX.1.01" and ended with a file identified as "NIX.3.FILE.12". On information and belief, the 84 unenhanced images sent by NARA to Other Counsel for Plaintiff were the result of Aerospace's (and/or Los Alamos') subjecting 28 consecutive frames from the Nix Film to three different filters (*i.e.*, a red, green, and blue filter), as part of a color ratio analysis technique. 28 frames, with three filters applied to each frame, equals 84 total unenhanced images.

Dear Mr. Wilson:

In reply to your letter of July 2, we are unable to answer
completely all the questions you posed for us concerning the
administrative history and handling of the original and
various copies of the Zapruder, Nix and Muchmore audiovisual
items relating to the Kennedy assassination.

Ex. 24.

### Plaintiff's Efforts to Find the Nix Film

89. Beginning in 1991, after the end of the license period with UPI, Plaintiff (including where applicable for purposes of paragraphs 89-136, through his family members (including Gayle Nix Jackson), agents, counsel, and representatives) has exhaustively and diligently searched for the Nix Film.

90. Also beginning in 1991, the Government has repeatedly and consistently denied that it possesses the Nix Film. *See supra* ¶¶ 31-34.

91. Despite exhaustive searching, Plaintiff has been unable to locate any evidence recording or reflecting that the HSCA returned the Nix Film to UPI.

92. On information and belief, UPI has also been unable to locate any such evidence.

93. On information and belief, the Government has also been unable to locate any such evidence.

94. On October 26, 1992, the President John F. Kennedy Records Collection Act of 1992 ("the JFK Records Act") went into effect. 44 U.S.C. § 2107 note. The JFK Records Act directed NARA to establish a collection of "assassination records."

95. The JFK Records Act defines "assassination record" as any record "that was created or made available for use by, obtained by, or otherwise came into the possession of," but not limited

to, the Warren Commission, the HSCA, and NARA. *Id.* The JFK Records Act requires that "[n]o assassination record shall be destroyed, altered, or mutilated in any way." *Id.*

96.  The JFK Records Act further requires:

> When this act requires transmission of a record to the Archivist or public disclosure, it shall take precedence over any other law (except section 6103 of the Internal Revenue Code), judicial decision construing such law, or common law doctrine that would otherwise prohibit such transmission or disclosure, with the exception of deeds governing access to or transfer or release of gifts and donations of records to the United States Government.

> *Id.*

97.  The Nix Film is an "assassination record" under the JFK Records Act because it was made available for use by, and obtained by, the HSCA.

98.  Under the JFK Records Act, all assassination records were to be transmitted to NARA, where they would be publicly disclosed and made available to the public. Public disclosure and availability to the public of all assassination records was to be made no later than October 26, 2017, 25 years after the enactment of the JFK Records Act. *Id.* The JFK Records Act also created the ARRB. *Id.* In the 1990s, the ARRB devoted resources to films and photographs relating to the assassination of President Kennedy. On information and belief, the ARRB's efforts were largely concentrated on films and photographs that the Government already had in its possession or had access to, including the Zapruder Film and autopsy photos of President Kennedy, with a lesser effort devoted to searching for other films and photographs.

99.  On information and belief, the ARRB failed to find the Nix Film.

100.  In or around 2014, Ms. Nix Jackson contacted Mr. Blakey regarding the missing Nix Film.

101.  In 2014, Mr. Blakey informed Ms. Nix Jackson for the *first* time that, at the time he worked for the HSCA in the late 1970s, the HSCA did, in fact, have possession of the original Nix

Film, and not merely a copy. Ex. 25. Prior to this, Plaintiff could not substantiate that the HSCA had possession of the original Nix Film in the late 1970s.

102. Mr. Blakey further stated that the HSCA's chain of custody index would have been provided to NARA in the late 1970s, as part of the process of closing the HSCA's investigation.

