# EXHIBIT 18

**MEMORANDUM FOR FILE**

August 27, 1998

Written By:     Doug Horne, Supervisory Analyst

Subj:     Unanswered Questions Raised by the HSCA's Analysis and Conclusions
            Regarding the Camera Identified by the Navy and the Department
            of Defense as the Camera Used at President Kennedy's Autopsy

1.     As part of its efforts to authenticate the autopsy photographs of President
Kennedy, the House Select Committee on Assassinations (HSCA) went to considerable
effort to obtain from the Navy, through the Department of Defense, the camera used to
take the official photographs at President Kennedy's autopsy, conducted at Bethesda
NNMC on November 22-23, 1963. By having a commissioned panel of photographic
experts examine the camera, and compare its physical and optical characteristics to the
official JFK autopsy photographs in the Deed-of-Gift Collection at the National Archives,
the HSCA hoped to be able to use scientific techniques to render judgments and reach
conclusions regarding the authenticity of the autopsy photographs of President Kennedy.

2.     In 1996 the author discovered an important entry in one of the supplementary
volumes accompanying the HSCA's Report---namely, footnote number 1 on page 226 of
HSCA Volume 6, to wit: "Because the Department of Defense was unable to locate the
camera and lens that were used to take these [autopsy] photographs, the [photographic]
panel was unable to engage in an analysis similar to the one undertaken with the Oswald
backyard pictures that was designed to determine whether a particular camera in issue had
been used to take the photographs that were the subject of inquiry." Initially, the facts of
this entry were not questioned by anyone on the ARRB staff, and as a result the Review
Board staff asked Bethesda NNMC to search anew for the 4" X 5" view camera
purportedly used to take the photographs at President Kennedy's autopsy. It was felt that
if "the" camera referenced in 1978, or a different (but authenticated) camera could be
found, the ARRB could commission an authenticity study of its own by asking an
independent third party to compare the empirical characteristics of any camera found with
the autopsy images in the National Archives. Ultimately, the staff at Bethesda NNMC
could find no 4" X 5" view camera, and reported this negative result to the ARRB in
writing.[1]

3.     Following the discovery of this footnote in 1996, the "autopsy camera" became an
ongoing "back-burner" issue, and the author was on the lookout for any and all documents
related to this subject during the remainder of 1996 and 1997. From time to time,
documents relating to this subject were found in various HSCA files. At one point during
1996 or 1997, the contents of footnote number 1 on page 226 of HSCA Volume 6 were

---

[1]*See* ARRB's "Compliance File" on Bethesda NNMC.

1

shared with the ARRB's Head of Research and Analysis, T. Jeremy Gunn, who seemed to exhibit an amount of interest in the subject equal to the author's. Meanwhile, the ARRB staff was pursuing potential digitization, enhancement, and informal authenticity studies of the JFK autopsy images with Eastman Kodak.[2]

4.      By late 1997, enough related documents had been located and assembled by the author to bring into serious doubt the accuracy of the HSCA's conclusion (*see* paragraph 2 above) that "...the Department of Defense was unable to locate the camera and lens...used to take...[the autopsy] photographs." If the HSCA was *incorrect* in its conclusion that the camera it examined was *not* the autopsy camera, the implications for what may have happened on November 22-23, 1963 are considerable. In paragraph 5 below, a timeline has been constructed of HSCA activities in the autopsy camera area, referencing appropriate documents assembled by the author, that will explain why a reasonable student of the assassination might conclude that the HSCA reached the wrong conclusion regarding the autopsy camera. [Appropriate documents are attached to this memo as enclosures.] Implications of the HSCA's possibly incorrect analysis of the situation are explored in paragraph 6 below.

5.      Timeline of HSCA actions and conclusions regarding the camera used to photograph President Kennedy's autopsy:

Dec 7, 1977: Robert Blakey (Chief Counsel and Director, HSCA) wrote DOD to request access to the camera used to take the autopsy pictures of President Kennedy. (*See* enclosure 1, page 3.)

**Jan 16, 1978:** Harvey J. Wilcox, Acting General Counsel for the Department of the Navy, wrote a letter to Mr. Robert T. Andrews (Senior Advisor to DOD General Counsel Deanne Siemer), **transmitting to the Department of Defense OGC both one 4" X 5" Graphic View Camera, and a crucial BUMED Memorandum of the same date from LCDR Robert E. Broach, JAGC, USN,** addressed to Department of the Navy Associate General Counsel---a memo providing critically important identifiers for the camera such as purchase date of camera body (1945) and its serial number; brand and

---

[2]Eastman Kodak, in Rochester, eventually performed a considerable amount of *pro bono* work for the ARRB with the autopsy images in November 1997, in Rochester, N.Y. An ARRB staff Meeting Report was written on these events by the author, and Kodak subsequently produced a technical report on these events that is now in the JFK Collection. Although officially, the work performed by Eastman Kodak was limited to (a) the digitization all original autopsy images; (b) the digital enhancement of selected, representative images; and (c) the visual examination of selected JFK autopsy x-rays---an unofficial goal of both the author and Mr. Gunn was to determine whether there was any evidence whatsoever of inauthenticity in the collection of official autopsy images. No such evidence was noted, either by the Eastman Kodak imaging experts involved in the project, or by the author.

focal length of lens and its serial number; **and assurance that this camera was the only one of its type in use at Bethesda NNMC in November 1963.** (Note: There is no documentary indication that the HSCA staff ever saw this Harvey Wilcox letter or its attached BUMED memo from LCDR Broach.)[3] (*See* enclosure 2.)

Jan 24, 1978: HSCA's James Wolf called Bob Andrews (of DOD OGC) concerning "the January 18 [1978] letter requesting the camera at the autopsy." (Note: this implies a second HSCA letter was written, but the author could not find a copy.) "Andrews stated that the camera was in his office and there would be no problem for us to obtain it from 2/10/78-2/12/78. He stated that we should send a messenger over on 2/9/78 to pick up the camera and that the messenger would have to sign a receipt for the camera." (*See* enclosure 1, page 4.)

