# EXHIBIT 27

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **GAYLE NIX JACKSON**<br><br>Plaintiff,<br><br>vs.<br><br>**UNITED STATES OF AMERICA, and**<br><br>**NATIONAL ARCHIVES AND RECORDS ADMINISTRATION**<br><br>Defendants. | **Civil Case No.** |

# COMPLAINT

COMES NOW Plaintiff, Gayle Nix Jackson, by and through counsel, Athan T. Tsimpedes, Esq. complains of the Defendants, the Government of the United States of America and the National Archives and Records Administration and states as follows:

# INTRODUCTION

1. This is an action for return of a historical film of the John F. Kennedy (JFK) Assassination filmed by Dallas native, Orville Nix, on November 22, 1963. The Warren Commission who viewed the original Nix film, as part of its investigation and report, believed it to be just as important as the more famous Abraham Zapruder film. Although copies were made, the US Government had the original Nix film in its possession on at least several occasions, from the time it was handed over to the FBI in December 1963; then used by the

Warren Commission for its investigation an report; and again before the House Select Committee on Assassinations, headed by G. Robert Blakey, that had last possession of it in 1978. According to the Warren Commission, the Nix film is nearly as important[1] as the Zapruder film yet the public is mainly unaware of its significance. According to Mr. Blakey, the HSCA did possess the original film but does not know what happened since that time but assumed that the chain of custody would identify who had it last and has not been returned. The HSCA was the last to acknowledge having the original Nix film in its possession, and its whereabouts unknown to this day. When the HSCA was disbanded, its files and exhibits including the original Nix film should have been stored and kept at the National Archives and Records Administration in College Park, Maryland. In 1994, the Assassination Records Review Board (hereinafter "AARB") was established by Congress to speedily identify and declassify JFK assassination records. The Abraham Zapruder film was evidence of JFK's murder pursuant to the AARB mandate[2] that was to be returned to the Zapruder family but was wrongfully withheld by the U.S. Government that paid sixteen million dollars for the taking of his the property. In 2015, the National Archives and Records Administration stated to Plaintiff that it did not have the original Nix film although it had copies with no chain of custody of the original Nix film identified anywhere.

Without the Defendants taking any accountability let alone identifying the whereabouts of the original Nix film by negligence or otherwise, the granddaughter of Orville Nix initiates

---

[1] See *Warren Commission Report, pp. 96-97, 109-110.*

[2] The original camera processed Zapruder film was turned over to the owner, Abraham Zapruder (who was deceased at this time and therefore ownership and rights went to his heirs, Zapruder family) but was withheld by the US Government which paid sixteen million dollars to the Zapruder family for the original film with no copyrights.

[3] This further identifies the original Nix film described in this complaint.
[4] Orville Nix: The Missing JFK Assassination Film", pp. 94, 96; SFM Curator's Notes, op. cit.; Warren Commission Exhibit 2109 (also CD 385, p. 22) - FBI interview by SA Joe B. Abernathy with Orville Nix on December 1, 1963. Warren Commission Hearings, Vol. 24, p. 539.

2

this action. This action seeks the return of the original Nix film that would provide an opportunity for researchers and others to examine the JFK assassination and grassy knoll area to confirm the Warren Commission or HSCA findings or alternatively that the Government pay just compensation to plaintiff for its failure to secure, protect and turn over the film.

## JURISDICTION AND VENUE

2. This Court has subject matter and personal jurisdiction over this action and Defendants pursuant to 28 U.S.C.A §1331 and 5 U.S.C. §552 (a)(4)(B) and § 702.

3. Venue in this judicial district is proper pursuant to 28 U.S.C. A. § 1391 and 5 U.S.C. 552(a)(4)(B) and § 703.

## THE PARTIES

4. Plaintiff GAYLE NIX JACKSON, is an adult individual, who at all times relevant, resided in the State of Texas and is the owner of the original film and is the granddaughter of Orville Nix who recorded the JFK assassination on film (hereinafter referred to as plaintiff's "property" or "Nix film").

5. Defendant NATIONAL ARCHIVES AND RECORDS ADMINISTRATION (NARA) is located just outside the District of Columbia in College Park, Maryland and was entrusted to preserve material reviewed by the HSCA in 1978 that was later reinforced pursuant to the AARB mandate. The NARA is an "agency" within the meaning of 5 U.S.C. 552 (f) and was in possession and/or control of the property requested by Plaintiff which is the subject of this action.

