# EXHIBIT 37

 **Department of Justice**

FOR IMMEDIATE RELEASE
TUESDAY, AUGUST 3, 1999
WWW.USDOJ.GOV

CIV
(202) 514-2007
TDD (202) 514-1888

### PANEL ISSUES DECISION ON COMPENSATION FOR ZAPRUDER FILM

### DEPARTMENT OF JUSTICE STATEMENT

WASHINGTON, D.C. – An arbitration panel appointed to determine how much the government will pay for the film of President John F. Kennedy's assassination said today that the heirs of the late Abraham Zapruder will receive $16 million for the film. The decision, which is final and binding, was handed down in a two-to-one decision by the arbitration panel, chaired by the Honorable Arlin M. Adams, a former Circuit Judge on the United States Court of Appeals for the Third Circuit. The LMH Company, the former owner of the film, sought $30 million. Government experts testified that the film's value was between $784,000 and $1 million.

Arbitrator Walter Dellinger disagreed with the other two members of the panel, on the grounds that an award of $16 million was "simply too large an amount in light of the evidence in the record." Dellinger said that an award of $3 to $5 million would have been ample.

David W. Ogden, Acting Assistant Attorney General for the Civil Division, issued the following statement:

"Today's decision by the Arbitration Panel secures the original Zapruder film for the public and guarantees that it will be preserved in the National Archives, where it belongs. The resolution of these issues ensures that this evidence of one of the most tragic events in American history will be protected for scholarly and research uses."

\* \* \*

A law passed by Congress in 1992 requires that all records of President Kennedy's assassination be transferred to the National Archives so that they may be preserved and copies may be made available to the public for personal study, research, and other non-commercial purposes. Under that law, on August 1, 1998, the camera original of the film became public property when it was transferred to the JFK Records Collection at the Archives.

The Constitution requires the government to provide just compensation to the owners of private property that is taken for the public good. Under the terms of LMH Company's agreement with the government, LMH will retain ownership of the copyright of the film and control over commercial uses of the film.

99-339

## IN THE MATTER OF THE ZAPRUDER FILM

President John F. Kennedy was assassinated on November 22, 1963. A moving picture of the procession in which the President was riding at that time, including the police escort, as well as the firing on the President, was filmed by Abraham Zapruder, who was at the assassination site in Dallas on that fateful day.

The film was licensed by Mr. Zapruder to Time, Inc. (publisher of Time and Life magazines), which reproduced the pictures set forth on the film. The license fee was $150,000, to be paid in six installments of $25,000 each. After the six installments had been paid, Time, Inc. returned the film to Mr. Zapruder in exchange for a nominal consideration of $1.

Shortly after the shooting, President Johnson appointed a commission headed by Chief Justice Earl Warren (the Commission to Investigate the Assassination, also known as the Warren Commission) to investigate the matter.

Both before and after the Warren Commission completed its work, images from the Zapruder film were printed for general publication on a number of occasions by Time and Life magazines.

Abraham Zapruder died in 1970. He was survived by his spouse, Lillian, his son Henry, and his daughter Myrna. After the return of the original of the film from Time, Inc., Lillian, Henry and Myrna transferred ownership of the film to LMH Company, a Texas general

677325
07/16/99 03:16 PM

partnership. In 1978, LMH deposited the film with the National Archives & Records Administration for storage and safekeeping.

On August 1, 1988, the Assassination Research Board (ARRB) directed that the Zapruder film be transferred to the Records Collection within the National Archives & Records Administration. That same day, August 1, 1998, the Government seized the film, itself, but not the copyright for the film.

The Government's seizure of the film was pursuant to special legislation enacted by Congress and signed into law by the President. Under the Fifth Amendment to the U.S. Constitution, LMH is entitled to just compensation for the taking of the film. To determine the just compensation, the United States and LMH, which owned the film at the time the Government seized it, entered into an Arbitration Agreement, dated October 15, 1998. Under that Agreement, three arbitrators were selected to determine the amount the Government must pay as "just compensation" for its seizure of the film. The Arbitration Agreement provided that the amount determined by the Arbitrator could not be more than $30,000,000 - apparently a reflection of the fact that there is no readily apparent precedent to govern the determination of value in a situation such as this.