103. In light of this new information, on February 2, 2015, Gayle Nix Jackson filed a Freedom of Information Act request with NARA in connection with the Nix Film. On February 23, 2015, Dan Rooney, a NARA archivist, replied to Ms. Jackson via email, expressing, among other matters, his belief that NARA did not have the original Nix Film, only copies of it. Ex. 26.

104. On November 21, 2015, Gayle Nix Jackson brought an action in the United States District Court for the District of Columbia ("DC Action") seeking (i) the return of the Nix Film and (ii) damages for the taking of the Nix Film without just compensation. Ex. 27. Referencing the statement from Mr. Rooney, the complaint stated that "[i]n 2015, the National Archives and Records Administration stated to [Ms. Jackson] that it did not have the original Nix [F]ilm . . . ." *Id.* at ¶ 1.

105. On May 17, 2016, the Government filed a motion to dismiss the DC Action. Ex. 28. The Government based its motion in part on preemption, arguing that the JFK Records Act preempted Ms. Jackson's replevin claim because the Nix Film is an assassination record. Citing the complaint, the motion states that "NARA has told plaintiff that it does not have the [Nix] film." *Id.* at 19. Thus, the Government on May 17, 2016, affirmed by adoptive admission the statement by Mr. Rooney that NARA did not have the original Nix Film.

106. On March 31, 2017, the DC Action was dismissed without prejudice for lack of subject matter jurisdiction. The District Court held that it lacked jurisdiction over the replevin claim because not all administrative remedies had been exhausted, and that it lacked jurisdiction over the

takings claim because exclusive jurisdiction over such a claim is vested in the Court of Federal Claims under the Tucker Act, 28 U.S.C. §1491. Ex. 29.

107. The court, in granting the motion to dismiss, also stated that the "determination … regarding whether Plaintiff has been permanently deprived" of the Nix Film "will be made in October 2017, after the release of records by the NARA under the JFK [Records] Act." *Id*. at 7.

108. On October 26, 2017, NARA began releasing thousands of assassination records to the public.

109. On information and belief, the Nix Film was not among the published records.

110. The non-publication of the Nix Film on or before October 26, 2017, was at least consistent with both (i) the statement from Mr. Rooney, on behalf of NARA in response to an official Freedom of Information Act Request, about NARA not having the Nix Film, and (ii) the Government's subsequent affirmation by adoptive admission of that statement in the DC Action.

111. However, notwithstanding the provisions in the JFK Records Act regarding the deadline for publication, the Trump Administration in 2018 issued a Presidential Memorandum directing that certain unidentified items of evidence maintained under the JFK Records Act would remain held by the Government in confidence.

112. Accordingly, the non-publication of the Nix Film on or before October 26, 2017, was not conclusive as to whether the Government had possession of the Nix Film.

**The Aerospace Corporation Reveals the Transfer of the Nix Film to NARA**

113. After the dismissal of the DC Action, Plaintiff and Gayle Nix Jackson continued their search for the Nix Film.

114. In January 2021, Plaintiff and Gayle Nix Jackson engaged Other Counsel to assist with the search. Other Counsel for Plaintiff began retracing the path of the Nix Film.

115. Other Counsel for Plaintiff contacted a number of people who were previously involved, directly or indirectly, in the search for, or handling of, the Nix Film, including the ARRB researchers who headed up the ARRB's search for the Nix Film (including, on February 8, 2021, Dr. David Montague, a senior investigator with the ARRB) and an attorney who represented UPI in its negotiation with the HSCA.