Feb 1, 1978: HSCA's Wolf called DOD's Bob Andrews. Andrews told Wolf: "Deanne Siemer is concerned about the security of the camera." Andrews requested the [photographic] panel come to the Pentagon to examine the camera instead of having a messenger pick it up. (*See* enclosure 1, page 4.)

Feb 8, 1978: HSCA's Blakey called DOD's Bob Andrews, and expressed the need for the camera during the upcoming weekend (of February 10-12, 1978, inclusive), and "...stated it was unconscionable not to bring the camera to the panel." Blakey expressed the opinion that DOD's reluctance to relinquish the camera to the HSCA was impeding the HSCA's work. (*See* enclosure 1, page 5.)

Feb 8, 1978: DOD General Counsel Deanne Siemer wrote the HSCA's Robert Blakey a letter reiterating DOD's new position that the camera was available for inspection, but *only* within the Pentagon. (*See* enclosure 3.)

Feb 10, 1978: HSCA Chief Counsel Blakey wrote a letter of complaint to Secretary of Defense Harold Brown complaining about lack of cooperation between the DOD OGC and the HSCA staff on two major issues: requests for information, and access to the JFK autopsy camera. Specifically mentioned was Siemer's letter of February 8, to wit: "The Committee's [photographic] panel is meeting this weekend, but due to the uncooperative attitude of the General Counsel's office, the panel will be unable to inspect the camera when it convenes." (*See* enclosure 4.)

Feb 27, 1978: The HSCA Chairman, Congressman Louis Stokes, signed out a letter to Secretary of Defense Harold Brown complaining about two issues: the need to release all military personnel who were at the JFK autopsy from the formal oaths of silence

---

[3]This letter (and attached memo) was faxed from the Navy to the ARRB's Compliance Official, Mr. Ron Haron, on September 8, 1997; Mr. Haron, in turn, passed it to Jeremy Gunn on November 5, 1997, who in turn passed it to the author in Rochester, N.Y. later that day during the ongoing Eastman Kodak digitization work with the autopsy images.

imposed upon them shortly after the conclusion of the autopsy, and the need to deliver the autopsy camera to the HSCA on March 8, 1978, "for examination by the Committee's experts from March 8th through 11th." (*See* enclosure 5, page 5.)

**Mar 27, 1978:** HSCA Chief Counsel Robert Blakey signed a letter to Secretary of Defense Harold Brown that confirmed a Graphic View Camera possibly used to take the JFK autopsy photographs was indeed loaned to the HSCA on March 8, 1978, and was still in the Committee's possession. The letter goes on to say:

> **"After examining the camera and comparing its features with characteristics noted on the autopsy photographs, our photographic experts have determined that this camera, or at least the particular lens and shutter attached to it, could not have been used to take the autopsy pictures."**

The letter continues by requesting that the Navy search for records indicating whether or not the lens may have been changed subsequent to November, 1963---and also search for the film holders used at the autopsy. Blakey's letter indicates the HSCA still had possession of the camera at this point. (*See* enclosure 6.)

**April 20, 1978:** John G. Kester, Assistant to Secretary of Defense Brown for HSCA-related matters, appointed in the wake of Chairman Stokes' February 27, 1978 letter of complaint, signed out a letter to Robert Blakey on April 20, 1978 forwarding two fact sheets in response to HSCA questions. The second item, entitled "Fact Sheet on March 27, 1978 Letter," is in response to the HSCA's continued concerns regarding the autopsy camera provided for examination by DOD. This fact sheet strongly reiterates the Navy's position that the camera provided to the HSCA was indeed the camera used at the autopsy on President Kennedy. Partial quotes follow:

> **"It is presumed that the camera previously provided to the committee was the camera used at the autopsy; the camera was described in a previous Committee request as a 4" X 5" Graphic View type, and the camera provided to the Committee was the only one of that description in use at the National Naval Medical Center in 1963...although other lenses were also in use at the Medical Center during that time they have been replaced. Furthermore, no records have been located that indicate specifically which lens was used during the autopsy, nor does the Navy hold any records pertaining to the film holders used for the autopsy photographs. It is likely that those holders have been replaced due to normal wear and tear."** (*See* enclosure 7.)[4]

---

[4]Unfortunately, this document, as well as the Jan 16, 1978 Wilcox memo originally transmitting the camera to DOD OGC, were both discovered well *after* the ARRB deposition of autopsy photographer-of-record John T. Stringer, Jr. on July 16, 1996.

The HSCA published its conclusion, in Volume 6, that "...the Department of Defense was unable to locate the camera." (*See* enclosure 8.)

6.    **Unanswered questions and implications:**

   (a) Unanswered questions:

         (1) The author could find no records or working notes within the HSCA's files that recorded the basis upon which the HSCA's photographic expert panel concluded that the camera provided by DOD was *not* the camera used to create the autopsy images;

         (2) The author could find no records or working notes within the HSCA's files that indicated whether or not the camera provided for examination by DOD was ever returned to DOD by the HSCA. Although asked to search for it by the ARRB staff, neither Bethesda NNMC nor BUMED could locate the camera loaned to the HSCA in 1978. It is unknown whether it has been "surveyed (*i.e.*, officially destroyed or abandoned by the Navy)," or whether it remains in secure storage somewhere within the Pentagon, or some House of Representatives office building. The camera would have fallen into the category of what the Navy calls "controlled equipage," which means it would be highly unlikely that any individual would have been able to just "walk off with it," had it been returned to the Navy by the DOD Office of General Counsel. "Controlled equipage" items have to be signed for whenever checked out, and are reinventoried annually. On the other hand, the disposition instructions for controlled equipage and "survey" records called for retention for only 3 years.