6. The United States House of Representatives Select Committee on Assassinations ("HSCA") was established in 1976 to investigate the assassinations of John F. Kennedy and Martin Luther King, Jr. The HSCA completed its investigation in 1978 and issued its final report the following year, concluding that Kennedy was probably assassinated as a result of a conspiracy that contradicted the Warren Commission Report.  The HSCA was last in possession of the original Nix film in 1978 and its whereabouts since has been a mystery.  The HSCA is an "agency" within the meaning of 5 U.S.C.  552 (f) and was in possession and/or control of the property requested by Plaintiff which is the subject of this action.

7. Defendant, the Government of the United States of America is responsible for the actions of its agents, agencies or instrumentalities including the NARA or HSCA towards the original Nix film and is therefore identified as the Defendant throughout this complaint for purposes of liability as it has deprived Plaintiff of property without due process in violation of the 5th Amendment to the Constitution of the United States of America.

**FACTUAL ALLEGATIONS**

8. Orville Orhel Nix is the grandfather of Plaintiff Gayle Nix Jackson.



9. About a week before the President was due to visit Dallas in November 1963, Orville Orhel Nix, a 52 year-old Dallas native and employee of the General Services Administration based in the Terminal Annex Building at 207 South Houston Street, Dallas, had bought a new Keystone Model K-810 Auto-Zoom 8mm home-movie camera, Serial Number 5094T, from Sage's Department Store at 3140 Irving Boulevard in Dallas for $159.99.

10. On the advice of Forrest Sorrels, a long-time golf and poker-playing friend at the Riverlakes Country Club in Dallas, who was also the agent-in-charge of the Dallas Secret Service office, Mr. Nix positioned himself at the corner of Main and Houston Streets to await the arrival of the motorcade.

11. On November 22, 1963, Mr. Nix filmed three scenes; (1) the presidential motorcade entering Dealey Plaza (2) the headshot of the president with the grassy knoll in the background and (3) the chaotic and frantic scene on Elm Street in the immediate aftermath of the shooting.

12. At the time of the shooting, Mr. Nix stood first near the northwest corner of Main and Houston streets, then moved to the south curb of Main about 20 to 30 feet west of Houston.

View of Mr. Nix



13. Mr. Nix filmed just before or after Nellie Connally said to JFK, "You can't say Dallas doesn't love you, Mr. President!" The film sequence captured the fatal shot to President Kennedy's head with the grassy knoll in the background, Jackie Kennedy climbing onto the trunk of the car and Secret Service agent Clint Hill jumping onto the moving car. A few seconds later, Mr. Nix filmed people running towards the grassy knoll area and their actions.

14. On November 23, 1963, Mr. Nix returned to Dealey Plaza and filmed the main buildings, including the Texas School Book Depository with the Hertz sign on top as well as investigators standing at a spot on the south side of Elm near where some thought a bullet may have hit.

15. On November 30, 1963, Mr. Nix and Orville Jr., attended a high school football game in Dallas, and filmed a family friend involved in half-time activities on the same roll of film that contained the JFK assassination and its aftermath.

16. On his way home, Mr. Nix dropped his film off for overnight processing at the Dynacolor photo lab believed to be at 3221 Halifax Street, near Love Field airport in Dallas, Texas.

17. In the early hours of December 1, 1963, Dynacolor contacted Mr. Nix to inform him that he had captured the assasination on film, and offering to let him see the film before it was handed over to the FBI.

18. At approximately 2:30 am on December 1, 1963, Mr. Nix and Orville, Jr., went to the Dynacolor lab where they and two Dynacolor employees viewed the film over twenty times that was shown against a large white wall.

19.     On December 1, 1963, Mr. Nix was in possession of his developed reel of Kodachrome film[3], consisting of between 50 and 60 feet of 8mm colour film on a single reel. Orville Jr. stated that they "were given a roll (of film) in a metal box that we could watch on our projector at home", a clear indication that the film was now in slit 8mm wide format.

20.     Later on December 1, 1963, on the advice of Forrest Sorrels, Mr. Nix hand-delivered his film to the office of Gordon Shanklin, head of the FBI field office in Dallas, on the twelfth floor of the Santa Fe Building at 1114 Commerce Street on his way to work. On arrival there, Mr. Nix was met and interviewed by Special Agent Joe B. Abernathy and handed over his 8mm camera-original film[4].



---

[3] This further identifies the original Nix film described in this complaint.
[4] Orville Nix: The Missing JFK Assassination Film", pp. 94, 96; SFM Curator's Notes, op. cit.; Warren Commission Exhibit 2109 (also CD 385, p. 22) - FBI interview by SA Joe B. Abernathy with Orville Nix on December 1, 1963. Warren Commission Hearings, Vol. 24, p. 539.