To ascertain the proper amount, the arbitrators received and reviewed pre-hearing briefs; examined numerous affidavits from appraisers and art auctioneers; conducted two full days of hearings at the Courthouse for the U.S. Court of Appeals for the Federal Circuit, in Washington, D.C., at which appraisers and auctioneers for both the Government and LMH testified. The Arbitrators then received and reviewed post-hearing briefs.

-2-

For over 22 years, from 1976 through 1997, the film earned $878,997 for the Zapruder family. In 1994, the estate of Lilian Zapruder Grossman reported to the Internal Revenue Service that the film "has an appraised copyright and licensing value of $512,000 based on the income generated from licensing activities." Such an appraisal was apparently a reflection of the value of the film for purposes of "licensing activities" only; there had never been any effort in the past to determine the value of the film as an historical object.

The film is one-quarter of an inch wide and six feet long. A single frame of the film is one eighth of an inch long. If projected, the film's running time would be 26 seconds. Approximately 27 percent of the film shows motorcycle mounted police officers who led President Kennedy's motorcade and approximately 73 percent of the film contains images of the limousine in which the President was riding immediately before and at the time of the shooting as well as images of the President at the time of the shooting.

Although the images on the film remain clear, the film has been broken in two places and spliced together, and one or two frames are missing from the camera original. Experts advise that the film should not be projected through a film projector.

The United States is required only to pay just compensation for the original of the film; LMH retains commercial control of the images. Any purchaser of the film could not publicly project the film or exhibit copies of its frames without infringing upon the LMH copyright. 17 U.S.C. §§ 101, 106, 109(c). When the Government seizes property pursuant to the Fifth Amendment, it must pay only for the property actually taken, not for collateral interests. *United States v. General Motors Corp.*, 323 U.S. 373, 380 (1945).

-3-

The Government does not dispute that the camera original of the Zapruder film has value as a collectible property; its experts variously attributed values of $784,000 and $1,000,000 to the film.

The LMH appraisers described the film as an "icon" and attributed value to it due to that status. They claim a value ranging from $25,000,000 to no less than $40,000,000. LMH also claims that the seizure resulted in loss of income to them of at least $10,000,000. In claiming such value the LMH appraisers and their counsel stressed that the Government had seized the film as part of the historical record surrounding the Kennedy assassination; that the LMH appraisers were also experienced auctioneers who viewed the true value of the film, whatever its appraised value, as in the range of $25,000,000 to $40,000,000; that the film is unique and known as the "Zapruder Film" and is an example of Kennedy memorabilia that has particular value in the open market because of its relationship to the late President. For these reasons, it was argued by LMH and its expert witnesses that the film's true value was in the upper range of the figure set forth in the Arbitration Agreement.

An important characteristic of the film is the nature of its content. Despite the presence of many cameras at the Presidential parade route on November 22, 1963, the Zapruder film is the most complete recording of President Kennedy's assassination. Another characteristic that emerges from a consideration of the film's history is, as explained at the hearing, that the film presently provides no immediate answers to the various questions surrounding the death of President Kennedy.

To determine what just compensation is due, we adhere to Fifth Amendment principles, which address the fair market value of what a willing buyer would pay a willing seller.

-4-

We must not base an award upon speculation. *Olson v. United States*, 292 U.S. 246, 256 (1934). Lost profits from business opportunities foreclosed by the taking or other such consequential damages are not compensable. *United States v. General Motors Corp.*, 323 U.S. 373, 379, (1945).

Appraisers for the Government argue that there exists no proven market place for the sale of camera original film. Experts for LMH ask us to judge the Zapruder film equal in value to a number of rather well-known items of personal property sold in the past.