116. Other Counsel for Plaintiff also received, from a researcher assisting Plaintiff, copies of several HSCA "Outside Contact Reports" mentioning that Aerospace had obtained the Nix Film, along with chronologies covering the history of the Nix Film that the researcher had prepared. These "Outside Contact Reports" did not include the report mentioning that an Aerospace employee (Charles Leontis) was returning the Nix Film to Washington, D.C. *See supra* ¶ 47.[2] At the time he received the materials from the researcher, Other Counsel for Plaintiff was unable to reconcile statements in these Outside Contact Reports regarding Aerospace apparently having possession of the Nix Film, with the statement in the HSCA's final report that the original Nix Film was scanned by *Los Alamos* with the scanned data (i.e., copies) then sent to Aerospace for enhancement by computer, *see supra* ¶ 46, so he continued to pursue his investigation using the authoritative HSCA's final report, including its statement that the Nix Film was scanned by, and thus also possessed by, Los Alamos. Also at this time, Other Counsel for Plaintiff had no reason to believe that the Nix Film had not been returned by the HSCA to UPI, so Other Counsel for Plaintiff focused his search entirely on the post-UPI universe.

117. Other Counsel for Plaintiff further contacted American Broadcasting Corporation ("ABC") and the Associated Press ("AP"), both of which had purchased interests in UPI's affiliate

---

[2] Rather, this particular Outside Contact Report was obtained by Other Counsel for Plaintiff from NARA on a later date, October 26, 2021, after Other Counsel for Plaintiff submitted an emergency preservation search request to NARA. *See infra* ¶¶ 126-131.

company and could potentially have received the original Nix Film. Both ABC and the AP confirmed that they did not have the original Nix Film.

118. In or around April 2021, Other Counsel for Plaintiff discovered, in one of the chronologies of the Nix Film that he had received from the researcher, a reference to a paper titled "Restoration and Analysis of Amateur Movies from the Kennedy Assassination," authored by members of the team at Los Alamos that had copied the Zapruder Film on behalf of the HSCA, for presentation at, and publication in, the proceedings of the St. Louis 1980 ACSM-ASP Convention (March 9-14, 1980). Ex. 45. In this paper, the Los Alamos team members stated that the scanning of the Nix Film was done by *Aerospace*, and that the data tapes (containing the digitized results) were sent to Los Alamos, which is the exact *opposite* of what is stated in the HSCA's final report. It thus appeared from this paper that Aerospace had obtained the *original* Nix Film, and not Los Alamos. Later on in 2021, Other Counsel for Plaintiff tracked down and spoke on two occasions with Dr. Donald Janney, the lead author of this paper, who confirmed to him that Los Alamos had not obtained the Nix Film. By the end of April 2021, however, Plaintiff still did not have sufficiently substantial reason to believe that the Nix Film had not been returned by the HSCA to UPI.

119. Other Counsel for Plaintiff next contacted former UPI employees (including the head of a UPI alumni group and a former general manager of UPI Newspictures) regarding the Nix Film. These conversations confirmed that UPI had sent the original Nix Film to the HSCA, not a copy, but could not confirm whether UPI had received the original Nix Film back from the HSCA. With the benefit of this new information, Other Counsel for Plaintiff, turned his search to the HSCA, and then contacted Aerospace in search of further information.

120. On May 12, 2021, a representative of Aerospace contacted Other Counsel for Plaintiff, stating that Aerospace had in fact sent the Nix Film to NARA. Prior to receiving this new information, Plaintiff had understood from previous reports and statements by others that the Nix Film had been sent to either HSCA or UPI, as detailed above.

121. On or around June 17, 2021, Other Counsel for Plaintiff relayed this information to Mr. Rooney, the NARA archivist.

122. On July 14, 2021, Other Counsel for Plaintiff followed up with Mr. Rooney to request scanned copies of eight documents stored at NARA relating to Aerospace and the Nix Film. This request included the relevant box numbers, file numbers, and record numbers in order to facilitate retrieval.

123. On information and belief, these documents could only be obtained (i) by a NARA archivist; (ii) by an independent researcher, if approved by NARA; or (iii) by filing a Freedom of Information Act request. At that time, NARA was closed to the public due to the COVID-19 pandemic, so option (ii) was not available.

124. Other Counsel for Plaintiff also explained to Mr. Rooney that unless the Nix Film is found and properly preserved, the film would continue to degrade.

125. By the start of August 2021, NARA had not provided Other Counsel for Plaintiff with any of the eight documents requested.