   (b) Implications: If the Navy was correct in saying (in enclosures 2 and 6) that the camera they provided to DOD OGC *was indeed* the camera used at the autopsy, then there are two major, and contradictory, possible implications:

         (1) *Either* a benign but unknown explanation exists for why the HSCA photographic experts believed the autopsy photographs could not have been taken by the camera they examined, such as, perhaps, use during the autopsy of a different lens than the 135 mm Zeiss Jena Tessar provided by DOD to the HSCA for examination---*and all the photographs in the collection were indeed taken by John Stringer;*[5]

         (2) *Or* many or all of the official photographs of President Kennedy's autopsy now in the National Archives were taken by a photographer *different than John Stringer, and John Stringer's photographs (taken with the Navy camera provided by DOD for examination by the HSCA) were removed from the official collection prior to*

_____

[5]Supportive of this possibility is Stringer's testimony to the ARRB on page 45, line 7 of his ARRB sworn testimony of July 16, 1996 that he thought a lens of about 50 millimeters focal length would have been used with a large format view camera in shooting an autopsy.

its transmission from the U.S. Secret Service to the Kennedy family on April 26, 1965.[6] If this is the case, it could explain why many photographs that autopsy participants remember being taken are not in the official collection at the Archives.[7] Further support for more than one photographer at the President's autopsy is found in the ARRB interviews of Navy photography technicians Vincent Madonia and Saundra Spencer; in the ARRB deposition of Saundra Spencer; and in the HSCA deposition of former White House photographer and Navy Chief Robert Knudsen---all of whom recalled seeing with their own eyes, on the weekend of the assassination, 4" X 5" *color negatives* from the President's autopsy, whereas only 4" X 5" *color positive transparencies* have been in the official collection since April 1965. This possible "culling" of the collection---switching out John Stringer's photos for someone else's, or even selectively mixing two separate collections---could also explain why so many autopsy participants have stated on so many occasions that on November 22-23, 1963, they saw significant damage to the occipital region of the President's head, yet the only photographs of the back of the head in the official collection appear to show the hands of medical personnel holding flaccid scalp in place over the back of the head, or stretching what appears to be loose scalp over a "cavity" (possible area of missing bone) in the occipital region. One disturbing implication of the very real possibility that many, or all, of the photographs in the official collection are *not* those taken by John Stringer, is that in this scenario Mr. Stringer would surely be a person who has *not revealed all he has known* about the official collection of autopsy photographs in the National Archives; and indeed, there are just such hints in his two

_____

[6]White House photographer Navy Chief Petty Officer Robert L. Knudsen told his family for years that he photographed what he believed was President Kennedy's autopsy, and that it was "the hardest thing he had ever had to do in his life." Similarly, Petty Officer Floyd A. Riebe, assisting Mr. Stringer in the morgue the night of the autopsy, insists he took many photographs (although Mr. Stringer says Riebe did not). If Robert L. Knudsen did take photographs at the autopsy, and they made their way into the official collection in lieu of many (or all) of Mr. Stringer's photographs, it could explain why many normal autopsy photographic procedures were not followed (*see* Meeting Report of ARRB staff interview of former Bethesda medical photographer Earl MacDonald), and why the HSCA, in Volume 7, expressed the written opinion that many of the autopsy images are rather poor in quality: that is, Chief Knudsen was proficient in shooting official ceremonies, family photography, and portraits, but was not trained in shooting medical surgical procedures or autopsies---"macro" work.

[7]Such as photographs of the large bruise atop the apical portion of the President's right lung, described by Dr. Humes to the Warren Commission and ARRB under oath; the inside and outside of the entry wound in the bone of the posterior skull (with scalp reflected on the outside and the remnants of the brain removed from the interior of the cranium) described by Dr. Finck to the HSCA and the ARRB; photographs of probes in the body described by Dr. Karnei to the HSCA staff and the ARRB staff, and by Chief Knudsen under oath to the HSCA; and photographs of the President's body "sitting up" (*i.e.*, being propped up), remembered by both Floyd Riebe and John Stringer in their ARRB depositions.

interviews with the HSCA staff, and in his single ARRB interview and subsequent ARRB deposition.

7. Looking at this problem from another viewpoint, the HSCA report writers (presumably Blakey, Cornwell and Billings) might just as well have said, after receiving John Kester's letter of April 20, 1978, "Because the Navy *did provide* the camera used at the autopsy, through DOD, for our examination--and our experts have concluded it could *not* have been used to take the autopsy pictures--the Committee therefore concludes that the official autopsy photographs in the collection at the National Archives were taken by someone other than John Stringer, and that John Stringer's photographs were removed from the collection prior to April 26, 1965." But instead of openly pointing out, in its written report, the possibility of either conclusion being correct, the HSCA apparently assumed the photographs were Stringer's without question, and therefore concluded that the Navy and DOD must have provided the wrong camera to the Committee, in spite of the strong assurances of the Department of Defense that the Graphic View Camera provided for examination in 1978 was the only one used at Bethesda in November, 1963. Perhaps worst of all, the document that would have cast doubt on the seeming certainty of the HSCA's conclusion regarding the camera, the John Kester letter of April 20, 1978, was apparently sealed for 50 years by someone on the HSCA staff. In light of the HSCA's deposition of Robert L. Knudsen in August, 1978, in which he indicated with great certainty that he had developed color *negatives* (vice color *positive transparencies*) from the autopsy, and a *film pack* of black-and-white negatives (vice black-and-white negatives from a *duplex film holder*), and the Committee staff's subsequent decision *not to publish or even mention his testimony in its final report*, and to seal it for 50 years, one cannot wonder whether some important, high-ranking members of the HSCA staff had a strong disposition against accepting, at face value, indications that there may have been chain-of-custody or authenticity problems with key photographic evidence in the Kennedy assassination, and a predilection in favor of benign explanations for apparent discrepancies in the photographic evidence.

Horne: File 4.0.2 (JFK Medical); and 4.0.4 (Research Projects)

# HIGHLIGHT CHRONOLOGICAL SUMMARY

### Date

**8/2/77**  First written request to Defense Department asking for all information on Lee Oswald and the assassination investigation of the Naval Investigative Service.

**8/-/77**  Staff contacted people present at autopsy of the President. Persons cited the order of silence as the reason for not responding to staff inquiries.

**9/9/77**  Called Admiral Horgan's office. Admiral Horgan is Commanding Officer, National Naval Medical Center. Inquired about the procedure by which we could get the order of silence rescinded. We were referred to Captain Miller, Captain, Medical Service Corps., U. S. Navy, Director, Administrative Services.