7

21. According to an unpublished FBI file at NARA[5], the copy of the Nix film made for the FBI by Jamieson between December 1– 4, 1963 was sent to FBI headquarters on December 5, 1963.

22. During this time, United Press International ("UPI"), Time and other media outlets were in Dallas seeking to purchase film of the assassination. UPI had approached Mary Muchmore and Orville Nix for their film.

23. While his film was in the possession of the FBI in Dallas, Mr. Nix had been in contact by phone with Life magazine and had also met with Burt Reinhardt, the General Manager of UPI's Newsfilm division, who was in Dallas at the time, regarding the possible sale of his film. Mr. Reinhardt asked Mr. Nix not to make any deals before UPI had an opportunity to see the film.

24. On December 6, 1963, Mr. Nix and his son Orville, Jr., boarded an American Airlines flight to LaGuardia Airport in New York, where they were collected by a Life representative and taken, via their hotel, to the Time-Life offices. Following multiple viewings of the film in the 34th floor boardroom, Life's General Manager Arthur W. Keylor announced that they found the film to have "nuisance value only", and offered Nix $3,000 for his film, an offer which Mr. Nix immediately rejected.

25. As Nix and his son emerged from the elevator into the lobby of the Time-Life building, they were met by Burt Reinhardt and Maurice Schonfeld of UPI, who had been waiting for them. Following a one-hour meeting and several further viewings of the film at UPI, the original film was finally sold for $5,000. to UPI. Mr. Nix requested that the film be

---

[5] NARA FBI file 89-43-271 (or 1A271), dated January 11, 1968.

returned to his family after some time and Mr. Reinhardt stated he would return it in 25 years (presumably when the copyright expired). Mr. Reinhardt agreed to the terms and the two men sealed the deal with a handshake. There was no written agreement provided to Mr. Nix. The camera-original Nix film has never again been seen by a member of the Nix family.

26. On or about December 7, 1963, UPI news published several frames of the Nix film to its subscribers, and it appeared in theaters in a black-and-white Fox Movietone newsreel about the assassination.

27. On or about December 10, 1963, Mr. Nix received a copy of his film, a money order for $5,000 and a new fedora hat from UPI as agreed with the return of the original Nix film to take place 25 years later as the only remaining part of the agreement which never materialized as more fully stated herein.

28. On January 29, 1964, Mr. Nix loaned his camera to the FBI for testing and analysis, that was later used in the May 1964 assassination re-creation studies in Dealey Plaza.

29. Needing the camera for a planned vacation, Mr. Nix requested its return but the FBI delayed in producing it. When the FBI finally returned the camera to Mr. Nix it was damaged. The timing spring was bent and could not be used again to recreate the event using the camera. Eventually the FBI bought Nix a duplicate camera and finally returned the original damaged camera in June 1964.

30. The FBI then used a copy of the Nix film to study the assassination, and the Warren Commission reproduced six frames in volume 18 of its Report[6] along with frames from the Abraham Zapruder and Marie Muchmore films of the shooting.

---

[6] Exhibit no.'s 885 and 902 of volume xviii of the Warren Commission Report

31. In 1965, researcher Jones Harris of New York reported that he found what he thought was the image of a second gunman on the grassy knoll in the Nix film. Eventually UPI arranged for computer enhancement by the Itek Corporation, which reported in 1967 that the "man" was the shadow pattern of leaves and branches on the wall of the pergola.



32. Mr. Nix also appeared in *Rush to Judgment*, a 1967 documentary produced in conjunction with Mark Lane and his book of the same name. Mr. Nix explained then that he thought the shots he heard came from the fence on the knoll, but was told that there was concrete proof that the shots came from the Texas School Book Depository and so he was satisfied with the Warren Commission conclusion.



33. Mr. Nix also appeared in a June 1967 CBS News four-part special examining the Warren report; Nix's granddaughter and Plaintiff, Gayle Nix Jackson, rode with him to Dealey Plaza for the interview (although she did not appear in it).

34. On January 17, 1972, Orville Nix died of a sudden heart attack at the age of 61.

35. In 1978, the HSCA obtained the original 8mm Nix film and enhanced certain frames. Their experts allegedly confirmed the "gunman" image noticed by Jones Harris was actually shadows on a wall, but no other new information could be found. The HSCA findings stated: "The Committee believes, on the basis of the evidence available to it, that President John F. Kennedy was probably assassinated as a result of a conspiracy."

36. In 1988, Plaintiff Gayle Nix Jackson made inquiries to UPI in an effort to have the original Nix film and copyrights returned to the Nix family as agreed.