The absence of sales of similar property leaves the arbitration panel in a position where it "cannot predict with assurance" that the prices paid in the past for arguably similar items of personal property would have been repeated but for the governmental taking. *United States v. Toronto, Hamilton & Buffalo Navigation Co.*, 338 U.S. 396, 402 (1949).

The concern regarding the lack of an established market requires courts to reject consideration of particular sales alleged to be comparable "if those sales appear questionable in light of the market as a whole." *Florida Rock Industries v. United States,* 18 F.3d 1560, 1565 (Fed. Cir. 1994). Concern regarding the lack of a market may lead a court to base its valuation upon the actual sales history of the property in question, and not upon alleged comparable sales.

Witnesses for both parties recognized that, although many historic films exist, there is little market history documenting the sale of camera original film. However, there is a variety of historically significant films: a film of the 1934 assassination of King Alexander of Yugoslavia; a film of the shooting of Lee Harvey Oswald; films of the murder of national leaders and prominent world figures, such as Anwar Sadat, Rajiv Gandhi, Yitzhak Rabin, Benigno

-5-

Aquino, and Robert F. Kennedy and films of assassination attempts made upon the lives of Adolph Hitler, Theodore Roosevelt, Huey Long, George Wallace, the Shah of Iran, Nicholae Ceausescu, Ronald Reagan and Gerald Ford. There are also films of famous events, such as the bombing of Pearl Harbor, the Wright Brothers' flight at Kitty Hawk, and the explosion of the dirigible "Hindenburg." LMH argues that none of these films would appear to reflect the historical value of the Zapruder film.

There are also film images of the "60's" that are somewhat contemporaneous with the Zapruder film: monks immolating themselves in Vietnam, a South Vietnamese officer firing a pistol into the temple of a young man, American soldiers engaged in battle, war correspondents reporting body counts as sounds of war are heard, and the image of a Vietnamese child running naked and alone to escape the effects of the dropping of Napalm upon her village. To these war images can be added images of civil rights marches, the motel balcony scene moments after the shooting of Martin Luther King, the crowds at Woodstock, and the image of a college student kneeling before another student's lifeless body at Kent State University. There are also images of Lyndon Johnson taking the oath of office aboard Air Force One with Jacqueline Kennedy at his side, the arrival of President Kennedy's coffin at Andrews Air Force Base with his brother and wife looking on, and those of the President's son, John, Jr., Saluting his father's funeral procession. However, the panel recognizes the unusual circumstances surrounding the film's depiction of the Kennedy assassination, and the experts appear to have recognized this uniqueness as well.

No appraiser has documented a sale of the camera original of any of these well-known images, although many of these films and photographs are somewhat similar in the events

677325
07-16-99 03:16 PM

they capture to the event pictured by the Zapruder film. The Government maintains that the reason for the absence of sales of these rather well-known original films is that they are valuable for their content, not as relics or icons, and that the desire for film content has been satisfied by the existence of stock footage libraries.

The Government pointed to a number of important artifacts that have not approached the figures sought by LMH: President Eisenhower's D-Day Order; $200,000; President Lincoln's "House Divided" Speech, $1,500,000; original print of Declaration of Independence, $2,100,000.

In the absence of comparable sales, courts have fashioned other approaches to a determination of just compensation. In certain instances, reliance upon the actual sales history of the very property in question has been deemed appropriate. *Publicker v. Commissioner of Internal Revenue*, 206 F.2d 250 (CA3, 1953), at 254. Courts have rejected consideration of particular sales alleged to be comparable "if those sales appear questionable in light of the market as a whole." *Florida Rock Industries v. United States*, 18 F.3d at 1565. This is the approach adopted by John Staszyn, one of the government's experts, who explained that lack of any actual comparable sales prevented him from applying the analysis at an individual item level and required that the comparison be grounded in a market-level survey.

The matter at hand proved quite difficult mainly because the subject at issue did not fit readily into any of the categories set forth above or discussed by the experts. But a few conclusions may be drawn from the record that make the task easier.