126. On August 30, 2021, Other Counsel for Plaintiff contacted NARA to request an emergency preservation search of a set of documents relating to the Nix Film. This request also included the relevant box numbers, file numbers, and record numbers. Accompanying this August 30, 2021, request was a letter written by Dr. Kenneth R. Castleman, a nationally recognized expert in image processing and analysis. In this letter, Dr. Castleman expressed his professional opinion

that the Nix Film, a 58-year old film likely subjected to stresses during the 1978 analyses and likely not stored properly since then, may be at or nearing the end of its lifespan, and that aspects of the content of the Nix Film may soon be lost forever, absent emergency preservation measures. Ex. 30.

127. Other Counsel for Plaintiff also noted to NARA that a limited number of individuals who dealt with the Nix Film in 1978 are still alive and might be able to assist in the search for the Nix Film, but that the window to contact these individuals and receive their assistance might soon close forever.

128. On October 5, 2021, NARA denied the requested emergency preservation search. Ex. 31.

129. On October 8, 2021, NARA provided Other Counsel for Plaintiff with two of his requested documents.

130. On October 26, 2021, as part of an accommodation, NARA provided Other Counsel for Plaintiff with 19 more documents. Thus, after more than three months, Plaintiff received a total of 21 documents from NARA.

131. One of these 21 documents was the HSCA "Outside Contact Report" reflecting that in 1978, Aerospace had possession of the original Nix Film and that one of its employees (Charles Leontis) who was not a HSCA staff member was returning it to Washington, D.C., in violation of the agreement between UPI and the HSCA. *See supra* ¶¶ 47-48.

132. Another of the 21 documents was the HSCA's photo control log, which NARA had failed to turn over to Gayle Nix Jackson in 2015, indicating that HSCA staff had taken the Nix Film to Aerospace, without any record that the film had been returned to the HSCA or UPI. *See supra* ¶¶ 58-68.

133. Other Counsel for Plaintiff's discovery of these two documents, together with the information received from Aerospace, reflected for the first time to Plaintiff that, on information and belief, *NARA*, and not the HSCA, had taken possession of the Nix Film upon its return from *Aerospace* in 1978.

134. Other Counsel for Plaintiff, in the course of his research, also came across two documents in the records of the ARRB (on information and belief, first made publicly available on or after October 26, 2017) reflecting that Dr. Montague, the senior investigator with the ARRB with whom Other Counsel for Plaintiff had first spoken on February 8, 2021 (and with whom he again spoke on December 30, 2021), had: (i) written to Aerospace on November 6, 1995, to request copies of its records pertaining to the Nix Film, Ex. 46; and (ii) on information and belief, called Aerospace on April 1, 1996, after the ARRB had not received a reply from Aerospace in response to his request from November 6, 1995. On information and belief, Aerospace did not send any records to the ARRB in response to Dr. Montague's inquiries.

135. On information and belief, NARA continues to possess the Nix Film.

136. On November 29, 2021, Other Counsel for Plaintiff reiterated the need for an emergency preservation search for the Nix Film in a request to the Chief Archivist of the United States, David Ferriero. On December 15, 2021, Other Counsel for Plaintiff received a reply from William Bosanko, NARA's Chief Operating Officer, denying the request. Other Counsel for Plaintiff contested the denial but did not receive a reply. On information and belief, NARA has not provided Plaintiff with the additional information requested.

### Certain Features of Interest in the Nix Film

137. There are several aspects of the Nix Film that make it unique, irreplaceable, and extraordinarily valuable.

138. By way of example, the Nix Film is the only film showing the grassy knoll in full, and in a clear and unobstructed manner, in the moments surrounding the assassination of President Kennedy. By comparison, the Zapruder Film shows only a tiny part of the grassy knoll, and this appears in the Zapruder Film only after the fatal shot to President Kennedy. On November 22, 1963, Mr. Zapruder stated to the Secret Service that "the position of the assassin was behind" him, a position that only the Nix Film captures within the moments of the assassination of President Kennedy. Ex. 32.