**9/10/77**  Spoke with Captain Miller and asked that the order of silence be rescinded.

**9/16/77**  Asked Captain Miller for copy of memo written by Admiral Horgan requesting that the order of silence by rescinded.

**9/16/77**  Admiral Horgan's memo to the Chief of the Bureau of Medicine and Surgery regarding our request that the order be rescinded. Memo states "...it is suggested that the verbal order of the Surgeon General be rescinded or modified...so that any of the aforementioned members (present at the autopsy)...may provide such information as may be requested by the Committee."

**9/28/77**  We were contacted by Commander Averna regarding our request. Commander Averna requested that Mr. Blakey direct a letter formalizing our request that the order be rescinded and listing our other previous requests to Admiral George E. R. Kinnear, II, Chief of Legislative Affairs, Office of Legislative Affairs, Department of the Navy.

10/4/77    Letter sent in accordance with Commander
           Averna's request.

10/10/77   Informed Mike Andricos, Office of Legislative
           Affairs at the Defense Department would handle
           all Committee requests for information.

10/13/77   Andricos was called to ask status of our request.
           Andricos informed us he believed order would be
           able to be rescinded within the next full working
           day or so.

10/17/77   Andricos said rescision of order was delayed, but
           probably would be done within two or three days.

10/18/77   Andricos said Secretary of Navy Personnel would
           It would go to the Secretary for
           formal approval of rescission.

10/25/77   Andricos said matter is still being discussed
           at General Counsel and Public Affairs Department.
           Does not understand why order has not yet been
           rescinded.

11/2/77    Chairman Stokes wrote the Honorable W. Grayham
           Clayton, Jr., Secretary of the Navy, and detailed
           Committee attempts to rescind the order. The
           letter stated that "There would seem to be no
           reason why a request of this nature by the Select
           Committee could not be handled expeditiously by
           the Department of the Navy. I request that you
           take all necessary measures to insure that this
           order is rescinded without further delay."

11/3/77    Letter received from Deanne Siemer, General
           Counsel of Defense Department stating
           1)  Defense  Department has no documents in
               its possession relating to the autopsy since
               they were delivered to Admiral Burkley and
           2)  The order of silence will not be rescinded.

| | |
|---|---|
| 11/7/77 | Blakey called Siemer regarding Siemer's November 3 letter. Asked Siemer to resolve issue without further delay. Siemer said she would call back the next day. |
| 11/8/77 | Blakey met with Siemer at the Defense Department. Agreement reached to give Committee access to personnel. Issue on Committee use of autopsy materials left unresolved. Blakey asked for all original negatives of photographs of Dealy Plaza on November 22, 1963. |
| 11/10/77 | Blakey wrote letter confirming 11/8 meeting. |
| 11/16/77 | Blakey sent Siemer a letter requesting that staff have access to specified Navy personnel. |
| 12/6/77 | Blakey wrote to confirm oral request for photographs of James Powell. |
| 12/7/77 | Blakey wrote to request camera used to take autopsy pictures. |
| 12/6/77 | Blakey spoke with Deanne Siemer on the phone. She stated regarding the November 16 letter, it is still "in process." |
| 12/16/77 | Chairman Stokes wrote Vice Admiral Inman, Director of the National Security Agency, requesting access to information concerning the Cuban Intelligence network in the U.S. |
| 12/20/77 | Deanne Siemer wrote Blakey responding to letter of November 10 and December 6. She informed him that no photographs had been located that were taken by military intelligence in Dallas. She informed him that the Powell picture was in Mr. Powell's personal possession and not taken while he was on duty. |
| 12/21/77 | Blakey spoke with Siemer on the phone. She informed him of the contents of the letter of 12/20. |

12/27/77   Blakey wrote Deanne Siemer requesting information
           on 7 individuals.

1/19/78    Blakey wrote Deanne Siemer requesting information
           on 16 individuals.

1/20/78    James Wolf spoke to Frank Foster, Congressional
           Liaison of the National Security Agency regarding
           Chairman Stokes' letter of December 16, 1977.
           Foster said he sent our letter to Deanne Siemer
           prior to Christmas and he could not give us any
           information without her approval. He suggested
           contacting Siemer or Bob Andrews, Special Assistant
           to Siemer.

1/24/78    Wolf called Bob Andrews concerning the January 18
           letter requesting the camera at the autopsy.
           Andrews stated that the camera was in his office
           and there would be no problem for us to obtain
           it from 2/10/78 - 2/12/78. He stated that we
           should send a messenger over on 2/9/78 to pick up
           the camera and that the messenger would have to
           sign a receipt for the camera.

1/26/78    Blakey sent letter to Deanne Siemer requesting
           information on 42 individuals, documents or
           categories.

2/1/78     Wolf called Bob Andrews to see whether Item
           No. 42 in letter of January 26, 1978 could be
           available prior to 2/9/78 (Item No. 42 is a
           photograph of Lee Harvey Oswald). Andrews responded
           1) address all letters to the Secretary of Defense,
              not Deanne Siemer,
           2) Deanne Siemer is concerned about the security
              of the camera.
           He wanted the panel to come to the Pentagon
           view the camera instead of having a messenger
           pick it up.
           3) Deanne Siemer had prepared a response to
              Blakey's letter of 1/26/78. The response was
              in front of him but had not been signed. He
              stated the thrust of the response was that they

were being asked to provide too much
information. They wanted the relevance
of some people requested to our investigation
and other people were not sufficiently
identified. He also wanted to know if this
information was already included in the
Warren report and if we had access to such
information. Wolf told them we had access
to Warren Commission information but needed
Department of Defense files directly both
to evaluate the performance of the Warren
Commission and to pursue our individual
investigation. He reiterated that there were
problems with our request letter. He also
stated that Department of Defense had prepared
the information for the Warren Commission in
a rush, and that maybe some information not
sent to the Warren Commission could now be
located.

2/7/78    Blakey's secretary requested appointment for Blakey
to see Deanne Siemer on Tuesday or Thursday of
this week. Stated it is urgent he see her this
week. Siemer's secretary called back to state
could not see him this week but could see him next
Tuesday, February 14. Blakey's secretary confirmed
this appointment.