37. Plaintiff eventually reached Burt Reinhardt, the UPI executive who made the promise and agreement with Mr. Nix to return the original film after 25 years.

38. Mr. Reinhardt, who had now become a top executive with CNN, confirmed the agreement with Mr. Nix and offered to help with the return of the original film and the copies.

39. In 1991, more than twenty-five years after the film was purchased, WTN, the successor to UPITN[7], returned all material related to the Nix family except for the original Nix film as required by the original handshake agreement witnessed by his son Orville Nix, Jr.

40. In 1992, taking advantage of publicity generated by Oliver Stone's *JFK* movie, Plaintiff, Gayle Nix Jackson, appeared on several national and local talk and magazine TV shows, such as *Geraldo!* and *Entertainment Tonight* where she pleaded for the return of the original film.

---

[7] which was the successor of UPI that had the agreement with Mr. Nix. UPTIN is identified as UPI for convenience and consistency in this complaint.

41. Also in or about 1991, Plaintiff called the Dallas FBI office to inquire whether it had any copies of her film or information about the missing original. The office located an original, first-generation 8mm print of the film and offered to let her see it. After the viewing, Plaintiff asked if she could have the film because the original cannot be found. The agent said she would check with FBI headquarters. The following morning, the agent called to say, "It's yours. Come and get it." Jackson offered to give the FBI her grandfather's only original print, although it was badly scratched and worn; nevertheless, the FBI agreed to the exchange. The 8mm-print Gayle received is now part of the Texas School Book Depository Museum's Nix Collection (hereinafter referred to as the "Museum's Nix Collection") located in Dallas, Texas.

42. On or about October 26, 1992, President Bush signed into law the John F. Kennedy Records Collection Act of 1992 ("JFK Act") that sought to preserve for historical and governmental purposes all records related to the assassination of President Kennedy. The Act created the President John F. Kennedy Assassination Records Collection Act at NARA and required the expeditious public transmission to NARA and public disclosure of all assassination records.

43. The Act defined the term "Assassination record" to include records that were "made available for use by, obtained by, or otherwise came into the possession of," but not limited to, the Warren Commission, the HSCA and NARA. The term "record" included, among other items, sound or video recordings. The Act further stated that when it "requires transmission of a record to the Archivist or public disclosure, it shall take precedence over any law (except section 6103 of the Internal Revenue Code), judicial decision construing such law, or common law doctrine that would otherwise prohibit such transmission or disclosure, with

the exception of deeds governing access to or transfer or release of gifts and donations of records to the United States Government."

44.  According to the Warren Commission, the Nix film is nearly as important as the Zapruder film yet the public is mainly unaware of its significance.

45.  Whatever happened on November 22, 1962 and those involved, is only magnified by the disappearance, destruction or concealment of the Nix film after being in the possession of the HSCA and was the last known possessor.

46.  After the HSCA headed by Robert Blakey completed its tenure, all evidence and material including the Nix film was to be accounted and stored by the NARA. An index of the chain of custody of the original Nix film should have been maintained by the NARA but it too is apparently lost, stolen or destroyed[8].

47.  According to Mr. Blakey of the HSCA, he takes full responsibility for the missing original Nix film that was in his custody and has affirmed that many times telephonically to Gayle Nix Jackson as recently as 2014.

48.  Despite its significance and duty by the Government and its agencies who last possessed it to preserve the original Nix film and to turn it over the Plaintiff, it remains missing, stolen or destroyed.

49.  The Nix's film was not the only original film of the assassination not returned to its owner. In the summer of 1999, the US Government was ordered to pay sixteen million dollars to the Zapruder family for the original film it retained and never returned[9].

---

[8] In 2015, Plaintiff's request and inquiry to the NARA for the index of the chain of custody of the original Nix film confirmed it was non-existent.
[9] http://www.nytimes.com/1999/08/04/us/zapruder-heirs-get-16-million-for-dallas-film.html

50. From 1998 to the present, Plaintiff has attempted locate the original Nix film with the last known chain of custody of the original Nix film residing with the HSCA to the detriment of the Plaintiff and confirmed in 2015.

51. The US Government through its agents, agencies or instrumentalities identified herein, were the last to possess the property of the plaintiff, namely the original Nix film and Plaintiff demands its return without further delay or in the alternative to pay just compensation for failing preserve and return the original Nix film to Plaintiff.

## FIRST COUNT
### (Replevin)

52. Plaintiff repeats and reiterates each of the allegations contained in the preceding paragraphs.

53. Plaintiff is the owner or entitled to possession of certain property, namely the original Nix film that documented the JFK Assassination on November 22, 1963.