677325
07/16/99 03:16 PM

First, a careful review of the record makes clear that a substantial valuation is warranted in this case. Although the Government offered the testimony of two qualified appraisers of historical documents and artifacts, LMH offered witnesses who were both qualified appraisers _and_ undisputed world-class experts when it came to the role of auction houses and the process of auctioning to the public famous historical items. LMH, relying on the uncontroverted testimony of these individuals, made out a persuasive case that the value of the Zapruder film can be best determined by inquiring of the individuals who are in the business of conducting such auctions. Thus, for example, one experienced auction house expert stated that "the Zapruder film was worth at least $25 million and very possibly more than that . . . I think it could even be double that or triple that." (pp. 48; 64) This view was corroborated by a second witness with similar experience at both Sotheby's and Christy's, two internationally acclaimed auction houses:

> "my comparable is the Codex of Leonardo da Vinci
> and that's $30 million, and I think that we ought to
> be closer to that at $25 million than we would be at
> $20 million. Because that is my comparable, that's
> what I base my $25 million on." (p. 143)

The Government did not offer any witness with similar auction house or auctioneering experience to counter this type of testimony. In determining the fair market value of the Zapruder film, the arbitrators cannot ignore the impressive, and uncontradicted, evidence that was presented by the auction experts.

Second, in determining the value of the film we must note that it was seized by the Government and placed in the National Archives as a result of special legislation enacted by Congress and signed into law by the President. In what appears to be a most unusual act, the Government "took" the film from its private owners, concluding that its historical importance was

677325
07/16/99 03:16 PM

so significant that it should be secured under Government protection. For the Government to pass special legislation to secure the film - an act that was not duplicated in the case of the Lincoln memorabilia or copies of the Declaration of Independence or the other historical items referred to during the arbitration hearings - is significant in determining a fair valuation of the Zapruder film. This fact lends further credibility to the testimony of the auction house experts.

Third, the testimony made clear that in the last several years there has been a burgeoning market for auctioned items of all types, purchased by individuals of great wealth who are not necessarily professional collectors. The Leonardo Da Vinci Codex, purchased by William Gates for $30,000,000, is one example. World-famous works of art have also been purchased for very large amounts, well in excess of any predicted auction price. The panel is aware of market realities in the world of 1998, the year of the seizure, and that development is corroborated not only by evidence of such sales, but by the testimony of the auction house experts. One can readily envision a situation where a wealthy person would purchase the Zapruder film for $30 million or more and then donate the film to the Johnson Library in Texas, or the Kennedy Library in Boston, or, indeed, the National Archives. Maintaining the purchased film in one's own possession is, therefore, not the only option; wealthy individuals with the ability to purchase such a rare original item, would not be limited in the use to be made of the film.

Finally, the record is clear about the special value that attaches to historical items deemed to be "Kennedy memorabilia." Corroborating the testimony of the auction house experts is the fact that items associated with President Kennedy and his family have been increasing in value, apparently based upon the emotional significiance associated with President Kennedy. The

-9-

arbitration panel takes note of this well-known fact. In terms of its emotional and historical significance, the film would undoubtedly surpass previous "Kennedy memorabilia."

For all these reasons, after full and complete consideration, the panel believes that a figure of $16 million constitutes just compensation under the Fifth Amendment, and is also equitable to the Government and LMH.

Nevertheless, it is important to respond to the separate statement that maintains "that the award of $16 million is simply too large an amount in light of the evidence in the record." (p. 1, separate statement) (emphasis added).

However, as already indicated, "the evidence in the record" leads to the conclusion that $16 million is a fair if not conservative, approximation of what may be considered fair value. The separate statement contains a creative argument to justify a much lower figure; but that creative argument is not found in the record. To accept the argument would require the panel to reject critical testimony presented at the two day hearing by auction house experts concerning the value of the film. The separate statement ignores such testimony and suggests that, on the basis of circumstantial inference and the absence of certain facts in the record about comparable sales of historical film, the figure of $16 million is too high. We find no basis for such a conclusion.