139. Aerospace and Los Alamos, on behalf of the HSCA, focused on two objects in the Nix Film:

- An object by a retaining wall on the grassy knoll, and

- An object on the grassy knoll behind Abraham Zapruder (and to his right) that, as the HSCA explained, has been interpreted to be a rifleman in the classic prone posture for aiming and firing a rifle.

140. The HSCA, in its final report, stated that the Nix Film, as enhanced, shows an object by a retaining wall on the grassy knoll "that can be construed as having a shape similar to that of a person." HSCA Appendix to Hearings - Volume VI.IV.A, p. 127, ¶ 308. The HSCA, in its final report, presented the image below to show an enhancement of this object:



*Id.*

141. The HSCA concluded that an adult person was most probably standing behind the retaining wall at the time of the assassination of President Kennedy. HSCA Appendix to Hearings - Volume VI.IV.A, p. 124, ¶ 301.

142. Plaintiff observed that the enhanced image of the object by the retaining wall appearing in the HSCA's final report, is of poor quality. Plaintiff obtained a copy of this enhanced image, in color, that was made by Aerospace in 1978 for the HSCA's trajectory panel:



Ex. 33.

143. The full frame in the Nix Film from which the image above was excerpted is presented below.



*Id.*

144. Aerospace and Los Alamos also applied an enhancement technique known as "frame-averaging" to frames from the Nix Film to increase the image quality. HSCA Appendix to Hearings - Volume VI.IV.A, p. 128, ¶ 313. The image below demonstrates the result of averaging nine frames from the Nix Film around the time of the fatal shot to President Kennedy.



Ex. 34. (annotation added).

145. In at least two instances, when a frame-averaged image based on the Nix Film was presented to HSCA staff, the left edge of the image presented above (*i.e.,* the area within the red border) was not included. For example, the left edge does not appear in a frame-averaged image that Aerospace made for the HSCA's trajectory panel:



HSCA Record No. 180-10114-10418.

146. The left edge also does not appear in a frame-averaged image that Aerospace provided in a summary report that it prepared for the HSCA, dated December 1, 1978, describing its work upon various films and photographs:



HSCA Record No. 180-10116-10384, p. 40, Figure 5-5.

Further, below are two side-by-side images demonstrating, in black and white: (i) on the left, how the HSCA, in an appendix to its final report, presented the object by the retaining wall, as enhanced; and (ii) on the right, how the object by the retaining wall (which does not appear in the two images immediately above) appears as a result of frame averaging.



HSCA Appendix to Hearings - Volume VI.IV.A, p. 127, ¶ 308; Ex. 34.

147. The second object in the Nix Film that was examined by the HSCA—which the HSCA stated was as a "controversial aspect" of the Nix Film—was an object on the grassy knoll behind Abraham Zapruder. HSCA Appendix to Hearings – Volume VI.IV.A, p. 128, ¶ 311. The HSCA explained that in the background of the grassy knoll is a region of deep shadow that is broken by patches of light, and in this region:

> [f]or a number of frames [in the Nix Film] there appears to be a brightly lit object whose shape some have interpreted to be that of a man sighting a rifle toward the Presidential limousine. The right "arm" of this object is rigidly extended outward from the "body" with the left "arm" tucked in more tightly, as if supporting a rifle stock. There is, between and above these arms, a shape that looks like a "head." That object has been interpreted to be a rifleman in the classic military posture for firing a rifle.

*Id.*



Ex. 35 (annotation added).

148. Los Alamos, in 1978, after examining this object, could not conclude whether this object was a gunman. HSCA Record No. 180-10116-10267.

149. On information and belief, the Nix Film has a third feature that was not examined by the HSCA's photo contractors in 1978. The Nix Film shows the area around a picket fence on the grassy knoll that the HSCA's acoustic experts identified as the location from which there was a high probability that a second gunman fired at President Kennedy. The Nix Film is the only film in existence to show this area.