2/8/78    Blakey called Bob Andrews. Expressed need for
camera this weekend and stated it was unconscionable
not to bring the camera to the panel. Andrews states
that Siemer thinks this is a "grand issue". He will
take it up again. Blakey told him they are impeding
our work. Also informed him that the Church Committee
did not have any problems with Department of Defense.
Blakey said no reason why we are having all these
problems.



**DEPARTMENT OF THE NAVY**
OFFICE OF THE GENERAL COUNSEL
WASHINGTON, D.C. 20360

January 16, 1978

MEMORANDUM FOR MR. ROBERT T. ANDREWS, SENIOR ADVISOR TO
THE GENERAL COUNSEL, DEPARTMENT OF DEFENSE

Subj:　House Select Committee on Assassinations

Ref:　(a) Select Committee on Assassinations ltr dtd
　　　　7 Dec 1977 to General Counsel, DOD

Encl:　(1) BuMed Memo dtd 16 Jan 1978 to Associate General
　　　　Counsel, Department of the Navy

As requested by the Select Committee on Assassinations
in reference (a), I am transmitting herewith one 4 x 5
Graphic View camera believed to be that used during the
autopsy of President John F. Kennedy at the National Naval
Medical Center.

Enclosure (1) identifies the camera in more detail and
provides instructions for its return to the Bureau of
Medicine and Surgery when the Committee has completed its
examination.

HARVEY J. WILCOX
Acting General Counsel

Copy to:
LCDR R. Broach, BuMed

Enclosure 2

MEMORANDUM FOR ASSOCIATE GENERAL COUNSEL, DEPARTMENT NAVY

Subj: House Select Committee on Assassinations

1. Transmitted herewith is one Graphic View camera 4 x 5 format, serial number 6, with one standard Zeiss Jena Tessar 135 mm lens, serial number 922...

2. This camera and lens appear to meet the description the camera and lens requested by the House Select Committee on Assassinations as the camera and lens used during the autopsy on President John F. Kennedy at National Naval Medical Center on 22-23 November 1963. This camera and lens were purchased by the U.S. Navy in 1945, and the camera was the only Graphic View camera of this type in use at the National Naval Medical Center in November 1963.

3. When the House Select Committee on Assassinations has completed its use of this camera and lens, it is requested that they be returned to the Bureau of Medicine and Surgery (Attn: LCDR R. E. BROACH, telephone 254-4388).

Very respectfully,

ROBERT E. BROACH
Lieutenant Commander, JAGC, USN
Special Assistant to the Surgeon
General for Medico-Legal Affairs



February 8, 1978

G. Robert Blakey, Esq.
Chief Counsel and Director
Select Committee on Assassinations
U.S. House of Representatives
3331 House Office Building, Annex 2
Washington, D.C. 20515

Dear Mr. Blakey:

We have received your very extensive request dated January 26, 1978. With respect to this and any future requests, we believe it is appropriate that you include in your transmittal letter an affirmation that you have a reasonable basis for believing that the information requested is necessary for the conduct of the Committee's current investigation. I would appreciate receiving that confirmation before I request any of our components to begin the very substantial amount of work this request will entail.

We will make available the camera you have requested and will supply whatever you need, within reason, by way of quarters or facilities in the Pentagon in which to inspect or test it.

If we can be of further assistance, please let us know.

Sincerely,

Deanne C. Siemer

LOUIS STOKES, OHIO, CHAIRMAN

RICHARDSON PREYER, N.C.          SAMUEL L. DEVINE, OHIO
WALTER E. FAUNTROY, D.C.         STEWART B. MC KINNEY, CONN.
YVONNE BRATHWAITE BURKE, CALIF.  CHARLES THONE, NEBR.
CHRISTOPHER J. DODD, CONN.       HAROLD S. SAWYER, MICH.
HAROLD E. FORD, TENN.
FLOYD J. FITHIAN, IND.
ROBERT W. EDGAR, PA.

(202) 225-4624

**Select Committee on Assassinations**

**U.S. House of Representatives**    FEB 13   9 45 AM '76

3331 HOUSE OFFICE BUILDING, ANNEX 2    OFFICE OF THE
WASHINGTON, D.C. 20515                 SECRETARY OF DEFENSE

February 10, 1978

The Honorable Harold Brown
Secretary of Defense
The Pentagon
Room 3E880
Washington, D.C. 20301

Dear Mr. Secretary:

Regrettably, I have enclosed two letters
received from your General Counsel's office this
afternoon, which illustrate the necessity for my
letter to you of this morning. I have discussed the
enclosed two letters with the Chairman, and he asked
me to express his opinion that it is unreasonable for
a congressional committee to have to affirm in a letter
that there is a reasonable basis for believing the
information we request is necessary for the conduct of
the Committee's investigation. I would think it reasonable
to assume that a formal request from a congressional
committee for information in the Defense Department would
concern information that the Committee needed. Furthermore,
given the extensive delays that have already occurred in
the processing of our requests for information, I believe
it unconscionable that your General Counsel were to request
confirmation that we have a need for this information
before the Department of Defense would even begin the
processing of our requests.

Your General Counsel's office, by the letter
dated February 9, 1978, informed this Committee that the
camera we had requested to inspect would only be available
for inspection within the Pentagon. This information is
directly contrary to what we were verbally informed by
Mr. Bob Andrews of the General Counsel's office when the

2650

Enclosure 4

camera was first located.  Mr. Andrews knew that this
Committee had assembled a panel of approximately 20
consultants who were convening on the weekend of February
10-12 to view the photographic evidence relative to the
assassination of President Kennedy.  The camera in the
possession of the Defense Department is needed to authenticate
some of the photographs that were taken.  On January 24,
1978, Mr. Andrews was informed of this fact and assured us
that there was no problem to have this camera delivered to
the Committee's offices for the weekend of February 10 - 12.
Subsequently, he did inform us by telephone that your
General Counsel did not want the camera removed from the
premises of the Pentagon.  I informed him that I thought
this was an unreasonable imposition and hindrance to the
effective work of the Committee.  The Committee's panel
is meeting this weekend, but due to the uncooperative
attitude of the General Counsel's office, the panel will
be unable to inspect the camera when it convenes.