54. That the Plaintiff's property was taken into custody and controlled by the US Government by the FBI and then was used, possessed and controlled during the Warren Commission Investigation and Report as well as the HSCA investigations in 1978. Despite Plaintiff's attempts to obtain the return of the said property, Defendants have failed to produce it claiming ignorance or negligence of its existence entitling plaintiff for a judgment for its value. The property value is near that of the Zapruder film or market value of at least Ten Million Dollars.

55. The US Government by and through its agents, agencies or instrumentalities did posses and was the last known possessor of the original Nix film and Plaintiff request's its return without further delay, or should its return not be possible that just compensation be

made by Defendant.

56. Through the gross negligence, gross negligence, omission or concealment of information and record keeping, the Defendant(s) and its agencies have placed Plaintiff's property, a valuable and historical film of the JFK Assassination, in a state of limbo and to her detriment.

## SECOND COUNT[10]
**(Taking Without Just Compensation in Violation of the 5th Amendment)**

57. Plaintiff repeats and reiterates each of the allegations contained in the preceding paragraphs.

58. Defendant through its agents and instrumentalities did possess and take on a fiduciary duty to protect and preserve the original Nix film, which it has lost or allowed to be stolen or destroyed. Such action by Defendant through its agents constituted a taking of Plaintiff's property that was used for public purposes and for which Plaintiff has not been justly compensated or have the property returned.

59. The Plaintiff is entitled to the value of the property that has not been returned nor has the chain of its custody ever been produced to properly identify anyone other than the HSCA who had last possessed it.

60. As stated herein, the Government's actions shows that it violated standards of care in preserving or protecting the original Nix film. The Government's actions also constitute a due process violation and taking of the Plaintiff's property under the Fifth Amendment to the Constitution of the United States. Should the original Nix film be found and

---

[10] Plaintiff has alleged the basis for negligence and although not be stated by a separate count is deemed to be count three by reference here, if needed, and is incorporated herein for that purpose by alleging the HSCA or NARA has acted unreasonable while owing a duty of care to preserve the Plaintiff's property and in breach of the duty of care has failed to properly account, store or preserve the said property proximately causing and did cause damages to Plaintiff. In addition, the US Government is liable for the negligent actions of its agencies stated for depriving property belonging to the Plaintiff without due process or just compensation.

15

returned the Defendant would still be liable for a partial taking for the loss of value during the time of its disappearance. The Plaintiff has been deprived of all economically viable uses of the original Nix film property as a result of the failed duties of the Defendant and/or its actions, inactions or omissions towards the property and its preservation.

61. As a result of the Defendant's taking of an interest in the Plaintiff's property, a right has accrued to the Plaintiff for recovery from the Defendant of just compensation for the interests taken from the date of taking. The taking commenced on or about 1978 when it was last confirmed to be in the possession and control of the HSCA and continues through today as the Defendants have failed to acknowledge possessing the plaintiff's property by negligence, omission or concealment.

62. The sums claimed by the Plaintiff as the just compensation for the taking of the original Nix film that was determined by the Warren Commission to be almost or nearly as important as the Zapruder film that the US Government paid 16 Million Dollars for it provides the market value of the property and therefore just compensation.

63. The Plaintiff is therefore entitled to compensation for the economic loss of the property

64. The acts, omission or failures in the duties of Defendant through its agents, as stated in this complaint were the direct and proximate cause of and were a substantial factor in causing the loss, destruction or disappearance of the original Nix film.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the enter an order and judgment against Defendants, upon each count of the Complaint as follows:

1. Directing the United State Government and those agencies involved in the original Nix

Film to produce it without further delay and/or identify and produce all documents related to the property including any chain of custody, index or its whereabouts if it cannot be found; and/or alternatively

2. For just compensation for the taking, partial or full, of Plaintiff's Property or Compensatory damages, arising from the negligence of the Defendant and its agencies for the loss of Plaintiff's property to be determined at trial but no less than TEN MILLION DOLLARS; and

   c. Award of Statutory attorneys' fees and costs; and

   d. Grant such other and further relief, as the Court may deem just and equitable.

**VERIFICATION**

I certify that the foregoing statements made by me are true and correct. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

_____
Gayle Nix Jackson

Respectfully submitted,

TSIMPEDES LAW FIRM                                              dated: November 21, 2015

By:

Athan T. Tsimpedes, Esq
Bar no. 452341
1200 New Hampshire Avenue, N.W.
Suite 725 A
Washington, D.C.  20036
202-464-9910
athan@tsimpedeslaw.com
Attorney for *Gayle Nix Jackson*