The separate statement also maintains that "the seeming absence of any established (or event nascent) market for camera originals – separate and apart from the value of the copyrighted work – speaks volumes." (p.3, separate statement). Whatever the reason for the absence of a competitive market for historical films, we emphasize that, when it comes to the Zapruder film, it is the Government's seizure of the film that "speaks volumes." We know of no

-10-

other situation - nor did any of the participants in the two-day hearing – when the Government decided that it was in the public interest to assume control over an original historical film (or any other privately-owned historical memorabilia). The participants in the arbitration, including all the expert witnesses called by both sides, commented repeatedly on the unique quality of the Zapruder film, and on the fact that it was different from any other historical item previously evaluated. To attempt to reduce the value of this item by referencing the absence of a market in other film which has neither the notoriety nor indelible imprint of history on it, is to advance an argument not supported by the record. Simply stated, the Zapruder film is one of a kind. There are no comparisons, and we cannot accept any attempt to draw circumstantial inferences from the absence of a market in historical films.

Finally, the separate statement attempts to justify a lower valuation of the film by referring to "the actual prior market sale of the Zapruder film itself," and developing a computation using such a sale as a foundation. But, of course, this mathematical argument - "that the film (including copyright and licensing rights) was purchased in a market transaction for an amount equal to $780,000 in 1999 dollars" (p. 4, separate statement) - ignores the argument concerning the true historical value of the film in the marketplace at the time of the taking. Using 1963 dollars and extrapolating in order to show value in 1998 does not take into account the soaring value of the film from the time of the assassination to the time of the taking of an historical object. The consumer price index is an inadequate substitute for the testimony of experts concerning the historical value of the Zapruder film. Instead of relying upon the consumer price index, the vivid testimony of experts with extensive experience at Sotheby's and Christy's is far more relevant:

677325
07/16-99 03:16 PM

"In my opinion, the Zapruder film is a relic of very
highest quality. I think that it is an object carrying
with it a tremendous freight of historical interest and
significance. It's the narrative that captures a central
event in 20th Century American history. It is the
complete story of this great event - this tragic, but
great event, and it is a film that has developed a
unique persona itself. It has become one of the most
famous objects in the world. It is the object of
continuing study, of mystification, controversy.

I think, when I wrote my book on relics 25 years
ago, I really had no idea that 25 later the Zapruder
film would be so alive in the American psyche that it
would still be the object of so much thought and
speculation and meaning." (p 139). (Emphasis
added)

Twenty-five years ago, few if any, could predict the value of the Zapruder film as a unique

historical item of unprecedented worth. To mount an argument using variables like CPI and

"1999 dollars" is to fail to understand the historical value of the Zapruder film as it has developed

over time.

In sum, the panel reaches its decision not as an advocate determined to advance

the cause of one side or another, but as neutral arbitrators who have carefully listened to several

days of hearings, reviewed numerous exhibits filed by the experts and multiple briefs, and reached

a decision based

677325
07/16/99 03:16 PM

on the merits as found in the record of these proceedings. We are comfortable that the sum of $16 million is a fair and accurate reflection of the true value of the Zapruder film at the time of taking.[1]

Kenneth Feinberg

Arlin M. Adams

July 19, 1999

---

[1]     Paragraph VIII(A) of the Arbitration Agreement provides for interest. If the parties are unable to reach an agreement on the amount of interest, they may refer the matter of the interest calculation to the panel for resolution.

677325
07/15/99 11:18 AM

## IN THE MATTER OF THE ZAPRUDER FILM

Separate statement of Walter E. Dellinger:

In fulfilling its difficult mandate to establish the "just compensation" to be paid by the United States to LMH for the Zapruder film, the arbitration panel has conducted its inquiry in an exceedingly conscientious manner. The process agreed to by the parties was fair to both sides, the parties were very ably represented, and my colleagues were extremely careful in their analysis. I write separately, however, because I believe that the award of $16,000,000 is simply too large an amount in light of the evidence in the record.