150. The HSCA determined that scientific acoustic evidence established a high probability that two gunmen fired at President Kennedy, with one gunshot having been fired from the grassy knoll. The HSCA's acoustics experts concluded that there was a high probability that a gunshot was fired from a location behind this picket fence on the grassy knoll (see annotated image below).



Ex. 36.

151. However, on information and belief, the HSCA missed its opportunity to have this crucial area examined in the Nix Film, in order to finally confirm or reject the results obtained by its acoustics experts. This was, on information and belief, due to the following considerations: (i) the HSCA's acoustics experts reached their conclusion about a second gunman in this crucial area only very shortly before the HSCA completed its investigation (which was after frames from the original Nix Film had been examined by Aerospace and Los Alamos), and (ii) neither Aerospace nor Los Alamos had been instructed by the HSCA to examine this crucial area in the Nix Film (only the areas showing the two objects described above).

152. On information and belief, this crucial area, as it appears in the Nix Film, still remains to be analyzed.

153. On information and belief, modern-day restoration and enhancement techniques have never been applied to the Nix Film, including to determine whether a second gunman appears.

## **Importance of the Nix Film**

154. The Nix Film is regarded as the second most famous film of the assassination of President Kennedy, after the Zapruder Film.

155. The Zapruder Film has been exhaustively examined for decades. Each portion of the Zapruder Film has been scrutinized by photographic experts. Yet, based on analyses of the Zapruder Film alone, including analyses of the camera-original version, there are still critical open questions about the assassination of President Kennedy. Ex. 37 at 4 (as of 1999, the Zapruder Film had provided "no immediate answers to the various questions surrounding the death of President Kennedy.").

156. By comparison, on information and belief, the camera-original Nix Film has not been exhaustively examined (and has not been examined at all since 1978). Many Kennedy assassination researchers believe that the Nix Film can answer questions surrounding the death of President Kennedy that the Zapruder Film cannot answer, because the Nix Film shows several features that the Zapruder Film does not. For example, the Zapruder Film shows only a small part of the grassy knoll, and this small part appears only after the assassination of President Kennedy. By comparison, the Nix Film shows the grassy knoll in full in the moments surrounding the assassination of President Kennedy.

157. Further, the camera-original Zapruder Film is spliced in two areas, and on information and belief, six frames are now missing. In 1978, Los Alamos described what it observed to HSCA staff:

We found two splices in the exposed portion of the film. By measurements of the manufacturer's markings we deduced that one splice had two frames missing in the region between Frames 149 and 158. The other splice had four frames missing in the region between Frames 207 and 218. In enumerating and labeling the scanned frames we have counted the missing frames as if they were there. It was our understanding from Daly that we would then be in accord with the "standard" scheme.

The numbers of missing frames were deduced by Daly and R. C. Bagley (a LASL person) working together. The film edge was marked "Kodachrome II" and "Safety Film." Distances from the K to the S were measured, and were found to alternate between 21.2 cm and 20.2 cm in the region of undisturbed film. Assuming this alternation to be an invariant characteristic of the film, we deduced that the first splice was in a 20.2 cm region and that the second was in a 21.2 cm region. The first now actually measures 19.5 cm, or has 0.7 cm missing. The second now actually measures 19.7, or has 1.5 cm missing. If each frame is taken as 0.379 cm, these missing lengths imply 1.84 and 3.96 frames respectively. It is reasonable to round these results to 2 frames and 4 frames.

HSCA Record No. 180-10116-10373.

158. The Nix Film—and not the Zapruder Film—enabled the Warren Commission to establish the location of President Kennedy's limousine at the moment of the fatal shot to President Kennedy.