        As I stated to you in my letter this morning,
time is of the essence for our Committee's investigation.
I trust you will take note of the enclosed two letters as
an illustration of the unfortunate relationship this
Committee and your General Counsel's office has had in the
past.  I do look forward with every expectation to a good
working relationship with you and your personal representatives
in the future.

                            Sincerely,

                            G. Robert Blakey
                            Chief Counsel and Director

GRB:jwc
cc:  Ms. Deanne C. Siemer

LOUIS STOKES, OHIO, CHAIRMAN

RICHARDSON PREYER, N.C.          SAMUEL L. DEVINE, OHIO
WALTER E. FAUNTROY, D.C.         STEWART B. MC KINNEY, CONN.
YVONNE BRATHWAITE BURKE, CALIF.  CHARLES THONE, NEBR.
CHRISTOPHER J. DODD, CONN.       HAROLD S. SAWYER, MICH.
HAROLD E. FORD, TENN.
FLOYD J. FITHIAN, IND.
ROBERT W. EDGAR, PA.

(202) 225-4624

Feb 27  8 ...

**Select Committee on Assassinations**

**U.S. House of Representatives**

3331 HOUSE OFFICE BUILDING, ANNEX 2
WASHINGTON, D.C. 20515

.FEB 2 7 1978

HAND DELIVER

The Honorable Harold Brown
Secretary of Defense
Washington, D.C. 20301

Attention:  Mr. John G. Kester
            Special Assistant to the Secretary

Dear Mr. Secretary:

In connection with our investigation into the
assassination of President John F. Kennedy, the Select
Committee requests that you issue an order releasing
all military personnel who were present at the autopsy
of the President from the order of silence which was
placed upon them.  In addition, the Committee requests
delivery on March 8, 1978 of the camera used to take the
photographs at the autopsy.  As Mr. Blakey, the Committee's
Chief Counsel, indicated in his letter to you of February 10,
1978, the recission of the order was a priority request of
the Committee.  As is explained in the text of this letter,
the Committee has set March 10th as the date by which the
order should be rescinded.

The Committee is mandated by H. Res. 222 to
conduct "a full and complete investigation and study"
of the circumstances surrounding the assassination of
President Kennedy.  Obviously, an inquiry into the autopsy
performed on the President is necessary to fulfill the
Committee's mandate.

As was detailed in Mr. Blakey's letter, the order
of silence has been cited by military personnel contacted
by our staff as the basis for their refusal to provide
information pertinent to our inquiry into the circumstances
surrounding the autopsy.  Illustrative of the issues on

3309

The Honorable Harold Brown

which these individuals may have information are the
autopsy preparation, supervision and direction of personnel,
quality of photograph and X-ray techniques, disposition of
films, wound descriptions, exploration of and observations
regarding the origin, number and paths of bullets, and detailed
descriptions of the autopsy itself.

The order of silence has affirmatively hindered
our ability to investigate these issues; its continuance
will frustrate a duly authorized congressional investigation.
Furthermore, the order will needlessly intensify the doubts
which the public feels about the performance of military
personnel during the autopsy and will further call into
question the significance of any autopsy findings. As I am
sure you can understand, the autopsy findings are a crucial
element in our investigation into President Kennedy's assassina-
tion.

To place our priority request that this order be
rescinded in proper context, I remind you that this Committee
has attempted since September to get the order rescinded.
On September 16, 1977, in response to one of our requests
to get the order rescinded, Admiral Horgan wrote a memorandum
th the Chief of the Bureau of Medicine and Surgery suggesting
that the verbal order be rescinded or modified. A copy of
this memorandum was enclosed with Mr. Blakey's February 10th
letter. We also wrote the Chief of Legislative Affairs for
the Department of the Navy on October 4 and requested the order
be rescinded.

Due to the failure of the Department of Defense
to take action to rescind the order, I personally wrote
the Secretary of the Navy, the Honorable W. Grayham Claytor,
Jr. on November 2, 1977. I expressed dismay over the inexcusable
delay in the Department of Defense to cooperate with the
Committee's request that the order be rescinded, and I requested
that the Secretary take "all the necessary measures to insure
that the order is rescinded without further delay." On
November 3, the Committee received a letter from your General
Counsel, Dienne Siemer, which stated that the order would not

The Honorable Harold Brown

be rescinded.  Subsequent discussions with Ms. Siemer con-
cerning the rescission of the order proved fruitless, and
our Chief Counsel wrote you on February 10 stating the
rescission of the order was a priority request.  I write this
final letter requesting that the order be immediately
rescinded only as an accommodation to the anticipated
new spirit of cooperation reflected in Mr. Blakey's
letter of February 10th.  The failure of the Department of
Defense to respond to our prior requests is frankly unconscionable

The following are the individuals who were present
at the autopsy and subject to the order of silence that we
request be released from the order:

1.  Major Samuel Bird (USA)
    8230 Brookhollow Street
    Wichita, Kansas 67206

2.  Dr. J. Thornton Boswell (USN)
    National Orthopaedic Hospital
    2455 Army Navy Drive
    Arlington, Virginia

3.  Mr. Chester Boyers (804 357-5582) (USN)
    Rte. 1, Box 447
    Smithfield, Virginia 23430

4.  Mrs. Elsie B. Clossen (GS-9)
    -as of 12/27/65:
    7310 Mill Rain Drive
    Derwood, Maryland 20752

5.  Mr. Gregory H. Cross (USN)
    Chief of Surgery
    Portsmouth Naval Hospital
    (804 488-9590;
    (o) 804 397-6541, ext. 735)