In arriving at that conclusion, I do not in any way question that the Zapruder film represents the only complete visual account of a uniquely tragic event in American history. The vivid images captured by the Zapruder film are eminently recognizable, perhaps more so than any film footage ever captured, and so much so that anyone who reflects on President Kennedy's assassination quite likely does so instinctively from Abraham Zapruder's vantage point. Indeed, when a copy of the Zapruder film was shown to the panel at the outset of our two days of hearings, I found the dramatic images far more riveting than I had recalled or imagined.

The value of those images, however, is not at issue in this matter. The images from the film are available from a variety of sources, ranging from the three first-day, first-generation copies (of which LMH continues to own one) to subsequently produced copies readily available in video stores. Because LMH continues to own all copyrights in the Zapruder film and thereby

retains full commercial control of its visual images, moreover, a hypothetical purchaser of the camera original film could not publicly project it. Thus, the sole issue here is the value of the out-of-camera original film itself as an artifact – i.e., the one-quarter inch wide by six-feet long strip of 8mm celluloid that is the original (but by no means the only) source of the famous images – and not the value of any rights in the images captured in the film or of the thousands of copies of the film.

I also do not question that the camera original film itself has some value as a collectible historical object even entirely apart from the series of images it portrays, perhaps in much the same way that the actual camera used by Abraham Zapruder to capture the footage would also have value as an artifact. Both the camera and the film have historical significance because they are the direct and original sources of the famous images. But presumably, the value of any film lies primarily in the images it depicts, since it is only through those images that a film becomes manifested in the public eye. It is not surprising, then, that a reference to the "Zapruder film" evokes in the mind not the actual one-quarter inch by six feet strip of celluloid at issue here, but instead the sequence of memorable images. It is only the former, and not the latter, whose fair market value we are charged to assess. Simply put, we are not assessing the value of the "Zapruder film" as that term is normally understood, but only the value of one (especially significant) source of those images, the camera original.

Estimating the value of the camera original film itself is no easy task. A principal means of assessing an object's value is to analyze actual market sales of comparable items. The best

2

comparison in this case would be to other camera original strips of film that are the source of historically significant or otherwise well-known images, many examples of which are identified in the Government's submissions (pages 21-22 of the Government's pre-hearing brief) and in my colleagues' opinion (at pages 5-6).

But, as the Government emphasized in its submissions (pages 21-22 of pre-hearing brief), and as witnesses testified in the hearings (page 249 of transcript), the record does not reflect any documented sale of any other camera original strip of film. Although there may be an explanation for why some of the noteworthy camera original films identified in the Government's submissions and in my colleagues' opinion have not been sold – the camera originals in some instances, for example, may have deteriorated or been damaged – the parties have not presented evidence of a single sale of a camera original strip of film, to any buyer, at any time. The seeming absence of any established (or even nascent) market for camera originals – separate and apart from the value of the copyrighted work – speaks volumes. In my view, the absence of any known market for other camera original film strips strongly suggests that a camera original ordinarily has little independent value. So even if one were to assume, as I agree might well be the case, that the camera original of the Zapruder film has more value as a historical object than any camera original in history, one would presumably seek guidance on its value by looking to sales of the second, third, or fourth most valuable camera originals. Such sales, however, do not appear to exist.

In the absence of any evidence in the record of any sale of a camera original film, the actual prior market sale of the Zapruder film itself – which included transfer of the intellectual property rights in its images – may be the best starting point for estimating the portion of the film's value attributable to the worth of the one-quarter inch by six feet celluloid as a historical object. In 1963, Abraham Zapruder sold the film to Time, Inc., for $150,000. We do not know whether Time, Inc., attached any significant value to the strip of film as an artifact separate from the copyright and licensing rights in the film's images, but we do know that Time, Inc., thought all of those together were worth an amount equal to $780,000 in 1999 dollars. We also know that Time, Inc., transferred both the camera original film and the copyright back to the Zapruder family in 1975 for the nominal sum of $1 (Time retained a right to reproduce the images). We also know that for estate purposes, the copyright and licensing rights in the film were valued at $512,000 in 1994.