159. The HSCA designated the Nix Film as one of the most important items of original evidence that it obtained. HSCA Appendix to Hearings - Volume VI.I., p. 12, ¶ 42; Volume VI.IV.A, p. 109, ¶ 245. Moreover, the HSCA, based on the work of its acoustics experts, concluded that there was a high probability that a second gunman fired at President Kennedy from behind a picket fence on the grassy knoll (*i.e.*, that there was a high probability of a conspiracy). On information and belief, the Nix Film is the only film in existence showing this crucial area on the grassy knoll within the moments surrounding the assassination of President Kennedy. This area, as it appears in the Nix Film, still remains to be analyzed.

160. Because the Nix Film is the only film to show the grassy knoll in full during the moments surrounding the assassination of President Kennedy, the Nix Film is therefore at least as important

as the Zapruder Film, and more important in evaluating whether a second gunman fired at President Kennedy, and whether there was a conspiracy to assassinate President Kennedy.

161. Modern enhancement technologies have improved by orders of magnitude since 1978, and applying them to the Nix Film could be of significant value. For example, the following shows the extent to which modern imaging techniques can extract details from older images, in this case a photograph featuring NASA astronaut Buzz Aldrin's face taken during the Apollo 11 moon landing in 1969:



*Surprising new discovery in iconic moon landing photo of Buzz Aldrin*, Yahoo News Australia (Oct. 4, 2019), https://au.news.yahoo.com/apollo11-new-discovery-iconic-moon-landing-photo-buzz-aldrin-092453206.html.

162. Modern photo enhancement techniques were also able to recover the content of a poorly exposed photo taken of a NASA astronaut in flight:



*About the Processing*, Andy Saunders Apollo Remastered (last visited May 9, 2023), https://www.apolloremastered.com/the-image-processing.

**Value of the Nix Film**

163. An arbitration panel previously calculated a value for the Zapruder Film. As of October 26, 1992, the date of the enactment of the JFK Records Act, the Zapruder Film was then being held in courtesy storage at NARA, on behalf of an entity owned by members of the Zapruder family. On August 1, 1998, the Assassination Records Review Board directed that the Zapruder Film be transferred to the Records Collection with NARA, in accordance with the JFK Records

Act. On that same day, the Government seized the Zapruder Film. The Zapruder family sued the Government alleging a taking in violation of the Fifth Amendment, and on July 19, 1999, an arbitration panel found that the Zapruder family was owed $16 million as just compensation for the taking.

164. The Zapruder Film arbitration panel noted that there was a lack of prior sales of comparable camera-original films and photos. In response, the arbitration panel considered additional factors, including the testimony of "witnesses who were both qualified appraisers and undisputed world-class experts [in] the role of auction houses and the process of auctioning to the public famous historical items"—in deciding that the just compensation that was due for the Government's taking of the Zapruder Film was $16 million. Ex. 37.

165. The panel noted that one experienced auction house expert stated that, as of 1998-99, the Zapruder Film was worth $25,000,000 to $40,000,000, and that another expert with "experience at both Sotheby's and Christy's [sic]" corroborated the $25,000,000 valuation.

166. The panel also acknowledged that in 1998-99, "there has been a burgeoning market for auctioned items of all types, purchased by individuals of great wealth who are not necessarily professional collectors." *Id.* For example:

> The Leonardo Da Vinci Codex, purchased by William Gates for $30,000,000 is one example. World-famous works of art have also been purchased for very large amounts, well in excess of any predicted auction price. . . . One can readily envision a situation where a wealthy person would purchase the Zapruder film for $30 million or more and then donate the film to the Johnson Library in Texas, or the Kennedy Library in Boston, or indeed, the National Archives. Maintaining the purchased film in one's own possession is, therefore, not the only option; wealthy individuals with the ability to purchase such a rare item, would not be limited in the use to be made of the film.