6.  Mr. Jerrol F. Custer (412 493-4031) (USN)
    Monitor Hospital
    Saltsberg, Pennsylvania

7. Dr. John H. Ebersole (USN)
   1440 Hunsicked Road
   Lancaster, Pennsylvania 17601

8. Dr. James Joseph Humes (USN)
   1336 Lochmoor Boulevard
   Grosse Point, Michigan 48236

9. Mr. James Curtis Jenkins (USN)
   210 Flag Chapel Drive
   Jackson, Mississippi 39209

10. Dr. Robert F. Karnei, Jr. (USN)
    1605 Arbor View Road
    Wheaton, Maryland 20902

11. Mr. Richard A. Lipsey (USA)
    12985 Highland Road
    P. O. Box 2506
    Baton Rouge, Louisiana

12. Mr. James E. Metzler (215 323-5264)(USN)
    1325 So. Street
    Pottstown, Pennsylvania 19464

13. Mr. Paul K. O'Connor (USN)
    Shady Nook Trailer Park
    Gainesville, Florida

14. Mr. Edward F. Reed, Jr. (215 ES9-4140)(USN)
    54 Blake Avenue
    Rockledge, Pennsylvania 19111

15. Mr. Floyd Albert Riebe (918 247-6616)(USN)
    P. O. Box 185
    Kellyville, Oklahoma 74104

16. Mr. Robert W. Rittmeyer (USN)
    427 Seminary Avenue
    Woodstock, Illinois 60801

17. Ms. Jan Gail Rudnicki    (h)   301 933-6743 (USN)
    312 Jennings Road        (o)   301 587-5633
    Kensington, Maryland

18. Mr. Harold A. Rydberg (USN)
    202 Lorain Street
    Chapel Hill, North Carolina
    Note:   Medical illustrator
            for the autopsy.  He was
            not present at autopsy, but
            was placed under the same
            order.

19. Mr. John T. Stringer, Jr.
    23 Dolphin Drive
    Vero Beach, Florida 32960

On March 10, 1978, we are beginning an important weekend meeting of our medical consultants in Washington, D.C. to discuss the Committee's inquiry into the autopsy. The people involved in the autopsy project are completing their investigative plans and strategy at that time, and I request that the order be rescinded prior to that date in sufficient time so that an effort can be made to interview the military personnel before then.

Further, this Committee has formally requested that it be given delivery of the camera used to take the autopsy photographs. The prior requests concerning this issue are referred to in Mr. Blakey's second letter of February 10th to you. It is requested that the camera be delivered to the Committee for examination by the Committee's experts from March 8th through 11th. If security of the camera is of concern to your staff, you may have it delivered by your staff and have them stationed outside the rooms where the examination will be conducted. I believe the latter procedures

The Honorable Harold Brown

- 6 -

are unnecessary from your standpoint, as the Committee is extraordinarily conscious of security concerns. Nevertheless, the Committee would be glad to accommodate you in this fashion.

Frankly, I am sure you will understand the depth of the Committee's frustration in the long delay associated with these requests and recognize that if the order is not rescinded by March 10, 1978, and the camera not delivered on March 8, 1978, the Committee will be reluctantly forced to pursue other processes in an effort to obtain this information to fulfill its legislative mandate. I know you share my desire that it not be necessary that this latter alternative be taken.

Sincerely,

Louis Stokes,
Chairman

LS:jwc

LOUIS STOKES, OHIO, CHAIRMAN

RICHARDSON PREYER, N.C.          SAMUEL L. DEVINE, OHIO
WALTER E. FAUNTROY, D.C.         JOHN B. ANDERSON, ILL.
YVONNE BRATHWAITE BURKE, CALIF.  STEWART B. McKINNEY, CONN.
CHRISTOPHER J. DODD, CONN.       CHARLES THONE, NEBR.
HAROLD E. FORD, TENN.
FLOYD J. FITHIAN, IND.
ROBERT W. EDGAR, PA.

(202) 225-4624

**Select Committee on Assassinations**

**U.S. House of Representatives**

3342 HOUSE OFFICE BUILDING, ANNEX 2

WASHINGTON, D.C. 20515

MAR 27 1978

The Honorable Harold Brown
Secretary of Defense
Washington, D.C. 20301

Attention:  Mr. John G. Kester
            Special Assistant to the Secretary

Dear Mr. Secretary:

    In connection with the investigation by this Committee into
the death of President John F. Kennedy, this will confirm a
telephone conversation between Donald A. Purdy, Staff Counsel,
and Judy Miller, DOD staff liaison, March 16, 1978 concerning a
Graphic View camera possibly used to take autopsy photographs
of President Kennedy in November 1963.  This camera was loaned
to us on March 8 and is still in the Committee's possession.

    After examining the camera and comparing its features with
characteristics noted on the autopsy photographs, our photographic
experts have determined that this camera, or at least the
particular lens and shutter attached to it, could not have been
used to take the autopsy pictures.  We have requested additional
information from your records in an attempt to locate another
camera that might have been used and to determine if the lens
could have been changed subsequent to November 1963.  Also, if
the film holders used in the autopsy photographs have been
retained by the Navy, we would like to obtain them for examination.

    We originally planned to complete our work and return the
camera and equipment on March 12.  However, in light of our
request for additional information, we would like to retain the
camera in our secure facilities in case further examination is
necessary.

    Your cooperation in this matter is greatly appreciated.

                            Sincerely,

                            G. Robert Blakey

GRB:mgm                     G. Robert Blakey
cc:  Judy Miller            Chief Counsel and Director

Enclosure 6



**OFFICE OF THE SECRETARY OF DEFENSE**
WASHINGTON. D.C. . 20301

April 20, 1978          007348

G. Robert Blakey, Esq.
Chief Counsel and Director
Select Committee on Assassinations
House of Representatives
Washington, D.C.  20515

Dear Bob:

Attached are two fact sheets in reply to your letters
of March 13, 1978, and March 27, 1978, concerning informa-
tion on John David Hurt and the Navy camera used during
the autopsy of President Kennedy.

As your office has previously been informed, all the
information requested in fourteen letters sent by you
between December 27, 1977 and April 7, 1978 has been made
available for review at this Department--with the exception
of a few items where further information has been requested
to permit completion of the search.

Sincerely,

John G. Kester

Attachments

assigned to the places he mentions at the times he mentions.
Neither of these avenues of inquiry, however, would turn
up any new evidence on Mr. Hurt.