Given that the film (*including* copyright and licensing rights) was purchased in a market transaction for an amount equal to $780,000 in 1999 dollars, and that the copyright and licensing rights were valued at $512,000 in 1994, I think it is likely that the value of the camera original as a historical artifact is much closer to the $1 million suggested by the Government as a maximum value than my colleagues' assessment of $16 million, an amount that would assess the value of the strip of celluloid as a historical object as being 30 times greater than the value of the copyright and licensing rights in the film's images. The higher figure, in my view, cannot be squared with the complete absence in the record of any evidence of an ascertainable market for camera original strips of famous films.

4

My colleagues' valuation apparently is influenced in part (pages 8-9, 10-11) by the fact

that the Government took the camera original Zapruder film. It should be noted, however, that

the Government did not single out the Zapruder film for acquisition, but instead took the film

pursuant to the John F. Kennedy Assassination Records Collection Act of 1992, Pub. L. No. 102-

526, 106 Stat. 3443-3458 (Oct. 26, 1992), which calls for collection in the National Archives of

*all* records used in any official investigation of President Kennedy's assassination in order to

facilitate their orderly disclosure to the public.

My colleagues also base their conclusion on the testimony of two representatives of

prominent auction houses, each of whom testified that the camera original film could command

at least $25 million at auction: One compared the camera original strip of film to works of art by

Van Gogh, Monet, and Picasso, and the other compared it to Leonardo Da Vinci's Codex

Leicester, a collection of hundreds of sketches made by Da Vinci over a period of years that

reflect his innovative thoughts across a host of scientific disciplines. The Government, on the

other hand, produced experts in appraisal of historical objects and photographic items who

opined in their submissions that comparisons to famous paintings or to Da Vinci's Codex are

inapt because the attributes of the Codex and the paintings that give rise to their value –

including the status of their artist or creator, their aesthetic appeal, and their sales and ownership

history – have little bearing on the value of the camera original Zapruder film as a historical

artifact. They therefore focused instead on the past transactions involving the Zapruder film

5

itself and on sales of other historic objects and photographic items, reaching a conclusion that the camera original film is worth no more than $1 million as a historical object.

I do agree with my colleagues, however, that the association of the Zapruder film with the Kennedy family enhances its value, and that the general trend in the market to place increasingly higher values on historical objects at auction would have the same effect. But both of those together, in my view, would increase the value of the film at most threefold, fourfold, or even fivefold, to between $3-5 million. An award in that range would substantially exceed the price paid for the most expensive single item of the Kennedys' personal property sold at auction (apart from jewelry) – the 1766 desk upon which President Kennedy signed the Nuclear Test Ban Treaty, which sold for $1.4 million. An award of $3-5 million would also exceed the highest price paid for a 20th century American history artifact (Dwight Eisenhower's D-Day order, sold for $200,000), the most expensive manuscript in American history (President Lincoln's "House Divided" manuscript, sold for $1.5 million), and the most expensive historical document of any kind in American history (an original broadsheet of the Declaration of Independence, sold for $2.4 million). A valuation of $3-5 million would thus provide ample recognition to the value as a historical object of this strip of film.

One final point:  Although my colleagues and I differ as to the amount of compensation to be paid, we are in complete agreement that the LMH Corp. is justly entitled to full compensation.  The film in question was its private property, Congress chose to take that property for public use, and, as the parties have agreed, it is entirely appropriate for the government to pay its full and fair market value.

Both the LMH Corp. and the Government are to be commended for the settlement that permitted this matter to be resolved without expensive, time-consuming litigation.  My colleagues have reached a result after careful consideration and thoughtful deliberation.  I regret that I am unable to agree fully with their conclusion.

Walter E. Dellinger