*Id.*

167. The panel also acknowledged the "special value that attaches to historical items deemed to be 'Kennedy memorabilia.'" *Id.* The panel noted that "items associated with President Kennedy

54

and his family have been increasing in value, apparently based upon the emotional significance associated with President Kennedy." *Id.*

168. The Nix Film, given its central importance in the Warren Commission's and HSCA's investigations, as well as the potential for image enhancement using modern techniques, and given that—in contrast to the Zapruder Film—it is, on information and belief, the only remaining item of original evidence that might shed further light on whether there was a conspiracy to assassinate President Kennedy, is at least as valuable as the Zapruder Film.

169. The July 1999 valuation of $16,000,000 adjusted for inflation through the date of the filing of the original complaint in this action, May 11, 2023, was $29,733,493.40.[3]

## CAUSE OF ACTION

### COUNT I: PERMANENT TAKING OF PROPERTY WITHOUT JUST COMPENSATION

170. Plaintiff incorporates by reference as if fully set forth herein the allegations found in Paragraphs 1-169.

171. The Fifth Amendment provides that private property cannot "be taken for public use without just compensation." U.S. Const. Amend V.

172. Plaintiff possessed and continues to possess cognizable property rights in the Nix Film, and under the JFK Records Act, the Government was entitled to the lawful possession of the Nix Film as an "assassination record."

173. The Government, through the HSCA, obtained custody of the Nix Film on April 3, 1978, from Plaintiff's then-licensee, UPI.

---

[3] This adjustment was calculated according to the Consumer Price Index measure of inflation from the Bureau of Labor Statistics. *See, e.g.*, *Consumer Price Index*, U.S. Bureau of Labor Statistics (last updated at least as of May 29, 2024, https://www.bls.gov/cpi/; *Consumer Price Index, 1913-*, Federal Reserve Bank of Minneapolis (last accessed June 2, 2024), https://www.minneapolisfed.org/about-us/monetary-policy/inflation-calculator/consumer-price-index-1913-.

174. The Government, through the HSCA, intentionally obtained custody of the Nix Film by issuing a subpoena requiring submission of the Nix Film to the HSCA.

175. The Government obtained custody of the Nix Film for public use, including by using the film in the HSCA investigation of the assassination of President Kennedy, and later enacted the JFK Records Act, which required the Government to transfer the Nix Film to NARA and make it publicly and permanently available under the terms and provisions in that Act.

176. By enacting the JFK Records Act, the Government gave itself the right to permanently possess the Nix Film and to display it to the public, insofar and to the extent that the film was in the Government's possession. Further, under the Act, the Government intentionally and permanently deprived Plaintiff of possession of the Nix Film, insofar and to the extent the film was in the Government's possession. Plaintiff, however, did not and could not become aware of this denigration of its property rights until Plaintiff determined in 2021 that the Government, on information and belief, in fact possessed the film.

177. The Government has engaged in a permanent taking of Plaintiff's property.

178. The Government has failed to provide just compensation to Plaintiff for the permanent taking of the Nix Film.

179. As a direct and proximate result of the Government's taking of the Nix Film without compensation, Plaintiff has suffered monetary damages of not less than $100,000.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter an order providing the following relief:

A. Entry of judgment that Defendant United States Government took the Nix Film without just compensation having been paid to Plaintiff;

B.  Entry of judgment for compensatory damages in an amount to be determined at trial;

C.  An award of attorneys' fees; and

D.  Such other relief as this Court may find appropriate.

Dated: October 25, 2024

Respectfully submitted,

Orville Nix, Jr.

By his counsel,

FISH & RICHARDSON P.C.


*/s/ Thomas L. Halkowski*

Thomas L. Halkowski
halkowski@fr.com
FISH & RICHARDSON P.C.
1000 Maine Avenue, S.W., Suite 1000
Washington, D.C. 20024
Tel: (202) 783-5070
Fax: (202) 783-2331

Kurt L. Glitzenstein
glitzenstein@fr.com
Daniel H. Wade
wade@fr.com
FISH & RICHARDSON P.C.
One Marina Park Drive
Boston, MA 02210
Tel: (617) 542-5070
Fax: (617) 542-8906