Fact Sheet on John David Hurt Request


In a letter dated March 13, 1978, the Defense Department was requested to provide any documents it has on a Mr. John David Hurt of Raleigh, North Carolina. Subsequently the House Select Committee staff informed the Department that Mr. Hurt was a member of the Army Counterintelligence Corps during World War II.

The computerized index to the files in the National Personnel Records Center indicates that a John David Hurt, SSN 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, born May 12, 1909, River Bend, Colorado, enlisted in the Army on November 5, 1942, and was discharged on December 28, 1945. His Army Service number was 14180986. The personnel file on Mr. Hurt, to which this index entry pertained, was destroyed in the July 1973 fire at the Center that destroyed 16.5 million files on Army personnel who served before 1960. The Defense Department has found no other information on Mr. Hurt. If he served in Army intelligence, he would have had an intelligence dossier on him, but such a file would have been destroyed before now: files of this sort containing derogatory information on the subject of the file are destroyed after 25 years; files without derogatory information are destroyed after 15 years.

Although the Defense Department has no further information on Mr. Hurt, it may be able to aid the Committee in verifying certain facts concerning Mr. Hurt's service in the Army. If he served in Army intelligence, Mr. Hurt would have been provided a badge number. If he can remember this number, the Army could search its records of intelligence badges issued and try to verify the fact. Also, if Mr. Hurt can remember the units to which he was assigned and the places where he served, Army files could be checked to determine whether the units he mentions were assigned to the places he mentions at the times he mentions. Neither of these avenues of inquiry, however, would turn up any new evidence on Mr. Hurt.

Fact Sheet on March 27, 1978 Letter


This is in regard to the Committee's request for the Navy camera used during the autopsy of President Kennedy at the National Naval Medical Center on 22-23 November 1978. Based on information provided to Ms. Judy Miller by the Select Committee staff as to the location of Navy documentation pertaining to the autopsy camera and lens, a thorough and diligent search was conducted of the files at the National Naval Medical Center, and the Bureau of Medicine and Surgery. Unfortunately, these additional efforts have failed to reveal any records stating the identity or location of the camera and lens in question.

It is presumed that the camera previously provided to the Committee was the camera used at the autopsy; the camera was described in a previous Committee request as a 4 x 5 Graphic View type, and the camera provided to the Committee was the only one of that description in use at the National Naval Medical Center in 1963. The lens provided to the Committee is a standard lens that was in use at the Medical Center in 1963. Although other lenses were also in use at the Medical Center during that time they have been replaced. Furthermore, no records have been located that indicate specifically which lens was used during the autopsy, nor does the Navy hold any records pertaining to the film holders used for the autopsy photographs. It is likely that those holders have been replaced due to normal wear and tear.

# INVESTIGATION OF THE ASSASSINATION OF PRESIDENT JOHN F. KENNEDY

*United States. Congress. House.*
*" Selective Committee on Assassinations.*

# APPENDIX TO HEARINGS

### BEFORE THE

## SELECT COMMITTEE ON ASSASSINATIONS

#### OF THE

## U.S. HOUSE OF REPRESENTATIVES

### NINETY-FIFTH CONGRESS

#### SECOND SESSION

---

## VOLUME VI
### PHOTOGRAPHIC EVIDENCE

---

#### MARCH 1979

---

Printed for the use of the Select Committee on Assassinations



U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1979

42–370 O

For sale by the Superintendent of Documents, U.S. Government Printing Office
Washington, D.C. 20402
Stock No. 052–070–04977–4

Enclosure 8

(518)  2. Right lateral projection of a skull with the same identification symbols.

(519)  3. Left lateral projection of a skull with the same identification symbols.

(520)  4. Three radiographs of three fragments of bone unidentified by symbols.

(521)  5. An anteroposterior projection of a chest with the same identification symbols as Nos. 1–3 above. This radiograph was obtained with the thoracic cage intact, that is, before autopsy.

(522)  6. An anteroposterior projection of a chest with the same identification as No. 5 above. This radiograph was obtained after the thorax had been opened and the lungs and mediastinal contents had been removed.

### (d) Procedures

(523)  Independent of the panel's analysis, the photographs and X-rays were reviewed by the three physicians who performed the autopsy, the leader of the X-ray team that took the postmortem X-rays, and by the photographer who took the autopsy pictures. These individuals indicated that the photographs and X-rays accurately portrayed Kennedy's various wounds.(197).

(524)  The panel's board of consulting forensic anthropologists and a forensic ondontologist compared the photographs and X-rays with premortem photographs and X-rays of Kennedy. Premortem materials were studied for the purpose of discerning unique anatomic features whose presence in the postmortem photographs and X-rays would verify that the individual depicted was, in fact, Kennedy.

(525)  The photographic materials and X-rays were examined visually by the panel.[1] This review included both miscroscopic examination and viewing relevant photographs in a stereoscope, a special device that allows pairs of photographs to be viewed in three dimensions. Because stereoscopy provides an excellent means by which altered or doctored photographs can be detected,[2] primary reliance was placed upon this analytical technique.[3]

(526)  Finally, the autopsy X-rays, in addition to being reviewed by the panel, were analyzed for evidence of fakery by a radiologist who had particular expertise in the area of image enhancement.

### (e) Conclusion

(527)  1. The postmortem photographs and X-rays in the custody of the National Archives purporting to depict Kennedy do, in fact, depict him.

---

[1] Because the Department of Defense was unable to locate the camera and lens that were used to take these photographs, the panel was unable to engage in an analysis similar to the one undertaken with the Oswald backyard pictures that was designed to determine whether a particular camera in issue had been used to take the photographs that were the subject of inquiry.

[2] The principle of stereoscopy is discussed in detail in pars. 75–79. 434–36 supra.

[3] While several of the autopsy photographs and X-days were enhanced through the use of digital image processing, the resulting enhanced photographs and X-rays were used exclusively by the autopsy panel for determining the nature and cause of wounds. They were found to be unnecessary in the analysis to detect possible fakery, since the original materials, when viewed stereoscopically, were of sufficient quality to resolve this issue.